HBLHALM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

    v.         16 Cr. 670 (KMW)

MARIA SOLY ALMONTE,

             Trial

    Defendant.

------------------------------x

            New York, N.Y.
            November 21, 2017
            12:06 p.m.


Before:

       HON. KIMBA M. WOOD,

            District Judge
            and a jury

        APPEARANCES

JOON H. KIM
  Acting United States Attorney for the
  Southern District of New York
STEPHANIE LAKE
ALISON GAINFORT MOE
MICHAEL FERRARA
  Assistant United States Attorney

ANTHONY CECUTTI
JENNIFER RUSHING LOUIS-JEUNE
  Attorneys for Defendant

ALSO PRESENT: STACY SHAHRANI, Special Agent FBI
       COLLEEN GEIER, Paralegal Specialist USAO

1              (In open court)

2              (A jury of 12 and 3 alternates was impaneled and

3     sworn)

4              THE COURT:  All right.  Thank you.

5              I think it would be good to take a break now.  I'd say

6     a lunch break from 12:05 to 12:30.

7              Addressing those of you in the back of the courtroom,

8     your presence here has been very important to the course of

9     justice.  We needed to have you here.  Although you weren't

10    selected, there's no reason for you to feel rejected.  You've

11    all done your duty, and this has been a fair process.  I want

12    to thank you for being here.  You're free to check in with the

13    jury assembly room.  Please do.  I don't think you'll have to

14    serve anymore.  Thank you.  You're free to leave.

15             Now, for the jurors in the jury box, let's take lunch

16    from 12:05 to 12:30, and we'll then hear the lawyers' opening

17    statement after my preliminary instructions.

18             Those of you who have been in the jury box should

19    follow my deputy into the jury room where she will take certain

20    information.

21             (Jury excused)

22             THE COURT:  All right.  I'll ask everyone in the

23    spectator section to leave the courtroom at this point.  We'll

24    be taking up some legal matters.

25             (Continued on next page)

Hb11alm2

1              (In open court; jury not present)

2              THE COURT:  All right.  Counsel, do you want to raise

3      anything now?

4              MS. MOE:  Not from the government, your Honor.  Thank

5      you.

6              MR. CECUTTI:  Your Honor, we spoke with Ms. Almonte.

7      She informed us that she did receive her keyboard.  We thank

8      the Court for the Court's efforts in making that happen.

9      However, she did not receive her medication last night.  I

10     don't know what the issue is.  I know that your Honor had

11     spoken with the Marshals.  I trust the Marshals did everything

12     that they could on their end to facilitate the process.  It

13     must have been an issue on the end of MCC.  But she didn't

14     receive her medication.

15             THE COURT:  All right.  I'll make a call.

16             MR. CECUTTI:  Thank you, your Honor.

17             THE COURT:  Thank you.  We're adjourned until 12:30.

18             MS. MOE:  Thank you, your Honor.

19             (Luncheon recess)

20

21

22

23

24

25

Hbl1alm2

                          AFTERNOON SESSION

                              12:31 p.m.

 3          (In open court; jury not present)

 4          THE COURT:  Good afternoon.  I hope everyone got

 5   lunch.  We'll bring the jury out now.

 6          MR. FERRARA:  Your Honor, briefly?  Could we ask you

 7   to, in front of the jurors, order us not to speak to the jurors

 8   so they understand why we're ignoring them.

 9          THE COURT:  That's part of my preliminary

10   instructions.

11          MR. FERRARA:  Thank you so much.

12          THE COURT:  Which I'm giving now.

13          MR. CECUTTI:  Your Honor, just a reminder on the

14   headset.  If they could be instructed as to why Ms. Almonte is

15   wearing the headset.

16          THE COURT:  Thank you for reminding me.  I'll mention

17   that.

18          MR. CECUTTI:  Thank you.

19          MS. LAKE:  I think the last oddity in the requested

20   preliminary instructions had to do with the minors' initials.

21   Is that going to be covered?

22          THE COURT:  Yes.  I thought I decided that their names

23   would not be used.

24          MS. LAKE:  That's correct, your Honor.  We had

25   requested that as part of the Court's preliminary instructions

Hbl1alm2

1    there be a note that the parties will be referring -- and the

2    witnesses will be referring to people who are currently under

3    the age of 18 by their initials.  This is simply a matter of

4    law; it has nothing to do with this case in particular.

5          THE COURT:  Right.  I now see.  You're looking to your

6    opening statement.  I was going to give it right before victims

7    testify.  But if you want me to do it now, I will.

8          MS. LAKE:  I think because the first witness will

9    refer to at least one minor by the minor's initials, I think it

10   would be helpful and demystify why that's happening for the

11   jury if this were included in the preliminary instructions.

12         THE COURT:  Okay.  So it is those under 18?

13         MS. LAKE:  Yes.

14         THE COURT:  Okay.  This is already in my preliminary

15   instructions.

16         MS. LAKE:  Oh, wonderful.

17         And one final question.  May we move the podium now so

18   we don't have to move it in front of the jurors?

19         THE COURT:  Sure.

20         What is the exact wording of the witness instruction

21   you'd like to have me give?

22         MS. MOE:  I apologize, your Honor, we don't have it

23   handy, but we had emailed it to chambers.  I don't know if you

24   can locate it that way.

25         MS. LAKE:  I'll try to find it.

Hbl1alm2

```
 1              (Discussion off the record)
 2              MS. LAKE:  So I believe we didn't specify the
 3    language.  We just asked that in the Court's preliminary
 4    instructions, the Court instruct the jury that -- and this can
 5    be the language -- as a matter of federal law, current minors
 6    must be referred to by their initials.  This rule of applies in
 7    all cases, not simply in this case.
 8              THE COURT:  Just a moment.  As a matter of federal
 9    law --
10              MS. LAKE:  Current minors must be referred to by their
11    initials.  This rule applies in all cases, not simply in this
12    case.  And perhaps a preliminary sentence could be:  In the
13    course of the trial, you may hear certain individuals referred
14    to by their initials.
15              THE COURT:  Your second sentence was:  As a matter of
16    federal law, current minors must be --
17              MS. LAKE:  Referred to by their initials.
18              THE COURT:  Okay.  Okay.  Got it.  Thank you.
19              We're awaiting one juror.  While we wait, I'd like to
20    mention that I had a talk with Adam Johnson about Ms. Almonte's
21    medications.  He said that if she was back there at 5:30, she
22    should have received them.  Was she back there at 5:30?
23              MR. CECUTTI:  One moment, your Honor.
24              (Defendant conferring with her counsel)
25              MR. CECUTTI:  Your Honor, Ms. Almonte got back to her
```

Hbl1alm2

1       unit at 6:10 p.m. last night.

2                THE COURT:  All right.  Adam Johnson told me that the

3       medical facility is just one floor above where Ms. Almonte is

4       housed and that if she speaks to any prison person and says she

5       needs her pills, they will get them for her, even if she's

6       late.

7                MR. CECUTTI:  Your Honor, Ms. Almonte said that she

8       did do that last night.

9                THE COURT:  Well, if you want to give me the name and

10      any other information, I'll continue to ask Adam about it.

11               MR. CECUTTI:  Thank you, your Honor.

12               Ms. Almonte informed me that she asked Officer

13      Cappiello --

14               (The reporter interrupted for clarification)

15               MR. CECUTTI:  Cappiello.  I don't have a spelling.

16               THE COURT:  Cafuello?

17               MR. CECUTTI:  Cappiello.

18               THE LAW CLERK:  Jury entering.

19               (Jury present)

20               THE COURT:  The jurors should sit in number order so

21      my law clerk will double-check where you sit.

22               Please have a seat.

23               All right.  Good afternoon.

24               THE JURORS:  Good afternoon.

25               THE COURT:  The case is now officially on trial.

Hbl1alm2

1          As I stated earlier, the trial is expected to last for

2     about a week and a half, although we never know exactly how

3     long a case will last.

4          We will begin each morning at 9:30 sharp.  To ensure

5     that we start on time, I always allow an extra 40 minutes

6     because of subway problems or driving problems.  I'll ask you

7     to try to be in the jury room each morning by 9 a.m.  You will

8     have there coffee, muffins, tea, and you can bring newspapers

9     to read, but I would urge you to come early.

10          As I told you before, we will take one short break

11     each day around 11:45 a.m.  That will last half an hour.  And

12     we will end at 2:30 p.m.  Given how short the break is in the

13     middle of the day, you won't be able to go out to get food, and

14     so it's a good idea to bring in a small lunch or snack to tide

15     you over.

16          I'd like to give you some instructions about your

17     duties as jurors.  At the end of the trial, I will give you

18     more detailed instructions, and those will control your

19     deliberations in the case.  But for now, I will explain how the

20     trial will proceed.

21          In the course of the trial, certain persons may be

22     referred to only by their initials rather than their full

23     names.  As a matter of federal law, current minors must be

24     referred to by their initials rather than their names.  This

25     rule applies in all cases, not just in this case.

Hbl1alm2

1      The first step in the trial will be the lawyers'

2  opening statements.  The government will make an opening

3  statement, and after that, I expect the lawyer for the

4  defendant to make an opening statement as well.  But they're

5  not required to do so.  Those statements are not evidence.

6  They serve no purpose other than to give you an idea in advance

7  of the evidence that the lawyers expect you to hear from the

8  witnesses.  The only evidence comes from the witnesses and the

9  exhibits.

10      After opening statements, the government will present

11  its evidence.  The government's evidence will consist of

12  testimony of witnesses as well as documents and other exhibits.

13  The government will examine the witnesses and then the

14  defendant's lawyers may cross-examine them.

15      Following the government's case, the defendant may

16  present a case if she wishes.  Again, because of the

17  presumption of innocence, the defendant is not required to give

18  any proof.

19      If the defendant does present a defense case, the

20  defense witnesses will testify and the government will have the

21  opportunity to cross-examine them.

22      After the presentation of the evidence is completed,

23  the lawyers will deliver their closing arguments to summarize

24  and interpret the evidence as they see it.  Just as the

25  parties' opening statements are not evidence, the closing

Hbl1alm2

1    arguments are not evidence either.

2           Following closing arguments, I will instruct you on

3    the law.  You will each have a copy of my legal instructions

4    with you and you can take it into the jury room.  Sometimes

5    people like to follow along because it helps their

6    concentration, so you'll have it while I'm reading it to you.

7    The law requires me to read it out loud to you.

8           After I instruct you on the law, you will retire to

9    deliberate on your verdict, which must be unanimous and must be

10   based on the evidence presented at trial, or the lack of

11   evidence.  Your deliberations are secret.  You will never have

12   to explain your verdict to anyone.

13          Under the law, a defendant in a criminal case is

14   presumed innocent and cannot be found guilty of the crime

15   charged unless a jury, having heard all the evidence in the

16   case, unanimously decides that the evidence proves the

17   defendant guilty beyond a reasonable doubt.

18          In a criminal case, the burden of proof remains with

19   the prosecution -- the government.  For the jury to return a

20   verdict of guilty as to the defendant, the government must

21   prove that the defendant is guilty beyond a reasonable doubt.

22   A person charged with a crime has absolutely no burden to prove

23   that he or she is not guilty, and if the defendant chooses not

24   to present any proof, that decision cannot be held against her

25   and may not enter into your deliberations at all.  I will

Hbl1alm2

1   instruct you fully on the burden of proof after all the

2   evidence has been received.

3          Let me explain briefly the jobs that you and I are to

4   perform at trial.

5          I decide what rules of law apply, and I do that by

6   making legal rulings during the presentation of evidence and

7   also, as I told you, in giving the final instructions to you,

8   after the evidence and arguments are completed.

9          In order to do my job, I may have to interrupt the

10  proceedings from time to time to confer with the parties

11  outside of your hearing about the rules of law that should

12  apply here.  Some of these conferences may take more time, and

13  as a convenience to you, I may excuse you from the courtroom.

14  You should bear in mind that those conferences are necessary

15  and may in fact speed up the trial.

16         While I decide the law that applies to the case, you,

17  ladies and gentlemen of the jury, are the triers of fact.  You

18  will weigh the evidence and decide whether the government has

19  proved beyond a reasonable doubt that the defendant is guilty

20  of each charge in the indictment.  You must pay close attention

21  to all of the evidence presented and you must base your

22  decision only on the evidence in the case and my instructions.

23         What is evidence?  Evidence consists only of the

24  testimony of witnesses, documents, and other things admitted as

25  evidence, or stipulations agreed to by the parties.  Some of

Hbl1alm2

1   you probably have heard the terms circumstantial and direct

2   evidence.  Do not be concerned with these terms.  You are to

3   consider all the evidence given in this trial.

4           Certain things are not evidence and must not be

5   considered by you.

6           The government will examine its witnesses and the

7   defense lawyers may cross-examine the witnesses.  Following the

8   government's case, the defendant may present a case if she

9   wishes.  Again, because of the presumption of innocence, the

10  defendant is not required to provide any proof.  If the

11  defendant does present a defense case, the defense witnesses

12  will testify and the government will have the opportunity to

13  cross-examine them.

14          After the presentation of evidence is completed, the

15  parties will deliver their closing arguments, to summarize and

16  interpret the evidence.  Just as the parties' opening

17  statements are not evidence, their closing arguments are not

18  evidence either.

19          Following closing arguments, I will instruct you on

20  the law.  You will have copies of my legal instructions with

21  you in the jury room.  After I instruct you on the law, you

22  will retire to deliberate on your verdict, which must be

23  unanimous and must be based on the evidence presented at trial,

24  or lack of evidence.  Your deliberations are secret.  You will

25  never have to explain your verdict to anyone.

Hbl1alm2

1          Under the law, a defendant in a criminal case is

2    presumed innocent and cannot be found guilty of the crime

3    charged unless the jury, after having heard all the evidence in

4    the case, unanimously decides that the evidence proves that the

5    defendant is guilty beyond a reasonable doubt.

6          In a criminal case, the burden of proof remains with

7    the prosecution -- the government.  For the jury to return a

8    verdict of guilty as to the defendant, the government must

9    prove that the defendant is guilty beyond a reasonable doubt.

10   A person charged with a crime has absolutely no burden to prove

11   that she is not guilty, and if the defendant chooses not to

12   present any proof, her decision cannot be held against her and

13   may not enter into your deliberations at all.  I will, however,

14   instruct you fully on the burden of proof after all of the

15   evidence has been received.

16         Listing what should not be considered as evidence:

17   Statements, arguments, and questions by the lawyers are not

18   evidence, nor are statements I make or questions I ask of a

19   witness.

20         Objections to questions are not evidence.  The lawyers

21   have an obligation to make an objection when they believe

22   evidence being offered is improper under the rules of evidence.

23   You should not be influenced by the objection or my rulings on

24   them.  If the objection is sustained, ignore the question, and

25   ignore any answer that may have been given.  If it is

Hbl1alm2

1    overruled, treat the answer like any other.  If you are

2    instructed that some item of evidence is received for a limited

3    purpose only, you must follow that instruction.

4         Third, testimony I have excluded or told you to

5    disregard is not evidence and must not be considered.

6         Fourth, anything you may have seen or heard outside

7    the courtroom is not evidence and must be disregarded.

8         You are to decide the case solely on the evidence

9    presented here in the courtroom.

10        There is no formula to evaluate testimony or exhibits.

11   For now, it suffices to say that you bring with you into this

12   courtroom all of the experience and background of your lives.

13   Do not leave your common sense outside the courtroom.  The same

14   types of tests that you use in your everyday dealings are the

15   tests that you should apply in deciding how much weight, if

16   any, to give to the evidence in this case.  The law does not

17   require you to accept all of the evidence admitted at trial.

18   In determining what evidence you accept, you must make your own

19   evaluation of the testimony from each of the witnesses and the

20   exhibits that are received in evidence.

21        It's essential that you keep an open mind until you

22   have heard all of the evidence in the case.  A case can be

23   presented only step by step, witness by witness, before all

24   evidence is before you.

25        Studies have shown that sometimes jurors make up their

Hbl1alm2

1   minds rather early in the case, even after opening statements.

2   That would betray your duty as a juror to keep an open mind

3   until you've heard all of the evidence.  As you know from

4   experience, you can hear one person give his or her version of

5   an event and think it sounds very impressive and even

6   compelling, and yet upon hearing another person's version of

7   the same event, or the same person cross-examined with respect

8   to the event, things may seem very different.  In other words,

9   there may be another side to any witness' story.

10          You should use your common sense and good judgment to

11   evaluate each witness' testimony based on all of the

12   circumstances.  I cannot emphasize too strongly that you must

13   keep an open mind until the trial is over.  You should not

14   reach any conclusions until you have all the evidence before

15   you.

16          I remind you that you've taken an oath to render

17   judgment impartially and fairly, without prejudice or sympathy,

18   and without fear, based solely on the evidence in the case and

19   the applicable law.  It would be improper for you to consider,

20   in reaching your decision as to whether the government

21   sustained its burden of proof, any personal feelings you may

22   have about the race, religion, national origin, class, gender,

23   sex, or age of the defendant, or of witnesses, or of lawyers,

24   or any other person involved in this case.  I'm sure you know

25   that if you let conscious or unconscious bias, prejudice, or

Hbl1alm2

1    sympathy interfere with your clear thinking, there is a risk

2    that you will not arrive at a just verdict.

3            I'd like to caution you about certain rules governing

4    your conduct as jurors in this case.

5            First of all, you must not talk to each other about

6    this case, or about anyone who has anything to do with this

7    case, until the end of the case, when you go into the jury room

8    to decide on your verdict.  One reason for this requirement is

9    that you must not reach any conclusion on a charge until you

10   have heard and seen all of the evidence.  Again, studies have

11   shown that if you talk to one another before you've heard all

12   of the evidence, you may harden your views on certain things

13   that would prevent you from keeping an open mind.

14           Second, do not communicate with anyone else about this

15   case or about anyone who has anything to do with it, until the

16   trial has ended and you have been discharged as jurors.  Anyone

17   else includes members of your family and your friends.  No

18   communicating about the case means no communicating on

19   Facebook, Twitter, blogs, whatever.  You may tell your family

20   and friends that you are a juror in a criminal case, but please

21   do not tell them anything else about it until you have been

22   discharged as a juror.

23           Make sure you do not talk about the case or anyone who

24   has anything to do with it, even if it's someone else who tries

25   to engage your attention to it.  If anyone should try to

Hbl1alm2

communicate with you about this case, either in or outside the

courthouse, you must immediately report that to my deputy,

Ms. Tomasello, and to no one else.  When I say to no one else,

I mean you should not even tell your fellow jurors.  Just tell

my deputy.

To minimize the possibility of such improper

communication, it is important that when you arrive on the

26th floor, you go straight to the jury room, and that you

remain in the jury room for the duration of the day.  You

should use the bathrooms in the jury room rather than the other

bathrooms on this floor.  As you've probably already been told,

you may not use the cafeteria, and you should not linger in the

public areas of the courthouse on this floor or elsewhere.

Given that we will be taking only one break, and a relatively

short one, it's best that you remain in the jury room if you

can and that you bring something to eat with you, as I said

earlier.

Don't research or do any investigation about the case

or anyone who has anything to do with it.  Don't visit any

place mentioned during the trial.  Don't listen to, read, or

watch any news reports about the case.  Don't go on the

internet or use whatever digital or communications device you

use to see what you can learn about this matter.  That is

because you can take into account only the evidence and the

exhibits and the law as I've read it to you.

Hbl1alm2

1    My law clerk will hand out to you now the jury pledges

2    in which you each pledge not to use the internet or other

3    devices to research about the case.  You can take it into the

4    jury room.  You don't need to read it now.  And either

5    Ms. Tomasello or one of my law clerks will collect your pledges

6    in the jury room.

7    Finally, each of you has been given a notepad and a

8    pen.  That is because I permit jurors to take notes.  Sometimes

9    they help listeners collect their thoughts, analyze their

10   thoughts.  But you do not need to take notes.  Notes are just

11   an aid to someone's recollection.  We have a better aid, which

12   is that the court reporters in this case record everything that

13   is said in the courtroom, and any portion of the testimony that

14   you wish can be sent back to you during your deliberations.

15   If you do take notes, be aware that note-taking may

16   distract you from hearing something important that is happening

17   on the witness stand.  Whether or not you take notes, rely on

18   your own recollections, not the fact that another juror has

19   taken notes.  If you do take notes, all notes must be left each

20   day in the jury room in manila envelopes with your name on the

21   envelope.  Ms. Tomasello will make sure that they are secure.

22   From this point on, until you retire to deliberate, it

23   is your duty not to discuss the case and not to remain in the

24   presence of other persons who may be discussing the case.  In

25   this regard, I have instructed the parties and counsel in the

1     case to have no contact with any of you -- no contact at all.

2     So if you happen to see any of them outside the courtroom and

3     they do not acknowledge you, they don't say hello, they don't

4     make small talk, please don't take offense.  They're not being

5     rude; they're just following my instructions.

6            That concludes my preliminary instructions to you.

7            Now we will begin with the initial stage of the case,

8     which, as I said to you, is opening statements.  And we begin

9     with the government.  I ask all of you to give your undivided

10    attention to these statements.  Thank you.

11           MS. LAKE:  Thank you, your Honor.

12           One of the girls was only 13 years old.  Another was

13    17 years old.  There were more in between.  These were the

14    girls who spent their days, their nights, their afternoons,

15    working as prostitutes, for this woman, the defendant, Soly

16    Almonte.

17           Among these girls there was a runaway.  There was also

18    a friend of a friend.  Some were just girls looking for money.

19    Some of these girls, they were the defendant's own sisters.

20    One way or another, the defendant found them.  And after she

21    found them, she advertised them online.  She got clients --

22    men -- to have sex with these girls.  She got apartments to run

23    her business out of.  One of the girls was allowed to live with

24    her in one of those apartments, as long as she worked as a

25    prostitute.  And the defendant, she pocketed $20 for every half

1     hour of that work.

2            This is why we're here today -- because between 2014

3     and 2016, Soly Almonte ran a business selling minors for sex --

4     that is, girls who were under 18 years old.  Make no mistake,

5     those child prostitutes were the defendant's victims.

6            Now over the next few minutes I'm going to explain to

7     you what I expect the evidence at this trial will show.

8            I expect you will learn that the defendant ran a

9     prostitution business that operated out of different locations

10    in the Bronx and Harlem, between 2014 and 2016.  The

11    defendant's prostitution business advertised on the internet.

12    Clients generally contacted the defendant, or one of her

13    confederates, by calling the defendant's phone.  They were then

14    directed to the apartment that the prostitution business was

15    operating out of at that time.  Different people worked in the

16    defendant's prostitution business at different times.  You will

17    hear that some of the defendant's younger sisters worked in the

18    prostitution business at one point or another.

19           Now some of those sisters were over 18, but some of

20    them were minors -- that is, they were 17 years old or younger.

21    Early on, the defendant kept this business within the family.

22    The defendant, she worked as a prostitute too.  Even the

23    defendant's mother played a part in this business.  You will

24    learn that as time went on, some people outside of the family

25    became involved in the defendant's prostitution business.  This

1    included both adult prostitutes and minor girls.

2            One of the defendant's sisters brought in a

3    19-year-old friend named Gabriely José.  Gabriely, or Gabby, as

4    she was called, started working as a prostitute in the

5    defendant's business.  And over time, she began to help run the

6    defendant's business.  For example, she would answer phones for

7    the defendant's business, hold the money for the defendant's

8    business, and post ads for prostitution to the internet for the

9    defendant's business.

10           You will hear that not long after Gabby joined the

11   business, the defendant began renting a room in her cousin's

12   apartment.  That apartment quickly became a base of operations.

13   It was a brothel.  For approximately five months in 2015, men

14   came through that apartment day and night.  They would come for

15   sex in the living room or more often in the bathroom of that

16   apartment.  You will hear that many women and girls worked as

17   prostitutes out of that apartment in the time that it operated

18   as a brothel.

19           But for all the different girls, some things remained

20   constant.  The defendant was in charge.  The defendant found

21   the clients.  The defendant provided the phones.  And the

22   defendant took a cut of the money that those girls made working

23   as prostitutes.

24           You will hear that in around June of 2015, the

25   defendant arranged a trip out of state.  It was to

1    Pennsylvania, where one of her cousins lived.  But she didn't

2    go there alone.  She brought Gabby, and she also brought two of

3    the minor girls who worked for her.  They traveled from the

4    Bronx to Allentown, and while they were there, Gabby and the

5    two minors had sex with men for money.  The defendant, she did

6    not.  She didn't need to.  She was getting paid either way.

7         We'll hear that not long after returning to the Bronx

8    from Pennsylvania, the defendant had to find a new location for

9    her brothel.  So she moved to a house not far from her cousin's

10   apartment.  Around that same time Gabby learned about a

11   13-year-old girl who was looking for work.  So who did Gabby

12   tell about that 13-year-old girl?  She told the defendant.  And

13   that 13-year-old girl became another one of the defendant's

14   teenage prostitutes.

15        Soon after this young girl arrived, the defendant

16   moved the business yet again, this time back to the building

17   her cousin lived in, but to an apartment on a lower floor.  You

18   will hear that that apartment was a trap house -- in other

19   words, it was a place where drugs and other kinds of illegal

20   activity, that a guy known as Daweezy let the defendant use.

21        You will learn that the NYPD raided that trap house as

22   part of an undercover operation in September of 2015.  When the

23   police went in that day, they found a few important things.

24   One important thing was the defendant's phone.  You're going to

25   hear a lot about that phone over the next few days.  For

Hbl1alm2                        Opening - Ms. Lake

1    example, you're going to hear that the phone number for that

2    phone was used in advertisements for prostitution on the

3    internet, and that that phone number was registered to the

4    defendant using an alias -- Soly Montana.

5            Another important thing the police found in the trap

6    house that day was three girls who were working as prostitutes.

7    One was a 20-year-old prostitute named Vetthya Alcius.  The

8    other two were teenage prostitutes.  One had been working for

9    the defendant for months.  She had just turned 18 years old.

10   The other, she was 15 years old.

11           That is what the government will prove to you in this

12   trial -- that the defendant ran a prostitution business that

13   trafficked kids.  She sold children to adult men to line her

14   pockets.

15           As a result of these actions, the defendant is charged

16   in five counts.  One of the counts charges her with being part

17   of a conspiracy to engage in sex trafficking of minors.  Two

18   counts charge her with a substantive crime of sex trafficking

19   of minors.

20           Now sex trafficking of minors, as I expect you'll

21   learn, is basically just acting like a pimp for someone who's

22   too young to legally consent.

23           In addition to those counts, the defendant is charged

24   in two counts with conspiracy to use and using the internet and

25   phones to promote her prostitution business.

1           Now I want to talk briefly about how we will prove

2      that the defendant is guilty of these crimes -- that is, some

3      of the types of evidence that you will hear and see during this

4      trial.  You will hear testimony from witnesses.  You're going

5      to hear from some of the NYPD detectives who went into the trap

6      house I mentioned on that day in September 2015.  You'll also

7      hear from FBI agents, who participated in a search of the

8      defendant's home approximately one year later.  You'll hear

9      from people who knew some of the minor victims, not as teenage

10     prostitutes, but as the kids that they really were.  You're

11     going to hear from two of the people I've mentioned to you

12     today -- two people who worked with the defendant in her

13     prostitution business.  You're going to hear from Gabriely José

14     and Vetthya Alcius.  They're going to take the stand and tell

15     you about the defendant's prostitution business.  They're going

16     to tell you about the kids who worked for the defendant, how

17     the defendant found the clients, posted the ads, fielded the

18     calls, set up the brothel locations.

19           Now Alcius and José have also committed crimes through

20     their involvement in the defendant's prostitution business.

21     And they're going to be testifying, because they've made

22     agreements to cooperate with the government.  So you should

23     scrutinize their testimony carefully.  Ask yourselves whether

24     it's consistent with the other evidence in the case.  Some of

25     that other evidence includes documents.  For example, you will

1    see some of the online advertisements that the defendant posted

2    in order to find the clients -- that is, the men who wanted to

3    have sex with the women or girls working for the defendant.

4    Those advertisements list prices, locations, the defendant's

5    phone number, for clients to call to set up a date.  They also

6    have pictures.  Some are pictures taken from the internet, some

7    are pictures of the defendant herself, some are pictures of the

8    minor girls in this case.

9            And you'll also see Facebook messages from the

10   defendant's account, from minor victims' accounts, and more,

11   talking all about the defendant's prostitution business.

12           For example, you're going to see a message in which

13   the defendant told another individual that she had been working

14   in her trap and that she hadn't been able to leave because she

15   can't leave these "hos" unattended.  Those were her words.  She

16   was referring to these kids as "hos."

17           Now you'll also see electronic evidence.

18   Specifically, you're going to see information from two phones.

19   The first phone was the defendant's phone, which she used for

20   the prostitution business.  That's the phone that was recovered

21   from the trap house that day in September 2015.  That's the

22   phone with the phone number that's listed in online ads for

23   prostitution, and it's the phone that has explicit photographs

24   of girls stored, many of the very same photographs found in the

25   online ads for prostitution that you'll see.

1          You're also going to see a phone belonging to one of

2     the defendant's minor sisters.  Among other things, that phone

3     had recordings on it, recordings of the defendant admitting in

4     her own words that she ran this prostitution business.  You

5     will hear the defendant say she got the clients, she got the

6     apartment, and so she got a cut of the money.

7          Now we will have another opportunity to talk to you at

8     the end of this trial.  Between now and then, I'm going to ask

9     you to do just three things:  First, listen to the evidence

10    carefully; second, listen to Judge Wood and her instructions on

11    the law; and third, use your common sense, the same common

12    sense that you use in your everyday lives as New Yorkers.  And

13    if you do those three things, when all is said and done, the

14    defendant will get a fair trial, the government will get a fair

15    trial, and you will reach the only conclusion supported by the

16    evidence in this case -- that the defendant is guilty of

17    running a business that sold minors for sex.

18          THE COURT:  Thank you.

19          Mr. Cecutti?

20          MR. CECUTTI:  Thank you, your Honor.

21          Good afternoon, ladies and gentlemen.

22          This is a sad and tragic case.  In this trial you will

23    hear evidence of prostitution by young women and minors, young

24    girls.  You will hear evidence that this prostitution took

25    place in absolutely awful conditions.  This case will take many

1    of you to a foreign world -- a world of lost innocence,

2    selfishness, the chase and pursuit of Air Jordans and Louis

3    Vuitton bags, rather than childhood dreams, and of struggle and

4    survival through sex and drugs.

5            In the early morning hours of September 12, 2016,

6    Maria was asleep in her twin bed with her daughter snuggled

7    next to her.  At that time Maria was living at her mother's

8    house -- her apartment, at 203 West 145th Street,

9    Apartment 2A, which was a New York City homeless shelter.  Her

10   mother's apartment had one bedroom.  Her mother slept in that

11   bedroom with her boyfriend Ronnie.  Maria and some of her six

12   sisters slept in the three beds that came with the apartment in

13   the living room.  There was also a bathroom and there was also

14   a kitchen.  A red bed frame in the living room standing upright

15   served as a clothing rack.  There were some tables and chairs

16   that also came with the apartment.  The apartment was filthy,

17   mold infested, a crash pad that revealed the struggle to

18   survive.  It was far from a home of a mother and her daughters.

19           Suddenly federal agents stormed into the apartment,

20   yelling, with their guns drawn.  Maria and her daughter awoke

21   to a nightmare.  The agents tore up the apartment and arrested

22   Maria and her mother.  The agents also took into custody

23   Ronnie, Maria's daughter, and one of Maria's sisters.  Maria

24   was scared, she was shocked, and she was confused.

25           During their search, the agents found lingerie, mail,

and other personal items.  You will see photographs they took

of this apartment.  They also found a pink purse.  The purse

contained $140, an employment card, a public benefits card, a

small bag of marijuana, and two condoms.  This purse, this pink

purse, belonged to Maria.  Maria's nightmare started that day.

Hours later, she learned that she and others, including other

young women that you've already heard about -- Gabriely José

and Vetthya Alcius, had been charged with sex trafficking of

minors and other offenses.  She also learned that she was

accused of being the boss, who ran a prostitution business that

involved sex trafficking of minors.  As the government

indicated, they're going to call witnesses and they're going to

present exhibits to you in an effort to prove these things,

that Maria Soly Almonte was a boss.

Maria was never a boss.  Maria is a mother, and Maria

was a prostitute.  She sold her body to men to survive

struggles she was in.  You will hear that she performed oral

sex for as little as 10 to $20.  She had sex in her cousin's

apartment at a public housing project in the Bronx, and in the

small bathroom of her mother's apartment at the homeless

shelter in Harlem.

In 2014, Maria was living in a halfway house.  In

early 2015, you will hear and you will learn that she moved

into her cousin's new apartment at 1408 Webster Avenue,

Apartment 19G.  Her cousin, as you will hear, is Darlene

1  Deleon, and Darlene has three children.  Excited that Darlene

2  had a new apartment, Maria's mother and sisters came over.

3          Soon, Darlene's home turned into a party house, with

4  drug use and prostitution happening every single day at all

5  hours.  Some of Maria's younger sisters prostituted themselves,

6  and so did Darlene.  So did other young women and young girls.

7  However, this was a prostitution bad girls club where survival

8  of the fittest reigned supreme.  Although they worked at the

9  same location or were associated or even related to each other,

10  everyone worked independently.  There was no trust, there was

11  no loyalty, no one helped each other to survive.  No one worked

12  for anyone.  There was constant competition amongst everyone

13  for business.  Fights, fights with Maria, her sisters, and

14  other young women, all trying desperately to earn money through

15  selling their bodies.

16          You will hear that many of the young women made a lot

17  of money, and they bought expensive items -- clothing, shoes,

18  purses, and jewelry.  Not Maria.  After relapsing back into

19  drug use, much of her money went into feeding her drug

20  addiction.  At the time Maria struggled to support herself

21  through temp work.  She saw that her younger sisters had money,

22  nice clothes, and other expensive items.  One of her sisters

23  that you will hear about, Maribel, made a lot of money through

24  prostitution.  She showed Maria how to get clients by posting

25  ads on the internet on a site called Back Page.

1          MR. CECUTTI:  Maria began posting ads up to her

2     arrest.  You will hear that she posted a lot of ads.  Maria

3     struggled, struggled to prostitute herself at the party house

4     at 1408 Webster.  It was out of control.  Complaints were made

5     by neighbors of ongoing prostitution which resulted in a Child

6     Protective Services investigation in August of 2015.  It also

7     resulted in the breakup of the party house.  Maria's mother and

8     her sisters stopped prostituting out of 19G at 1408 Webster and

9     continued at 145th Street.  Others that were prostituting

10    themselves continued selling their bodies for other pimps at

11    other locations.

12          You will hear some of the prostitutes began working

13    out of Apartment 10J at 140 Webster for a man named Daweezy

14    Dykes.  Dykes was a drug dealer.  He was more than a drug

15    dealer.  Dykes was a pimp.  Maria had no connection to Dykes

16    other than he was someone that she bought drugs from, drugs

17    after she relapsed, marijuana, cocaine, and pills.  Other

18    prostitutes worked for other pimps in the Bronx, such as Jimmy,

19    Julio, pimps that had worked on and off while also working

20    independently at 1408.

21          Later, upon receiving information that a minor was

22    prostituting herself out of Apartment 10J at 1408, a raid

23    occurred by the New York City Police Department that resulted

24    in the arrest of several individuals.  Maria was never

25    questioned, and she was never arrested.  And she stayed at 1408

1    inside Apartment 19G with Darlene, and she continued to

2    prostitute herself out of Apartment 19G.  After another Child

3    Protective Services complaint in late 2015, Maria moved out of

4    Darlene's apartment in early 2016 and moved into the homeless

5    shelter where her mom and her sisters lived.  Again, Apartment

6    2A at 145th Street, 203 West 145th Street to be exact, and

7    there Maria's sisters had to pay their money, a cut of what

8    they earned.  So did Maria.  Like 1408, there was no loyalty

9    and there was no trust.  It was every woman for herself as each

10   prostitute worked independently.

11           The government, as they've already alluded, will argue

12   that Maria made a lot of money as the boss.  Whether at 1408,

13   145th Street, or anywhere else, Maria did not make any money

14   off of anyone.  The money that she did earn was to survive.

15   She didn't tell any of the other prostitutes what to do.  She

16   took the low bidders.  She had sex for money for as little as

17   10 to $20.  She engaged in degrading sex acts to survive and

18   struggle, to buy drugs and to buy food to eat.  She smoked a

19   lot of marijuana, and she used a lot of drugs.  She never

20   trafficked any minors or anyone.  You will hear evidence that

21   other prostitutes and Maria's sisters brought in minors.  There

22   will be no credible evidence to show that Maria made hundreds

23   of dollars, thousands of dollars, or any substantial amount of

24   money.  The evidence will show that Maria made little money and

25   that she sold her body out of desperation to survive her

1    struggle.

2              The government will present evidence from Backpage,

3    from Facebook, from WhatsApp to prove to you that Maria was the

4    boss and running this business involving the sex trafficking of

5    minors.  I expect that you will hear Maria's voice in some of

6    the WhatsApp messages.  When the government presents this

7    evidence, we simply ask that you listen, that you consider all

8    the evidence that is presented to you in this trial.  Also, we

9    ask that you consider this evidence from the world in which

10   this case take places, a world of trauma, a world of survival,

11   and loss.  It will become clear to you by the end of this trial

12   that Maria was not the boss of anything.

13             The government starting today will parade one witness

14   into this courtroom after another.  However, they will rely

15   heavily on two cooperating witnesses:  Gabriely Jose and

16   Vetthya Alcius.  You will learn that Jose and is Alcius have

17   extensive histories of criminal activity, lying, deceit,

18   manipulation, and engaging in fraudulent conduct.  You will

19   also learn that they are both desperate.  Jose is facing a

20   mandatory minimum prison sentence of 17 years for sex

21   trafficking offenses related to minors and other offenses

22   related to fraud.  You will also learn that Alcius is facing a

23   mandatory minimum prison sentence of 15 years for sex

24   trafficking offenses related to minors and child pornography

25   offenses.  You will also learn that both are young, and they're

1    also facing the possibility of life sentences.

2            You will learn that both Jose and Alcius entered into

3    cooperation agreements with the government, that each made a

4    deal with the government, and the government made a deal with

5    each of them.  You will learn that if Jose helps the government

6    through the substantial assistance in the prosecution of

7    others, then the government will write a letter called a 5K

8    letter to Judge Wood.  This 5K letter is critical for Jose.

9    Without it, the lowest possible sentence that she can receive

10   is 17 years.  With it, she can receive a sentence under 17

11   years and possibly even time served and go home.  Same with

12   Alcius.  If she helps the government through substantial

13   assistance in the prosecution of others, she can also receive a

14   5K letter and get from underneath her 15-year mandatory minimum

15   prison sentence and have a chance at her freedom.

16           If Alcius and Jose do not tell their stories to you

17   about what was going on at 1408 Webster and 145th Street and

18   specifically Maria Soly Almonte, they would have no deal with

19   the government.  They would be stuck, have no value to the

20   government.  They would have no meaning, no value.  They need

21   Maria.  If they did not tell and continue to tell a story that

22   includes lies about Maria, they will not be able to avoid

23   substantial mandatory minimum prison sentences and the

24   possibility of life in prison.

25           Think about that for a moment.  At least 15 or 17

HBLHALM3                    Opening – Mr. Cecutti

1    years or possibly the rest of their lives in prison.  This

2    means being locked up inside a federal prison possibly forever

3    with no possibility of parole.  For Jose, it means possibly

4    never being able to have a meal with her mother or celebrating

5    her birthday, never getting married or having a child.  For

6    Alcius, it means possibly never seeing her young son again.

7    For both of them, it means being incarcerated for a very long

8    time and possibly the rest of their lives, never being able to

9    enjoy life's intimate moments, ordinary experiences, and simple

10   pleasures that you and I often take for granted, but if they

11   were taken from us, we would desperately yearn for.

12          There's only one check for cooperators like Jose and

13   Alcius, and that's you, the jury.  You, and certainly not Jose

14   or Alcius, will decide what evidence in this case is credible,

15   reliable, and trustworthy.  You will decide whether the

16   government has proven the charges beyond a reasonable doubt.

17   This is an extremely serious case, and you have an awesome

18   responsibility.  You have the life and future of Maria in your

19   hands, and we simply ask that you take that responsibility

20   seriously.  Maria is presumed innocent.  The cloak of innocence

21   that she wears protects her and remains with her throughout

22   this entire trial.  As we begin this trial, she is as innocent

23   as each and every one of us in this courtroom.

24          As Judge Wood has told you, you, the jury, are the

25   triers of fact.  You and you alone will decide whether to

1    remove Maria's cloak of innocence.  In other words, it is

2    ultimately your decision and no one else's whether the

3    government has proven beyond a reasonable doubt that Maria is

4    guilty.  Beyond a reasonable doubt does not mean maybe or

5    possible.  It means proof beyond a reasonable doubt, and Judge

6    Wood will give you an instruction later at the end of this

7    case.  The government has the burden of proof, and even if we

8    present evidence, this burden always remains with them.  They

9    are always responsible for proving the charged crimes.

10            Today each of you took an oath, an oath to be fair in

11    assessing the evidence.  Hold the government to what our

12    Constitution demands, proof beyond a reasonable doubt and

13    Maria's presumption of innocence.  Keep an open mind today and

14    throughout this entire trial.  Don't just accept what you hear,

15    what you see, and what you read.  Carefully analyze the

16    evidence.  Scrutinize the witnesses.  Don't jump to

17    conclusions.  Be the type of juror that you would want if you

18    were on trial in this courtroom or if a loved one or friend was

19    on trial in this courtroom.

20            After you hear all the evidence in this case and

21    examine the lack of reliable evidence presented to you by the

22    government, we will ask you to do one thing.  We will ask you

23    to end this nightmare for Maria Soly Almonte and conclude that

24    the government has failed to prove to you that Maria was the

25    boss, that she had a business or trafficked in minors.  Rather,

HBLHALM3                    Wong - Direct

```
 1    Maria Soly Almonte was a prostitute, a prostitute who
 2    desperately sold her body in order to survive her struggle.
 3              Thank you.
 4              THE COURT:  Thank you, Mr. Cecutti.
 5              We are ready for the first witness.
 6              MS. MOE:  Thank you, your Honor.  The government calls
 7    Detective James Wong.
 8              THE COURT:  Thank you.
 9              Whenever we're waiting for a witness to come in, you
10    should feel free to stand and stretch, talk among yourselves.
11              Please come forward to the witness stand, detective.
12    JAMES WONG,
13         called as a witness by the Government,
14         having been duly sworn, testified as follows:
15    DIRECT EXAMINATION
16    BY MS. MOE:
17    Q.  Good morning, Detective, or good afternoon.  Could you
18    please pull the microphone a little closer to you.  Thank you.
19              Detective Wong, are you currently working?
20    A.  No, I'm retired.
21    Q.  When did you retire?
22    A.  March of 2017.
23    Q.  Where did you work before you retired?
24    A.  I worked for the NYPD.
25    Q.  What was your title there?
```

1   A.  I was detective.

2   Q.  How long did you work for the NYPD?

3   A.  Seventeen years.

4   Q.  While you were there, were you assigned to any particular

5   unit?

6   A.  Yes.  I was with the major case vice unit, the human

7   trafficking team.

8   Q.  What sort of work did you work on, on that team?

9   A.  I was an investigator.

10  Q.  What types of cases did you investigate?

11  A.  Human and sex trafficking cases.

12  Q.  During the course of your career, approximately how many

13  human trafficking and sex trafficking investigations have you

14  worked on?

15  A.  I never really took count, but between myself and my

16  coworkers, my teammates, I would say somewhere near a thousand

17  or so.

18  Q.  During the course of your work as a detective, have you

19  become familiar with somebody named Maria Soledad Almonte?

20  A.  I did.

21  Q.  How did you become familiar with her?

22  A.  She was the subject of an investigation.

23  Q.  Did you conduct that investigation alone or were there

24  other investigative agencies involved?

25  A.  I conducted along with the FBI, C20 team, the child

1   exploitation team.

2   Q.  Before we go any further, do you see Ms. Almonte in the

3   courtroom today?

4   A.  I do.

5   Q.  Can you indicate to us by an article of clothing she's

6   wearing.

7   A.  She's the young lady back there with the glasses and dark

8   shirt.

9           THE COURT:  Indicating the defendant.

10  Q.  During the course of your investigation, did you become

11  familiar with any other names used by the defendant besides

12  Maria Soledad Almonte?

13  A.  She went by Soly, S-o-l-y.

14  Q.  Detective Wong, what prompted your investigation?

15  A.  I received a NCMEC report from the National Center for

16  Missing and Exploited Children that a 13-year-old minor was

17  being exploited.

18  Q.  Approximately when did you receive the report that prompted

19  this investigation?

20  A.  It was September of 2015.

21  Q.  What investigative steps, if any, did you take after you

22  received that report?

23  A.  With some of the information I received on the report, I

24  did a Backpage search of 170th Street and Webster Avenue.

25  Q.  What is Backpage?

1    A.  Backpage is a website where escorts commonly advertise

2    their services.

3    Q.  How are you familiar with Backpage?

4    A.  It was very common that escorts advertised their services

5    there, and we used it also as an investigative tool.

6    Q.  When you conducted searches on Backpage, what were you

7    looking for?

8    A.  I was looking for little bit of information we had was

9    cross street of 170th Street and Webster Avenue.

10   Q.  When you searched for that address, what, if anything, did

11   you find?

12   A.  I did find an ad using that cross street, 170

13   Street/Webster Avenue.

14   Q.  Did you preserve the ad that you found in any way?

15   A.  I did.

16   Q.  How did you preserve that ad?

17   A.  I printed it out.

18   Q.  I'm showing you on the screen in front of you what's been

19   marked for identification as Government Exhibit 960.  It may

20   take a moment to load.  Could you please let us know when you

21   see it, Detective Wong.

22   A.  There it is.

23   Q.  Do you recognize this, Detective Wong?

24   A.  Yes, ma'am.

25   Q.  What is Government Exhibit 960?

1   A.  That is the ad I printed out.

2            MS. MOE:  Your Honor, the government offers Government

3   Exhibit 960.

4            THE COURT:  Any objection?

5            MR. CECUTTI:  No objection.

6            THE COURT:  All right.  Government Exhibit 960 is

7   received without objection.

8            (Government's Exhibit 960 received in evidence)

9            MS. MOE:  Ms. Geier, could you please publish for the

10   jury Government Exhibit 960.

11   BY MS. MOE:

12   Q.  Detective Wong, directing your attention to the text of

13   this advertisement -- and, Ms. Geier, if you could just

14   highlight the bulk text -- what's the title of this

15   advertisement?

16   A.  It's "New mamis, new sexy skinny, new Haitian big girl, $60

17   special -- 22."

18            MS. MOE:  And the text beneath that, Ms. Geier, can

19   you please highlight that.

20   Q.  Detective Wong, what's the text of this advertisement?

21   A.  "Three beautiful *mamis*, sexy Dominican *mamis* and new

22   Haitian *mamis* and a big girl, no pimps, 170 Webster Avenue,

23   girl team $60 the half, $120 an hour, 347-982-1528.  Dominican

24   *nueva mamis*, new Dominican, Puerto Rican, and Haitiana.

25   *Llamame, media hora* $60, 347-982-1528.  *Una hora* $120.

1   Poster's age, 22.  Location, Bronx, Webster Avenue, 170, Bronx

2   Train D."

3   Q.  Now, the phone number that you just read, for today's

4   purposes I'm just going to refer to that as the 1528 phone

5   number.  Will you know what I mean when I say that?

6   A.  Yes.

7   Q.  Thank you, Detective.

8          After you found this ad, what, if anything, did you do

9   in your investigation?

10  A.  Placed a phone call to that phone number.

11  Q.  Is that the 1528 phone number?

12  A.  That's correct.

13  Q.  What happened when you called that phone number?

14  A.  It went to voice mail.  I left a message hoping somebody

15  would get back to me.  And during the course of the day, nobody

16  did get back to me.

17  Q.  When no one got back to you, what did you do then?

18  A.  That's when I notified my sergeant of what I discovered,

19  and I coordinated with a Special Agent Nicholas on what I

20  discovered.

21  Q.  Did you have any other contact with that phone number after

22  you left that message and didn't receive a call back?

23  A.  We went to the area of 170 Webster Avenue.  We went to

24  scope out what was in that area to see what was in the area,

25  and there was a housing development in the area and commercial

1   properties in the area.

2   Q.  Focus specifically on the phone number on the

3   advertisement.  Did you ever contact that phone number again?

4   A.  Yes.  Days later I did place a phone call in to that

5   number.  That was September 15, 2015.

6   Q.  What happened when you called that phone number on that

7   day?

8   A.  I did have a conversation with a female.

9   Q.  What was the substance of that conversation?

10  A.  It was a -- I was acting as a john, and I asked what kind

11  of females was working that day.  I was told it was three.  I

12  asked for a *flaca*, which is a short Latina.  And I was told

13  there was one working and what time I was coming by.  And

14  during the course of the conversation, she asked me a couple

15  times if I was the police, and of course I told her, no, I was

16  not.

17  Q.  How did that call end?

18  A.  They asked me what time I was coming through.  I told her

19  that I was getting off of work about 5:30, and maybe I'll come

20  through about 6:30 or 7:00.  Left it at that.

21  Q.  After you hung up the phone, what's the next step you took

22  in the investigation?

23  A.  I notified my sergeant, and he instructed me, turn over the

24  phone number to the undercovers and let the undercovers deal

25  with the girls and, what we call, make a date.

HBLHALM3                        Wong - Direct

1    Q.  Did you participate in an undercover operation?

2    A.  We did.

3    Q.  When did that operation take place?

4    A.  It was later that evening of September 15, 2015.

5    Q.  Who was involved in that undercover operation?

6    A.  Two undercovers, a sergeant, and multiple team members.  We

7    actually combined two teams together that day to get enough

8    personnel to go out.

9    Q.  What was your role in the undercover operation?

10   A.  I was the lead investigator of the day.

11   Q.  What types of tasks were you supposed to perform as the

12   lead investigator?

13   A.  If we made any arrests, then the arrest was part of my

14   investigation.

15   Q.  Had you ever run an operation like this before?

16   A.  Yes.

17   Q.  Approximately how many times?

18   A.  I don't really keep track.  In my career, I've done quite a

19   bit.  I would say couple hundred maybe.

20   Q.  What was the goal of the operation?

21   A.  We were looking to recover that minor that was listed on

22   that in NCMEC report.  National Center for Missing and

23   Exploited Children, we call it NCMEC for short.  It's National

24   Center for Missing and Exploited Children.

25   Q.  How did the operation first start?

1    A.   The undercovers made contact by calling that phone number.

2    And they set up a date, a time, and they were instructed to go

3    to the area of 170 Webster Avenue.

4    Q.   What happened after they had that call?

5    A.   We all headed up there into the area 170 and Webster Avenue

6    and the undercovers did place another call to let them know

7    they were in the area and where to meet the girls.

8    Q.   Where were they supposed to meet the girls?

9    A.   They were directed to 1408 Webster Avenue, tenth floor.

10   Q.   I'm showing you what's been marked for identification as

11   Government Exhibit 220.  Detective Wong, what is Government

12   Exhibit 220?

13   A.   That's the map of the county of Bronx, 170 Street and

14   Webster Avenue.

15   Q.   Is this a fair and accurate depiction of the area in the

16   Bronx where the address of 1408 Webster Avenue is located?

17   A.   It is.

18          MS. MOE:  Your Honor, the government offers Government

19   Exhibit 220.

20          MR. CECUTTI:  Your Honor, no objection.

21          THE COURT:  Government Exhibit 220 is received without

22   objection.

23          (Government's Exhibit 220 received in evidence)

24          MS. MOE:  Ms. Geier, could you please publish the

25   exhibit.

1    BY MS. MOE:

2    Q.   Detective Wong, could you please explain to the jury where

3    1408 Webster is located on this map.

4    A.   It's the county of the Bronx, and it's where the red bubble

5    and the black dot are.

6    Q.   What are the cross streets where that location is situated?

7    A.   It's 170th Street and Webster Avenue.

8    Q.   Detective Wong, I'm showing you what's been marked for

9    identification as Government Exhibit 223.  Do you recognize

10   this?

11   A.   I do.

12   Q.   What is this?

13   A.   That's 1408 Webster Avenue.

14   Q.   Is this a fair and accurate depiction of the apartment

15   building at 1408 Webster in the Bronx?

16   A.   It is the night of September 15, 2015.  There was

17   construction awning in front of the building.

18   Q.   Besides the construction awning, is this a fair and

19   accurate depiction of the location?

20   A.   It is.

21          MS. MOE:  Your Honor, the government offers Government

22   Exhibit 223.

23          MR. CECUTTI:  No objection.

24          THE COURT:  Government Exhibit 223 is received without

25   objection.

1          (Government's Exhibit 223 received in evidence)

2          MS. MOE:  Ms. Geier, could you please publish the

3     evidence.

4     Q.  After the undercover detectives received instruction to go

5     to this address at 1408 Webster Avenue, what's the next thing

6     that happened in the undercover operation?

7     A.  They ended up on tenth floor in Apartment J.

8     Q.  Did you go with them?

9     A.  No.

10    Q.  What happened after the undercover detectives went into

11    this building?

12    A.  Short time later, we received communications from the

13    sergeant, Sergeant Graves running the team, that it was a

14    positive buy and for us to move in.

15    Q.  What does a positive buy mean?

16    A.  That means the undercovers did get an agreement for sex in

17    exchange for money.

18    Q.  When you got that signal, what did you do?

19    A.  We headed toward the area in front of 1408 Webster Avenue

20    where we proceeded to exit our vehicles and head to the

21    elevators.

22    Q.  Where did you go after that?

23    A.  We ended up on tenth floor at Apartment J.

24    Q.  What happened after you got to Apartment 10J?

25    A.  I walked into the apartment.  There were already detectives

1    ahead of me.  It was a very small apartment.  There was a lot

2    of people in there between my detectives, my team members, and

3    people in the apartment.  I was also informed there was three

4    other girls waiting outside the apartment, and I seen everybody

5    in the apartment was handling everything, taking care of

6    business, so I proceeded to speak to the three females outside

7    the apartment.

8    Q.  What was that apartment like?

9    A.  It was very small.  If you walked in, to your right there

10   was a kitchen, right in front of you was the living room, off

11   to your left was a bathroom, and off to your catty left was a

12   bathroom.

13   Q.  Was there any furniture in that apartment?

14   A.  Very minimal.  There was a couple chairs in the living

15   room.  In the bedroom there was a bed on the floor.  No bed

16   frame or nothing.

17   Q.  Did you yourself seize any evidence while you were inside

18   that apartment?

19   A.  I did.  After I spoke to the three young ladies outside the

20   apartment and we deemed that they wasn't part of the

21   investigation or not quite immediately part of the

22   investigation, I walked into the apartment.  And I went to the

23   kitchen, and I discovered a cell phone being charged, laid on

24   top of a stove.

25   Q.  When you saw that cell phone on the stove, what did you do?

1  A.  I actually pulled out my own phone, and I dialed that 1528

2  number from the advertisement.

3  Q.  What happened when you called that number?

4  A.  The phone rang, and my cell phone number came up on the

5  screen.

6  Q.  What did you do with that phone?

7  A.  At that point in time, I took it in my custody.

8          MS. MOE:  Your Honor, may I approach the witness?

9          THE COURT:  Yes.

10 Q.  I've placed in front of you what's marked as Government

11 Exhibit 301.  Detective Wong, do you recognize this?

12 A.  I do.

13 Q.  What is Government Exhibit 301?

14 A.  That is the phone that I recovered from on top of the

15 stove.

16 Q.  And how can you tell that it's the same phone that you

17 recovered that day?

18 A.  I reviewed this with the AUSA prosecutor, and we also

19 checked it against the IMEI number against the subscriber

20 information we had, and it did match up.  So it was actually

21 deemed that was the exact phone.

22         MS. MOE:  Your Honor, the government offers Government

23 Exhibit 301.

24         MR. CECUTTI:  Your Honor, may I inspect the phone

25 briefly?

1          THE COURT:  Yes.

2          MR. CECUTTI:  Thank you.  May I approach the witness?

3          THE COURT:  Yes.  During the course of this trial,

4    anyone can approach the witness and opposing counsel can

5    approach at the same time if you wish.

6          MS. MOE:  Thank you, your Honor.

7          MR. CECUTTI:  Thank you, your Honor.  No objection.

8          THE COURT:  Government Exhibit 301 is received without

9    objection.

10          (Government's Exhibit 301 received in evidence)

11   BY MS. MOE:

12   Q.  Aside from the police officers who were in the apartment

13   when you arrived, who was inside that apartment?

14   A.  There was two males and three females.

15   Q.  Do you recall their names?

16   A.  Yes.

17   Q.  Who were those people?

18   A.  First one was Vetthya Alcius.  The second one was Arianna

19   Roman.  The third one was a 15-year-old minor.

20   Q.  What were her initials?

21   A.  JG.  The male was Dawitt Dykes.  A second male, I believe,

22   was Kevin Alston.

23   Q.  What happened to all those people that day?

24   A.  Four of them were arrested, and Kevin Alston was deemed he

25   wasn't part of the investigation, and he was let go.

1  Q.  At the time they were removed from the apartment, do you

2  know for sure how old the females you just described in the

3  apartment were?

4  A.  We did not.

5  Q.  Where were they taken?

6  A.  They were taken to the 42nd Precinct in the Bronx.

7  Q.  I'm showing you what's been marked for identification as

8  Government Exhibit 504.  Do you recognize this?

9  A.  Yes.

10  Q.  What is this?

11  A.  That's Dawitt Dykes, aka "Daweezy."

12  Q.  Is this a fair and accurate depiction of Dawitt Dykes at

13  the time he was arrested?

14  A.  Yes, it is.

15         MS. MOE:  Your Honor, the government offers Government

16  Exhibit 504.

17         MR. CECUTTI:  No objection.

18         THE COURT:  Government Exhibit 504 is received without

19  objection.

20         (Government's Exhibit 504 received in evidence)

21         MS. MOE:  Ms. Geier, could you please publish the

22  exhibit.

23  BY MS. MOE:

24  Q.  I'm now showing you what's been marked for identification

25  as Government Exhibit 506.  Do you recognize this?

1   A.  I do.

2   Q.  What is Government Exhibit 506?

3   A.  That's Vetthya Alcius, aka "Thya."

4   Q.  Is this a fair and accurate depiction of Vetthya Alcius at

5   the time she was arrested?

6   A.  It is.

7             MS. MOE:  The government offers Government

8   Exhibit 506.

9             MR. CECUTTI:  No objection.

10            THE COURT:  Government Exhibit 506 is received without

11   objection.

12            (Government's Exhibit 506 received in evidence)

13            MS. MOE:  Ms. Geier, could you please publish the

14   exhibit.

15   BY MS. MOE:

16   Q.  Detective Wong, I'm now going to show you what's been

17   marked for identification as Government Exhibit 513.  Do you

18   recognize this?

19   A.  Yes.

20   Q.  What is this?

21   A.  That is Arianna Roman, also known as "Ari."

22   Q.  Is this a fair and accurate depiction of how Arianna Roman

23   appeared on September 15, 2015?

24   A.  It is.

25            MS. MOE:  Your Honor, the government offers Government

1    Exhibit 513.

2              MR. CECUTTI:  No objection.

3              THE COURT:  Government Exhibit 513 is received without

4    objection.

5              (Government's Exhibit 513 received in evidence)

6              MS. MOE:  Ms. Geier, could you please publish.

7    BY MS. MOE:

8    Q.  Did you obtain pedigree information for Arianna Roman that

9    day?

10   A.  We did.

11   Q.  I'm showing you what's been marked for identification as

12   Government Exhibit 533.  Do you recognize this?

13   A.  Yes, it is the birth certificate.

14   Q.  Whose birth certificate is it?

15   A.  It's Arianna Roman's.

16             MS. MOE:  Your Honor, the government offers Government

17   Exhibit 533.

18             THE COURT:  Government Exhibit 533.

19             MR. CECUTTI:  Your Honor, one moment, please.  No

20   objection, your Honor.

21             THE COURT:  Government Exhibit 533 is received without

22   objection.

23             (Government's Exhibit 533 received in evidence)

24   BY MS. MOE:

25   Q.  I'm now going to show you on the screen in front of you

1   what's been marked for identification as Government

2   Exhibit 533R.  Do you recognize this?

3   A.  It's birth certificate of Arianna Roman.

4   Q.  What's the difference between Government Exhibit 533 and

5   Government Exhibit 533R?

6   A.  Her birth date is redacted.

7   Q.  Drawing your --

8   A.  Yes.

9   Q.  What is redacted from Government Exhibit 533R?  I know it's

10  a little blurry, but --

11  A.  I'm sorry.  That's the mother's date of birth is redacted

12  and the father's date of birth is redacted.

13          MS. MOE:  The government offers Government Exhibit 533

14  and 533R.

15          MR. CECUTTI:  No objection.

16          THE COURT:  Government Exhibit 533R is received

17  without objection.

18          MS. MOE:  Ms. Geier, could you please Government

19  Exhibit 533R for the jury.

20          (Government's Exhibit 533R received in evidence)

21  BY MS. MOE:

22  Q.  Detective Wong, based on the date of birth listed here, how

23  old was Arianna Roman on November 15, 2015?

24  A.  She'd just turned 18.

25  Q.  I'm showing you what's been marked for identification as

HBLHALM3                      Wong – Direct

1    Government Exhibit 515.  Do you recognize this?

2    A.   Yes.

3    Q.   What is Government Exhibit 515?

4    A.   She's a 15-year-old minor.

5    Q.   What are her initials?

6    A.   JG.

7    Q.   Is this a fair and accurate depiction of how JG appeared on

8    September 15, 2015?

9    A.   Yes, it is.

10            MS. MOE:  Your Honor, the government offers Government

11   Exhibit 515.

12            MR. CECUTTI:  No objection.

13            THE COURT:  Government Exhibit 515 is received without

14   objection.

15            (Government's Exhibit 515 received in evidence)

16            MS. MOE:  Ms. Geier, could you please publish the

17   exhibit.

18   BY MS. MOE:

19   Q.   Did you obtain pedigree information for JG that day?

20   A.   We did.

21   Q.   I'm showing you what's been marked for identification as

22   Government Exhibit 535.  Do you recognize this?

23   A.   That's a birth certificate of the 15-year-old minor.

24   Q.   Is that JG?

25   A.   That is JG.

1          MS. MOE:  The government offers Government

2    Exhibit 535.

3          MR. CECUTTI:  No objection.

4          THE COURT:  Government Exhibit 535 is received without

5    objection.

6          (Government's Exhibit 535 received in evidence)

7    BY MS. MOE:

8    Q.  I'm now showing you what's been marked for identification

9    as Government Exhibit 535R.  Do you recognize this?

10   A.  Yes.

11   Q.  What is the difference between Government Exhibit 535 and

12   Government Exhibit 535R?

13   A.  The 15-year-old minor's name and date of birth is redacted.

14         MS. MOE:  Your Honor, the government offers Government

15   Exhibit 535R.

16         MR. CECUTTI:  No objection.

17         THE COURT:  Government Exhibit 535R is received

18   without objection.

19         (Government's Exhibit 535R received in evidence)

20         MS. MOE:  Ms. Geier, could you please publish

21   Government Exhibit 535R.

22   BY MS. MOE:

23   Q.  Detective Wong, based on the date of birth listed here, how

24   old was JG on September 15, 2015?

25   A.  She was 15 years old.

1   Q.  Following the undercover operation that day, did you take

2   any other investigative steps as part of this case?

3   A.  Yes.  We filed multiple subpoenas.  And whatever leads we

4   had, we followed up on.

5   Q.  Broadly speaking, what types of investigative steps did you

6   take?

7   A.  We also interviewed the 15-year-old minor and a 13-year-old

8   minor, which was the 13-year-old minor that was listed on the

9   NCMEC report.

10          MS. MOE:  Your Honor, with the Court's permission I'd

11  like to read a stipulation between the parties marked

12  Government Exhibit 1007.

13          THE COURT:  All right.  For the benefit of the jurors,

14  a stipulation is simply an agreement between both sides that

15  something is true.  So you can take it as evidence that it is

16  true.

17          Go ahead.

18          MS. MOE:  Thank you, your Honor.

19          It is hereby stipulated and agreed by and among the

20  United States of America by Joon H. Kim, Acting United States

21  Attorney for the Southern District of New York, Stephanie Lake,

22  and Alison Moe, Assistant United States Attorneys of counsel,

23  and Maria Soly Almonte, the defendant, through her attorneys,

24  Anthony Cecutti and Jennifer Louis-Jeune, that if called as a

25  witness, a records custodian from T-Mobile would testify that

1    Government Exhibits 601 and 602 and their subparts are true and

2    correct copies of records from T-Mobile.  The records reflected

3    in Government Exhibits 601 and 602 and their subparts were

4    retrieved from the computer archive system of T-Mobile.  The

5    records reflected in Government Exhibits 601 and 602 and their

6    subparts were create by a person with knowledge of or created

7    with information transmitted by a person with knowledge of the

8    information shown, were created at or near the time the

9    information became available to T-Mobile, and were created and

10   maintained by T-Mobile as part of its regularly conducted

11   business activities.

12           It is further stipulated and agreed that this

13   stipulation as Government Exhibit 1007 and Government

14   Exhibits 601 and 602 and their subparts may be received in

15   evidence at trial.

16           Your Honor, the government offers Government

17   Exhibit 1007, Government Exhibit 601, and Government

18   Exhibit 602.

19           THE COURT:  Government Exhibits --

20           MR. CECUTTI:  No objection, your Honor.

21           THE COURT:  Government Exhibits 1007, 601, and 602 are

22   received without objection.

23           (Government's Exhibits 601, 602, 1007 received in

24   evidence)

25           MS. MOE:  Ms. Geier, could you please publish the

HBLHALM3                    Wong - Direct

1    third page of Government Exhibit 601.

2    BY MS. MOE:

3    Q.  Detective Wong, are you familiar with telephone records

4    based on your experience as a detective?

5    A.  I am.

6    Q.  Can you please explain for the jury what it is that we're

7    looking at here, at Government Exhibit 601.

8    A.  That's what we call the subscriber information.

9    Q.  Drawing your attention to the bottom of the exhibit --

10   Ms. Geier, if you could just highlight the bottom portion here

11   under "Device details."  Thank you -- what is the phone number

12   of this telephone record?

13   A.  It's 347 -- can you move that circle?  It's kind of

14   blocking my view of the phone number.  No, there's a circle in

15   the highlighted area.  There we go.  347-982-1528.

16   Q.  Is that the 1528 phone number?

17   A.  That's correct.

18   Q.  Is that the same phone number that you called from the

19   Backpage ad?

20   A.  Yes.

21   Q.  Who is listed as the subscriber for this phone?

22   A.  Subscriber name is Soly Montana.

23   Q.  What is listed as the address that the subscriber provided

24   to T-Mobile?

25   A.  211 145th Street, New York, New York.

HBLHALM3                    Wong - Cross

1                MS. MOE:  Your Honor, nothing further at this time.

2                THE COURT:  Thank you.

3                Mr. Cecutti.

4      CROSS-EXAMINATION

5      BY MR. CECUTTI:

6      Q.  Good afternoon, Detective Wong.

7      A.  Good afternoon, counselor.

8      Q.  You were a detective investigating sex crimes or sex

9      trafficking for about 17 years; correct?

10     A.  It wasn't for the whole 17 years.  It was starting

11     November 2006 is when I got to the unit.

12     Q.  How many years were you involved in investigating sex

13     trafficking?

14     A.  From 2006 to March 2017.

15     Q.  Nearly ten years?

16     A.  I believe it's a little bit over.

17     Q.  You're familiar with Backpage?

18     A.  I am.

19     Q.  Backpage is an Internet site; correct?

20     A.  Yes, sir.

21     Q.  And it's an Internet site used by prostitutes; correct?

22     A.  Yes.

23     Q.  So that prostitutes can post their ads to get johns;

24     correct?

25     A.  Yes.  It is their mode of advertisement.

HBLHALM3                        Wong - Cross

1  Q.  When a prostitute posts ads on Backpage, they do so
2  regularly; correct?
3  A.  Depending on how often they want to advertise.
4  Q.  You have seen prostitutes advertise as frequently as
5  hourly; correct?
6  A.  Yes.
7  Q.  So a prostitute can be posting ads on Backpage every hour;
8  correct?
9  A.  They can.
10  Q.  You're familiar with the term "pimp"?
11  A.  Yes.
12  Q.  And a pimp is someone who runs a prostitution business?
13  A.  Yes.
14         MR. CECUTTI:  May I have Government Exhibit 960,
15  please.
16  Q.  Detective, do you see Government Exhibit 960?
17  A.  I do, sir.
18         MR. CECUTTI:  May I have the ad portion highlighted,
19  please.
20  Q.  Does this ad indicate pimps or no pimps?
21  A.  This says "no pimps."
22         MR. CECUTTI:  Thank you.  Thank you very much.  I
23  don't need 960 anymore.
24  Q.  Now, you investigated in August of 2015, allegations of sex
25  trafficking at 1408 Webster Avenue; correct?

1    A.   I believe I got that information in September 2015.

2    Q.   One month later, September 2015?

3    A.   In September of 2015, correct.

4    Q.   And specifically, sex trafficking happened at 10J,

5    Apartment 10J; correct?

6    A.   No, the information from the NCMEC report was 170 Street

7    and Webster Avenue.

8    Q.   The investigation resulted in a raid at 1408 Webster

9    Avenue; correct?

10   A.   Yes, Apartment 10J.

11   Q.   And you had testified that you were investigating subjects

12   as part of your investigation back in September of 2015;

13   correct?

14   A.   We had the indication of a name, yes.

15   Q.   And your investigation continued after the raid; correct?

16   A.   That's correct.

17   Q.   And you continued to identify subjects; correct?

18   A.   We identified people involved, yes.

19   Q.   And one person that became a subject was Vetthya Alcius;

20   correct?

21   A.   Yes.

22   Q.   And another person that became a subject was Gabriely Jose;

23   correct?

24   A.   Yes, sir.

25   Q.   And other subjects included Maria Magdalena Almonte;

1   correct?

2   A.  Yes.

3   Q.  And that is Maria Soly Almonte's mother; correct?

4   A.  Yes, sir.

5   Q.  And other subjects included Darlene DeLeon; correct?

6   A.  Yes, sir.

7   Q.  And Arianna Roman; correct?

8   A.  She was not a subject of the investigation, no.

9   Q.  But certainly Ms. Alcius and Ms. Jose; correct?

10  A.  Yes.

11  Q.  And Maria's sisters; correct?

12  A.  Maria's sisters?

13  Q.  Maria Almonte's sisters became subjects of your

14  investigation; correct?

15  A.  Are you speaking of the mother or the daughter?

16  Q.  Maria Soly Almonte's sisters became subjects of your

17  investigation; correct?

18  A.  We did interview them, but they were not subjects at the

19  moment.

20  Q.  Now I want to turn to the raid that happened on

21  September 15, 2015, that you participated in.

22  A.  Yes, sir.

23  Q.  The undercovers were directed to the tenth floor; correct?

24  A.  That's correct.

25  Q.  And not Apartment 19G; correct?

HBLHALM3                         Wong - Cross

1    A.   Yes, they were directed to tenth floor.

2    Q.   There was a positive agreement made between the undercovers

3    and at least one woman in Apartment 10J; correct?

4    A.   Yes, there was agreement with the three females in the

5    apartment and the undercovers.

6    Q.   And that prompted you to go inside 1408 Webster Avenue;

7    correct?

8    A.   Yes, sir.

9    Q.   Specifically, to Apartment 10J; right?

10   A.   Yes.

11   Q.   And when you walked into Apartment 10J, you noticed that it

12   was small; correct?

13   A.   Yes, sir.

14   Q.   There was minimal furniture?

15   A.   Yes, sir.

16   Q.   And there was a mattress on the floor?

17   A.   In the bedroom, yes.

18   Q.   And no frame; correct?

19   A.   Right.

20   Q.   And you walked into the kitchen; correct?

21   A.   Yes, sir.

22   Q.   And you saw a phone; correct?

23   A.   Yes.

24   Q.   And you recovered that phone; correct?

25   A.   After I dialed the 1528 number and it rang, yes.

HBLHALM3                          Wong - Cross

1    Q.  And you later learned as part of your investigation that

2    the 1528 phone was the house phone; correct?

3    A.  Yes, that was what we referred to as the working phone.

4    Q.  Now, you participated in the arrest of Vetthya Alcius;

5    correct?

6    A.  Yes, that was that night, September 15.

7    Q.  And you vouchered Vetthya Alcius' property as part of your

8    work that night?

9    A.  A fellow detective did voucher property, yes.

10   Q.  And as part of her arrest, the house phone was vouchered;

11   correct?

12   A.  Yes, it was.

13   Q.  The house phone was vouchered as part of Ms. Alcius'

14   property; correct?

15   A.  That might have been, yes.

16   Q.  Now, there were two men inside of Apartment 10J; correct?

17   A.  Yes, sir.

18   Q.  One of those men was Dawitt "Daweezy" Dykes?

19   A.  Dawitt Dykes, aka Daweezy.

20   Q.  And he was arrested.

21   A.  Yes, sir.

22   Q.  You participated in his arrest?

23   A.  It was determined that he had the keys to the apartment.

24   That's, when sergeant said he was in control of the apartment,

25   that he was placed under arrest.

1    Q.  Now, as part of your investigation, you learned that

2    Daweezy Dykes was a pimp; right?

3    A.  We knew he was in control of the apartment and he was

4    letting the prostitution go on in the apartment.

5    Q.  And you also learned that Mr. Dykes was also a drug dealer;

6    correct?

7    A.  He did sell narcotics, yes.

8              MR. CECUTTI:  No further questions.

9              MS. MOE:  Your Honor, nothing further for this

10   witness.

11             THE COURT:  Thank you, detective.  You may step down.

12             THE WITNESS:  Thank you, your Honor.  Happy holidays,

13   everybody.

14             (Witness excused)

15             THE COURT:  Thank you.

16             MS. MOE:  Your Honor, the government calls Undercover

17   Detective No. 253.

18             THE COURT:  OK.

19             MS. MOE:  Your Honor, I believe one of the jurors is

20   motioning.

21             JUROR:  Can we use the restroom, please?

22             THE COURT:  Yes, let's take a restroom break.  Try to

23   make it a five-minute break.

24             (Jury excused)

25             MS. MOE:  Your Honor, may we approach briefly?

HBLHALM3                         Wong - Cross

1            THE COURT:  Yes.

2                 (Continued on next page)

1              (At sidebar)

2              MS. LAKE:  So we realize it's nearly 2:30.  This next

3    witness is very brief.  We'd like to get through him if we can.

4    From our view, we'd be happy to continue on further into the

5    day if the defendant is able, if defense counsel is willing.

6              THE COURT:  Tell us how long you think you'd be on

7    direct.

8              MS. LAKE:  For this witness --

9              MS. MOE:  I think five to ten minutes.  I'm hopeful we

10   can get through his entire testimony today and not need to

11   bring him back hopefully, your Honor.

12             MR. CECUTTI:  Your Honor, I'm OK with that.  My only

13   concern would be for the jurors, because they've been told

14   2:30.  It's the first day that they're serving.

15             THE COURT:  Right.  I'll ask them.

16             MR. CECUTTI:  I don't know if you want to get off to a

17   start where we're adjusting the time already.

18             THE COURT:  All right.  How about my --

19             MS. LAKE:  It is an exceptionally brief witness.

20             THE COURT:  How about my having my deputy ask them if

21   they can stay 10 to 15 minutes past 2:30?

22             MR. CECUTTI:  That's fine, yeah.

23             MS. LAKE:  Sure.

24             MS. MOE:  Thank you, your Honor.

25             MS. LAKE:  Thank you.

1          THE COURT:  I have an answer from my law clerk who has

2     talked to Adam Johnson who says Ms. Almonte has not received

3     her ear or psychiatric medication.

4          THE LAW CLERK:  That's from the defense.

5          THE COURT:  I'm sorry.  Does the government know this

6     now?

7          MS. LOUIS-JEUNE:  I don't believe so.

8          THE COURT:  OK.  The count did not clear by 5:00 p.m.

9     What does that mean?

10          MS. LOUIS-JEUNE:  Every day there's a count at the

11     jail, and it's usually done by 5:00 p.m., which is what we were

12     basing our timing on.  It took longer yesterday, so Ms. Almonte

13     was here in this facility longer.  She wasn't taken over to MCC

14     until 6:00 o'clock.

15          THE COURT:  In other words, they didn't let her in

16     during the count?

17          MS. LOUIS-JEUNE:  She was not let in.  She was here

18     with the marshals until 6:00.

19          THE COURT:  Well, we're going to try to work it out so

20     that it will all work in the future.

21          MS. LOUIS-JEUNE:  Thank you.  She still has not

22     received either medication.

23          THE COURT:  Sorry?

24          MS. LOUIS-JEUNE:  She has not received either

25     medication.

HBLHALM3                      Wong - Cross

1          THE COURT:  I understand that, and my expectation is

2     that she will receive it this evening.

3          MS. LOUIS-JEUNE:  Thank you, your Honor.

4          THE COURT:  We'll be breaking much earlier.

5          MS. LOUIS-JEUNE:  Thank you.

6          THE COURT:  Sarah, could you please go ask the jurors

7     if it would --

8          THE DEPUTY CLERK:  They're sort of coming in.

9          THE COURT:  -- whether it's all right for them to go

10    until about a quarter to 3:00 to allow one witness to get on

11    and off the stand.

12          (Continued on next page)

1            (In open court; jury present)

2            THE COURT:  Yes, sir?

3            JUROR:  Are we going past 2:30 again today or is that

4    going to be different?

5            THE COURT:  I'm about to ask all the jurors whether

6    going to 2:45 would be a hardship for anyone.  Would it be a

7    hardship for any of you now?

8            OK.  Sarah, you might ask the others.

9            (Pause)

10           THE COURT:  It would be wise to bring the witness in

11   while we're waiting.

12           MS. LAKE:  Thank you, your Honor.

13           THE COURT:  I want to thank the jurors for your

14   acquiescing and staying until 2:45.  Thank you very much.

15           The government calls?

16           MS. MOE:  Yes.  The government calls Undercover

17   Detective 253.

18           THE COURT:  I'm Judge Wood.  Could you please raise

19   your right hand.

20   UNDERCOVER 253,

21       called as a witness by the Government,

22       having been duly sworn, testified as follows:

23           THE COURT:  Thank you.  Have a seat.  State your name

24   for the record and then spell it.

25           THE WITNESS:  I'm Undercover 253.

1          THE COURT:  OK.  You don't need to tell us any more

2    than that.

3    DIRECT EXAMINATION

4    BY MS. MOE:

5    Q.  Where do you currently work?

6    A.  I currently work for the New York City Police Department.

7    Q.  What is your title there?

8    A.  I'm an undercover detective.

9    Q.  How long have you been an undercover detective in the New

10   York City Police Department?

11   A.  Six years.

12   Q.  What are your current job responsibilities as an undercover

13   detective?

14   A.  As an undercover detective, I'm tasked with engaging the

15   public as a regular civilian to see if anyone is willing to

16   engage in anything illegal with us.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MS. MOE:

2    Q.  Do you use your real name in connection with your work as

3    an undercover detective?

4    A.  No.

5    Q.  What do you use?

6    A.  I have a -- a number, a number alias, that's been assigned

7    to me.

8    Q.  And in what context do you use that number?

9    A.  That's for government paperwork, court paperwork, you know,

10   so nothing could be traced back directly to me.

11   Q.  Drawing your attention to September 15, 2015.  What was

12   your assignment on that day?

13   A.  I was a primary undercover that day.

14   Q.  What does it mean to be a primary undercover?

15   A.  It was decided that I'm going to be the main person to

16   engage in any -- with any subject that we have for that day.

17   Q.  And were you assigned to any particular task that day?

18   A.  Yes.

19   Q.  What did you work on?

20   A.  We had a -- a prostitution-related case.

21   Q.  And what were you assigned to do in connection with that

22   investigation?

23   A.  I was supposed to call a number that was given to me by the

24   investigative detective.

25   Q.  And who were you working with that day, in connection with

1   that assignment?

2   A.  I remember being with another undercover that was there,

3   Undercover 248.  I remember working with Detective Wong, and I

4   remember the supervisor being Sergeant Milici.

5   Q.  You mentioned another undercover, No. 248.  What was his

6   role that day, if you were the primary?

7   A.  His -- his role that day was to -- number one role was for

8   my safety.  His secondary role was to engage -- he was going to

9   be the connection between me, myself, and the -- the field

10  team.

11  Q.  And you referred to him as a secondary.  What other names

12  do you use to refer to a secondary?

13  A.  We call them the ghost.

14  Q.  And what kind of work were you assigned to do with

15  Undercover No. 248 that day?

16  A.  It was a prostitution-related investigation.

17  Q.  And had you ever participated in an investigation like that

18  before?

19  A.  Yes.

20  Q.  And what kinds of things have you done in connection with

21  investigations like that?

22  A.  Investigation like this, what do I do?  Typically I'll be

23  given like a number, like a phone number to call, and see what

24  happens, what they say on the phone number.

25  Q.  And in this case, what happened when you called the phone

1  number that you were given?

2  A.  In this case, after I dialed the number that was given to

3  me from the ad, I was directed by -- a female voice answered

4  the phone, and I was directed by the female voice to come to --

5  me, myself -- I told her it was two of us -- to come to the

6  corner of 170th Street and Webster Avenue in the Bronx.

7  Q.  And what happened after that call?

8  A.  After we -- after that call, I told the field team that the

9  voice told me to come to -- the person on the phone told me to

10  come to 170th and Webster Avenue.

11  Q.  And after you alerted the field team, what did you do next,

12  as part of your investigation?

13  A.  We went to 170th and Webster Avenue.

14  Q.  What happened when you got to that location?

15  A.  Once I got to Webster Avenue, I called the number again,

16  let her know I'm at 170th and Webster Avenue.

17  Q.  How did she respond?

18  A.  She -- she then told me to come to four -- come to the

19  front of 1408 Webster Avenue and to give her a call when I get

20  there.

21         MS. MOE:  Ms. Geier, could you please publish what is

22  in evidence as Government Exhibit 223.

23  Q.  Detective, do you recognize this?

24  A.  Yes.

25  Q.  And what is this?

1   A.   That's the apartment building that I was directed to go in

2   front of.

3   Q.   And what happened after you arrived and went in front of

4   this building?

5   A.   Once I got to the building, I, again, called the same

6   number that I called and let her know I'm in front of 1408

7   Webster Avenue.

8   Q.   What did she tell you?

9   A.   She told me to come up to the tenth floor of 1408 Webster

10  Avenue and to give her a call when I get to the tenth floor.

11  Q.   And what did you do once you got those instructions?

12  A.   Once I got to the tenth floor, me, along with 248, I called

13  her again.  This time she stayed on the phone.  I could hear

14  like a -- the lock unlock to an apartment, open -- she opened

15  the door, she opened -- the door opened, she's still on the

16  phone talking to me, she came towards me, 'cause I'm still on

17  the phone with her at this point, she recognized that I was the

18  person she was talking to, I recognized that, you know, okay, I

19  could still hear her through the phone and see her at this

20  point, at this point she let us into Apartment 10J of 1408.

21  Q.   What happened inside that apartment?

22  A.   Once I got into the apartment, I -- I observed that there

23  were other people inside the apartment.  There was a -- there

24  is a female black that came out to get us, you know, with --

25  she had on a jean shirt, I remember she had on -- I don't

1  remember the color of the shirt she had on, but I know I could

2  see her torso, her stomach was out, she had a tattoo with some

3  word on it, I don't remember what it said, but she had some

4  tattoos on her torso.  So she let us into Apartment 10J.

5  Inside of 10J, I -- we observed -- I observed that there was

6  two other females and a male inside the apartment.

7  Q.  What, if anything, did you discuss with the women?

8  A.  Once I got into the apartment, the male was on the floor

9  just talking on the phone, on his phone, totally ignore us.

10  The female that came to get us suggested that we go in the

11  kitchen, and we talked in the kitchen.  Once we got into the

12  kitchen, 248 and I, we got into the kitchen, we talked, she --

13  I asked -- she asked me how much time I wanted.  I told her,

14  I'll do an hour, and if it's good, I'll pay for another hour.

15  So she says, it's 120 an hour.  And if I needed two-girl

16  special, it will be 240.  I asked her, okay, I agree to the

17  price.  I asked her if she does anal, anal sex.  She says no.

18  She along with the other girl, the light-skinned girl that was

19  inside there, with braces on her teeth, they said if I wanted a

20  two-girl special, it would be 240 for one hour with two girls.

21  I agreed to the price.

22        My ghost relayed the agreement to members of the field

23  team.

24        We started talking again.  Once I -- I got the

25  agreement from her, I asked her, just randomly, what about the

1    third girl, the other girl that's in the apartment?  Is she

2    willing to have sex with my partner for a price?  She -- the --

3    they said sure.  The girl with the braces on her teeth asked

4    the girl that came and got me to go get the other girl

5    that's -- that was in the living room.  She came in, I asked

6    her like, are you willing to have sex with my -- I think I used

7    more clever words.  I didn't really say it properly.  Are you

8    willing to -- can I say --

9          THE COURT:  You can say it.

10   A.  Are you willing to fuck my friend for 120?  She says -- she

11   said yes.  So I -- we agreed to the price.

12          After I get the price from the -- the second girl,

13   they decided that, okay, we're going to get the agreement,

14   we're going to go to the room.

15          At this time the field team is not there yet, so I'm

16   trying to delay it, you know, hopefully, you know, praying that

17   they hear us and they can come and get us at this point.  Then

18   finally we heard a knock on the door.  Okay, good.  The field

19   team is here to save us now.

20          After she opened the door, she looked out the

21   peephole, I'm surprised she opened the door.  When she opened

22   the door, it wasn't the field team.  It was another female.  I

23   heard a voice, but I didn't get to see what she looks like.

24   She -- they said something.  I don't know what they said.  I

25   couldn't hear it 'cause I was still in the kitchen trying to

1   delay.  She -- they said whatever they said, they closed the

2   door, was moving towards the room, we're still trying to walk

3   slow, you know, trying to slow down the process, kind of

4   waiting for the field team to get there at this point.

5          After she got over to the door, she -- this is the

6   girl in the black that came -- this the girl that came to get

7   us.  She recognized the door was locked.  It looks like our

8   prayers were answered 'cause now we got a reason to slow down

9   the process even more.  She says, who let the door, the key or

10  whatever, and the guy that was still laying down on the floor

11  get up, and he had some object, I know it wasn't the key,

12  'cause no one had the key, it was some foreign object, and he

13  popped the door open.

14         So now the door's open.  And we can't go in that room

15  'cause we know we can't -- we can't go in there.  We don't want

16  to get to that point.  It's dangerous, and we don't want to go

17  in that room.

18         So then we hear a knock on the door, a second knock on

19  the door.  Good, hopefully it's the field team this time.  When

20  they looked out, they recognized it was the field team and they

21  start panicking and they're all running around and, shh, be

22  quiet.  And running around.  I think I'm like, look, I gotta

23  get out of here.  You know, police coming here, I gotta get out

24  of here, you guys set me up, and I'm just talking.  And I

25  opened the -- I opened the door, the main door to enter the

1   apartment, and the field team just came in.  They separated us.

2   They got us in -- they got -- they got me plus the other person

3   in like cuffs and all that and they got the -- freeze the

4   apartment.  They finally got us out.

5          Once they got us out, I -- I tell them -- I was able

6   to tell them in more details who I got the agreement from, the

7   price, the description, pretty much just explained what took

8   place inside the apartment.

9   Q.  So talking about those people specifically, you were

10  explaining to the field team when they arrived --

11         MS. MOE:  Ms. Geier, could you please publish

12  Government Exhibit 504.

13  Q.  Detective, do you recognize this person?

14  A.  Yes.

15  Q.  And who is this?

16  A.  This -- this was the guy that was on the phone on the --

17  laying on the floor.  He's the same one that got up and opened

18  the door that was locked.

19         MS. MOE:  And Ms. Geier, could you please publish

20  Government Exhibit 513, which has been admitted into evidence.

21  Q.  Do you recognize this person?

22  A.  This is a girl that was -- one of the girls that was in the

23  apartment.  She's the one that I said had the braces on her

24  teeth.  This one.

25         MS. MOE:  And Ms. Geier, could you please publish

1    Government Exhibit 515, which has been admitted into evidence.

2    Q.  Do you recognize the person depicted in this photograph?

3    A.  Yes.

4    Q.  And who is this person?

5    A.  She is a person that -- she's the last one we got the

6    agreement with, the one that I said is she willing to have sex

7    with my partner for a price, and they went and got her from the

8    living room.

9         MS. MOE:  And finally, Ms. Geier, could you please

10   publish Government Exhibit 506, which has been admitted into

11   evidence.

12   Q.  Do you recognize this person?

13   A.  Yes.

14   Q.  And who is this person?

15   A.  She's the one that was on the phone that came to get me

16   from the hallway, and she's the one that led me into the

17   apartment, the Apartment 10J, and she's the one -- she's one of

18   them that I initially had the agreement with for a two-girl

19   special.

20        MS. MOE:  Your Honor, may I have just one moment.

21        THE COURT:  Yes.

22        MS. MOE:  I have nothing further for this witness at

23   this time, your Honor.

24        THE COURT:  Okay.  Mr. Cecutti.

25        MR. CECUTTI:  Thank you, your Honor.

1          May we keep up Government Exhibit 506, please.

2     CROSS-EXAMINATION

3     BY MR. CECUTTI:

4     Q.  Good afternoon, Undercover 253.

5     A.  Good afternoon.

6     Q.  You recognize this woman, right?

7     A.  Yes.

8     Q.  She was the woman that you spoke with before you went to

9     1408 Webster?

10    A.  She -- I recognize her voice.  And I recognize her when she

11    came up, when she came -- when I got to the top, top floor, to

12    the tenth floor, she was the one that was on the phone with me.

13    Q.  And prior to that moment she was the one who directed you

14    to 170th and Webster, correct?

15    A.  Yeah, the voice sounds familiar.

16    Q.  And she was the one who directed you to the tenth floor,

17    correct?

18    A.  To -- to the tenth floor, yes.

19    Q.  And she was the one who you met in the hallway on the tenth

20    floor, correct?

21    A.  That's correct.

22    Q.  And she was the one who led you and Undercover 248 into

23    10J, correct?

24    A.  That's correct.

25    Q.  And she was the one who led you into the kitchen, correct?

1    A.  Yes.

2    Q.  And inside the kitchen is where you discussed with her

3    prices for sex acts.

4    A.  Yes, she -- she along with another one that -- that's

5    picture was up here was the two people that I originally -- or

6    initially had the -- the first agreement with.

7    Q.  The young woman with the braces, correct?

8    A.  The young woman with the braces, that's correct.

9    Q.  It was you, Undercover 248, this woman, and the young woman

10   with the braces, correct?

11   A.  That's correct.

12   Q.  And inside the kitchen, this woman, in Government

13   Exhibit 506, she told you what sex acts could be performed and

14   what could not be performed, correct?

15   A.  This is 506 and who?

16   Q.  This woman, in the kitchen --

17   A.  Yeah.

18   Q.  -- you and her discussed sex acts, correct?

19   A.  Yes.

20   Q.  And what types of sex acts could be performed and not could

21   be performed, correct?

22   A.  That's correct.

23   Q.  And there came a point in time when there was a discussion

24   involving a third girl, correct?

25   A.  Yes.

Hbl1alm4                    Undercover 253 - Cross

1    Q.  And there was a discussion as to whether or not that third

2    girl would be willing to engage in sex acts with Undercover

3    248, correct?

4    A.  That's correct.

5    Q.  And this woman, this black young woman, was the one who got

6    that young girl, correct?

7    A.  She -- she was told by the woman with braces -- I don't

8    know if it's -- if it's because of her proximity, proximity to

9    the living room, she said, sure, and she -- the one with the

10   braces asked this one to go get her, if she could get her from

11   the -- call her from the living room.

12   Q.  And this young black woman was the one who directed that,

13   correct?

14   A.  No.  After I asked them -- I just asked the question out to

15   all that was in the kitchen with me.  The one with the braces

16   is the one that asked her if she could get her from the living

17   room.

18   Q.  And with respect to the young woman with the braces --

19   A.  Mm-hmm.

20   Q.  -- you also got an agreement with her to have sex in

21   exchange for money, correct?

22   A.  That's correct.

23   Q.  And you looked at her, correct?

24   A.  Yes.

25   Q.  And when you looked at her, it was uncertain as to whether

1    or not she was under 18, correct?

2              MS. MOE:  Objection, your Honor.

3              THE COURT:  To the phrasing or something further?

4              MS. MOE:  On relevance.

5              THE COURT:  Okay.

6              MS. MOE:  May we approach, your Honor.

7              THE COURT:  I'll sustain.  Go ahead.

8              MR. CECUTTI:  Your Honor, can we have a brief sidebar,

9    please.

10             THE COURT:  Yes.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MS. MOE:  Your Honor, the legal standard, the issue of

3    age with respect to this case is whether the defendant knew or

4    had a reasonable opportunity to observe the minor in question.

5    The issue of whether the minor looks young or whether they

6    appeared under 18 is totally irrelevant to the issue that this

7    jury is being asked to decide.

8          THE COURT:  So the questions you would permit are, did

9    you know that she was under age; and secondly, does he have a

10   reasonable suspicion that she was under age?

11         MS. MOE:  So the issue of age in this case is about

12   whether the defendant had a reasonable opportunity to observe

13   the victim or knew their age, so this witness can't testify

14   about the defendant's operations, so --

15         THE COURT:  I see.

16         MS. MOE:  Defense is asking this witness to opine

17   about whether the defendant observed this witness.

18         THE COURT:  I missed that point.  I get you now.

19         MR. CECUTTI:  I'm simply asking what this person's

20   understanding was when they looked at a person and whether or

21   not this witness believed that this young woman was under the

22   age of 18 or not.  That's one of the critical issues in the

23   case.

24         THE COURT:  All right.  That's not relevant.  If you

25   want to brief it, the witness could conceivably come back, but

1    don't go into that line with this witness now.

2              MR. CECUTTI:  That's fine.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  You may continue.

3          MR. CECUTTI:  Thank you, your Honor.

4    BY MR. CECUTTI:

5    Q.  Undercover 253, that evening on September 15, 2015, you saw

6    a lot of people at 1408 Webster?

7    A.  On the outside there were definitely people going by, just

8    like a regular -- regular day to me.

9    Q.  On the tenth floor you saw a lot of people as well?

10   A.  On the tenth floor, I saw -- I wouldn't say it's a lot of

11   people on the tenth floor, but there were people walking by.

12   Q.  Inside Apartment 10J, you saw a lot of people.

13   A.  It was the male -- the female that came and got me, the

14   male that was laying on the floor, the girl with the braces,

15   and the heavy-set Hispanic, plus myself and 248.  That's six.

16   I wouldn't specify six people as a lot of people.

17   Q.  You were looking around inside Apartment 10J?

18   A.  Yeah, we were looking around.

19   Q.  You were looking around on the hallway of the tenth floor?

20   A.  I gazed my eyes, but you have to remain -- doing what I do,

21   you have to be natural, do things that everybody else is doing.

22   If I -- if I start looking around, they're going to be like,

23   no, this guy is not like a regular guy that comes up here to

24   have sex with you.  You know, I have to laugh, I have to fit

25   into my environment.  So I can't be gazing as I would if I was

97

Hbl1alm4

1   on patrol.  I have to fit in, laugh, listen to what they say,

2   and relax.

3   Q.  UC 253, at no point did you ever see Maria Soly Almonte

4   that night, correct?

5   A.  Who is that?

6   Q.  This woman.  You never saw her that night, correct?

7   A.  No.

8            MR. CECUTTI:  No further questions.

9            THE COURT:  Nothing further?

10           MS. MOE:  No further questions for this witness, your

11   Honor.  Thank you.

12           THE COURT:  Oh, thank you.

13           The jurors are free to leave for the evening.  Let me

14   remind you that you must not talk about the case with anyone

15   nor talk about any of the participants here in court.

16           We will begin with testimony tomorrow morning at 9:30.

17   I would appreciate your being in the jury room earlier than

18   that so that we can all start at 9:30, because we cannot start

19   unless all of you are here.

20           I hope you have a good evening and I thank you for all

21   of your patience.

22           I also remind you that when you come in in the

23   morning, you should go straight to the jury room, not come into

24   the courtroom, because we may be discussing legal matters.

25

Hbl1alm4

1           (Jury not present)

2           THE COURT:  Okay.  Counsel, would you like to raise

3     anything?

4           MS. MOE:  Could we have just one moment, your Honor.

5           THE COURT:  Sure.

6           I'm reminded by looking at Ms. Almonte that I have not

7     yet given the instruction about her headset.  I'll do that

8     first thing tomorrow.

9           MS. MOE:  Nothing from the government, your Honor.

10    Thank you.

11          MR. CECUTTI:  Your Honor, the only thing I was going

12    to mention was a reminder to the Court about the headset, so I

13    believe the Court reminded herself.

14          THE COURT:  Okay.  Yes.  Okay.  Thank you.

15          MR. FERRARA:  May we be excused, your Honor?

16          THE COURT:  I'm sorry.  Yes, we're adjourned.  Have a

17    good evening.

18          (Adjourned to November 22, 2017, at 9:30 a.m.)

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION
 2     Examination of:                              Page
 3     JAMES WONG
 4     Direct By Ms. Moe . . . . . . . . . . . . . .45
 5     Cross By Mr. Cecutti . . . . . . . . . . . . .68
 6     UNDERCOVER 253
 7     Direct By Ms. Moe . . . . . . . . . . . . . .80
 8     Cross By Mr. Cecutti . . . . . . . . . . . . .90
 9                         GOVERNMENT EXHIBITS
10     Exhibit No.                              Received
11      960   . . . . . . . . . . . . . . . . . . .49
12      220   . . . . . . . . . . . . . . . . . . .53
13      223   . . . . . . . . . . . . . . . . . . .55
14      301   . . . . . . . . . . . . . . . . . . .58
15      504   . . . . . . . . . . . . . . . . . . .59
16      506   . . . . . . . . . . . . . . . . . . .60
17      513   . . . . . . . . . . . . . . . . . . .61
18      533   . . . . . . . . . . . . . . . . . . .61
19      533R   . . . . . . . . . . . . . . . . . . .62
20      515   . . . . . . . . . . . . . . . . . . .63
21      535   . . . . . . . . . . . . . . . . . . .64
22      535R   . . . . . . . . . . . . . . . . . . .64
23      601, 602, 1007   . . . . . . . . . . . . . .66
24
25
```