HBMHALM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                                    16 Cr. 670 (KMW)


MARIA SOLY ALMONTE,

                                    Trial
          Defendant.

------------------------------x

                                    New York, N.Y.
                                    November 22, 2017
                                    9:35 a.m.


Before:

                      HON. KIMBA M. WOOD,

                                    District Judge
                                    and a jury

                         APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
STEPHANIE LAKE
ALISON GAINFORT MOE
MICHAEL FERRARA
     Assistant United States Attorney

ANTHONY CECUTTI
JENNIFER RUSHING LOUIS-JEUNE
     Attorneys for Defendant

ALSO PRESENT:   STACY SHAHRANI, Special Agent FBI
                  COLLEEN GEIER, Paralegal Specialist USAO

HBMHALM1

```
1         (Trial resumed)

2         THE COURT:  As I mentioned before, it's important for

3    us to bring the jury in at 9:30 every morning, because if we

4    don't, we'll get slippage, and they'll start coming in later

5    and later.  So if you have questions to raise with me, I'm

6    always available earlier in the morning.  So I was told about

7    this at 9:30.  I'm hoping it could have been raised earlier and

8    in the future will be.

9         What would you like to raise?

10        MS. MOE:  I'm sorry, your Honor.  If I could just have

11   one moment.

12        I'm sorry, your Honor.  I hope this will be a quick

13   issue.  I spoke with defense counsel this morning, and they

14   indicated that they're planning to cross-examine the first

15   witness we're intending to call this morning named Susan

16   Sanchez and introduce an exhibit which we produced as 3500

17   material which is marked as 3509-07.

18        THE COURT:  OK.  I took the 3500 material down to

19   chambers.

20        MS. LAKE:  Your Honor, may I bring it up?

21        THE COURT:  Yes.  Thank you.

22        MS. MOE:  Your Honor, this exhibit is a text message

23   that Susan Sanchez sent to an FBI agent, and it contains a

24   photograph of her daughter, one of the victims in this case,

25   Arianna Roman, and she's holding a gun.  And the message
```

HBMHALM1

1   beneath is from Ms. Sanchez, and she's saying essentially what

2   is heartbreaking.  She says, "There's nothing left for my

3   daughter except for a cell or the grave," and she's remarking

4   basically on where her daughter is and what's happened to her

5   in her life.  I can't imagine how this could possibly be

6   relevant at this trial, so I leave that to defense counsel.

7   But our view is this is not admissible under Rule 401 or 403.

8           THE COURT:  What is the argument for admissibility?

9           MR. CECUTTI:  Your Honor, one moment, please.

10          THE COURT:  We'll bring the jury in, and I'll hear you

11  at sidebar if need be.  Let's bring the jury in.  We'll make

12  sure they're here before they start coming in.

13          Mr. Cecutti, if you're ready, go ahead.

14          MR. CECUTTI:  Your Honor, after further consideration,

15  we are not going to get into that area on cross-examination.

16          THE COURT:  Thank you.  Good decision.

17          Did defendant get her medications?

18          MR. CECUTTI:  Your Honor, I am happy to report, I

19  think for the first time in a long time, that Ms. Almonte has

20  received both her ear medication and her psychiatric

21  medication.  We thank the Court for the Court's efforts.

22          THE COURT:  Very good.  Thank you.

23          (Continued on next page)

24

25

HBMHALM1                          Sanchez – Direct

 1            (Jury present)

 2            THE COURT:  Please have a seat.  Good morning, ladies

 3   and gentlemen.  We're ready to proceed.

 4            MS. MOE:  Your Honor, the government calls Susan

 5   Sanchez.

 6   SUSAN SANCHEZ,

 7        called as a witness by the Government,

 8        having been duly sworn, testified as follows:

 9            THE WITNESS:  My name is Susan Sanchez and you spelled

10   is SUSAN, and my last name SANCHEZ.

11            THE COURT:  Thank you.  You may proceed.

12   DIRECT EXAMINATION

13   BY MS. MOE:

14   Q.  Good morning, Ms. Sanchez.

15   A.  Good morning.

16   Q.  Where do you work?

17   A.  I work at Empire BlueCross BlueShield HealthPlus.

18   Q.  What do you do there?

19   A.  I'm a utilization management representative, and I do

20   authorizations for the five boroughs.

21   Q.  Ms. Sanchez, do you have any children?

22   A.  Yes, I do.

23   Q.  How many children do you have?

24   A.  I have four.

25   Q.  What's the name of your oldest child?

HBMHALM1                        Sanchez - Direct

1   A.  My oldest child is Arianna.

2         MS. MOE:  Ms. Geier, can you please publish what's in

3   evidence as Government Exhibit 513.

4   Q.  Do you recognize the girl depicted in this photograph?

5   A.  Yes, I do.  That's my daughter.

6   Q.  Let's talk about Arianna.  What's her last name?

7   A.  Her last name is Roman.

8   Q.  Did she go by any other nicknames besides Arianna?

9   A.  Ari.

10  Q.  When was Arianna born?

11  A.  Arianna was born August 18, 1997.

12        MS. MOE:  Ms. Geier, could you please publish what's

13  in evidence as Government Exhibit 533R.

14  Q.  Ms. Sanchez, do you recognize this?

15  A.  Yes, I do.

16  Q.  What is this?

17  A.  That's my daughter's birth certificate.

18  Q.  How old is Arianna now?

19  A.  Arianna's 20.

20  Q.  Where did she grow up?

21  A.  In Brooklyn, New York.

22  Q.  Where did she go to high school?

23  A.  She went to high school in EBC.

24  Q.  Where is EBC?

25  A.  It's located in Brooklyn, New York.

HBMHALM1                         Sanchez - Direct

1   Q.   How long did she live in Brooklyn?

2   A.   She lived in Brooklyn for 16 years.

3   Q.   Where did she live after that?

4   A.   I moved to the Bronx, in Norwood.

5   Q.   About how old was she when you moved to the Bronx?

6   A.   About little older than 16.

7   Q.   How long did Arianna live with you in the Bronx?

8   A.   About three months before her 18th birthday, so 17 and a

9   half.

10  Q.   Did there come a time when Arianna stopped living with you?

11  A.   Yeah, she did.

12  Q.   Approximately when was that?

13  A.   Three months before her 18th birthday.

14  Q.   What happened at that time?

15  A.   She just left.

16  Q.   How old was Arianna when she left home?

17  A.   Seventeen and a half.  It was three months before her 18th

18  birthday.

19  Q.   At the time she left, did you know where she went?

20  A.   No, I didn't.

21  Q.   What, if anything, did you do to try to find her after she

22  left?

23  A.   I located her on Facebook.  I reached out to her numerous

24  times, tried to call her cell phone.

25  Q.   After she left, did you hear from her again?

1    A.  Yes, I did.

2    Q.  When was the first time that you heard from her after she

3    left home?

4    A.  She called me.

5    Q.  When she called you, what happened?

6    A.  She told me that she was OK; that she was in some woman's

7    house.  That she was fine, for me not to worry about her.  That

8    she was OK.

9    Q.  When she said that, what's the next thing that happened?

10   A.  She gave the phone over to the lady that she was staying

11   with.

12   Q.  What did that woman say?

13   A.  The lady stated her name was Soly or Soly and that she was

14   OK.  That she was treating her like her daughter.  That I had

15   nothing to worry about.

16   Q.  After that phone call, when was the next time that you

17   heard from Arianna?

18   A.  The next time I heard from her was when I had my boyfriend

19   at the time set her up.  What I mean "set her up," she wouldn't

20   come to me because I wanted her to do the right thing.  So she

21   trusted my boyfriend, so I told her to tell her to come to

22   Harlem on 145th to meet us there -- meet him there, I'm sorry.

23   And you know, she did.  She did meet him there in Harlem.

24   Q.  What happened when she met him there?

25   A.  Well, he -- she thought that he was by himself, but it was

1    really me, my sister, and my brother-in-law waiting in the car.

2    Q.   Approximately when was this?

3    A.   She was still -- this was before her 18th birthday.  So

4    this was around 2015.

5    Q.   When she got there, based on your observations, how would

6    you describe her demeanor?

7    A.   She was very, very thin.  She was disarrayed.  She didn't

8    look like in her right state of mind.  So me and my sister and

9    my brother-in-law decided to take her to a hospital.

10   Q.   Did she say anything while you were with her in the

11   hospital?

12   A.   Yes, she did.  She cried a lot, tremendously.  She was

13   crying and she made me cry, and I told her, What's the matter?

14   What's going on?  You know, she can trust me with anything, but

15   she told me she cannot stay.  That she had to leave.

16   Q.   How long did she stay in the hospital?

17   A.   About a few hours.

18   Q.   What's the next thing that happened after she was

19   discharged from the hospital?

20   A.   I took her home with me.

21   Q.   How long did Arianna stay with you at home?

22   A.   She left the next day.

23   Q.   After she left home, when was the next time that you heard

24   from Arianna after that?

25   A.   The next time I didn't hear from her.  It was Detective

1   Wong that told me he had her in custody.

2   Q.  How did you learn that she was in custody?

3   A.  He called me and asked me if I was Arianna Roman's mother;

4   that she was arrested.

5   Q.  What did you do after you got that call?

6   A.  I went down to the Bronx and went to the courthouse located

7   in the Bronx.  I'm sorry.  I don't remember the address, but it

8   was located in the Bronx.

9   Q.  Was that state court or federal court?

10  A.  It was state.

11  Q.  What happened when you arrived at the courthouse?

12  A.  I arrived there.  I was waiting for a few hours until the

13  judge called Arianna Roman's case, and she had a codefendant

14  with her.  And I heard then she was arrested for prostitution.

15  I'm sorry.

16  Q.  Based on your observations when you saw her in court that

17  day, can you describe what Arianna Roman looked like.

18  A.  She was -- barely had any clothes on.  She was half naked.

19  She had, like, a tank top and I remember some blue little

20  shorts.  It was pretty cold outside, so she was really, like,

21  underdressed.  And they remanded her codefendant, and they let

22  my daughter go.

23  Q.  What happened after they let her go?

24  A.  She told me she had to go back to the place where she was

25  arrested.  I pleaded with her and told her not to, that it was

1    OK.  Whatever she needed, that I would give it to her, that she

2    didn't need any clothes or anything from that location, but she

3    would insist that she had to go back.

4              THE COURT:  If any juror ever during trial has

5    difficulty understanding any witness, please just raise your

6    hand.

7              Go ahead.

8    Q.  After she said that to you, what's the next thing that

9    happened?

10   A.  I went back with her to the place she was arrested and the

11   location.

12   Q.  Why did you go there?

13   A.  She would not take no for an answer, so I went back with

14   her to make sure she was going to be safe.

15   Q.  Do you remember approximately where it is that you went?

16   A.  I don't remember where I went, but it was located in the

17   Bronx.  I paid a cab, so we went over to that location, and I

18   remember it being projects, high-rise projects.

19   Q.  I'm showing you what's in evidence as Government

20   Exhibit 223.

21             Ms. Geier, could you please publish that.

22   A.  I remember that.  That's the building she went into.

23   Q.  What happened when you went with her to this building?

24   A.  She took many hours.  It was very late in the night.  It

25   was about 2:00 o'clock in the morning.  I was waiting for her,

1    I remember, because I was sitting in front of a bus stop in
2    front of that building.  There's a bus stop right in front of
3    it.  So I sat there for a long time waiting for my daughter to
4    come out that building.
5    Q.  Why did you wait there so long?
6    A.  'Cause I didn't want to leave her there.
7    Q.  While you were waiting there, what were you doing during
8    that time?
9    A.  Just sitting there playing with my telephone, and then a
10   call came in.  My daughter called me.
11   Q.  About how long had you been waiting by the time you got
12   that call?
13   A.  Two and a half to three hours.
14   Q.  When you got the call, what happened?
15   A.  She put the lady on again, Soly.  She spoke to me and told
16   me that she was going to keep my daughter for a day.
17   Q.  When she said that to you, what did you say?
18   A.  I told her absolutely not.  I will wait here all night.  I
19   want my daughter to come down.
20   Q.  What happened after you said that?
21   A.  Arianna came down about 40 minutes later.
22   Q.  You mentioned today that you had two phone conversations --
23   sorry.  Let me take a step back.
24          In that conversation that you had with that woman, do
25   you know who that woman was?

1   A.   Yeah.  It was Soly.

2   Q.   How do you know who that was?

3   A.   Because I spoke to her one time before when she told me my

4   daughter was a -- like a daughter to her, that she was in good

5   hands, and she spoke to me that second time when I was in front

6   of that building.

7              MS. MOE:  Your Honor, if I could just have one moment?

8              THE COURT:  Yes.

9   Q.   Ms. Sanchez, you mentioned that you had two phone

10  conversations with a woman named Soly.  Had you ever met with

11  the woman named Soly in person?

12  A.   No, I have not.

13             MS. MOE:  Your Honor, I have no further questions for

14  this witness at this time.

15             THE COURT:  Thank you.

16             You may proceed.

17  CROSS-EXAMINATION

18  BY MS. LOUIS-JEUNE:

19  Q.   Good morning, Ms. Sanchez.

20  A.   Good morning.

21  Q.   Ari left home in 2014?

22  A.   2015.

23  Q.   2015.  She left home more than once?

24  A.   Yes.

25  Q.   She would leave and you wouldn't hear from her for months?

HBMHALM1                          Sanchez – Cross

1   A.  Yes.

2   Q.  At one time you told her you didn't want her to come back

3   home because she was a bad influence to your other children?

4   A.  Yes, I did.

5   Q.  And that was because she had chosen to do things that you

6   didn't want her to do?

7   A.  Yes.

8   Q.  She lied?

9   A.  Yes.

10  Q.  She stole?

11  A.  Yes.

12  Q.  She dressed in ways that you didn't agree with?

13  A.  Yes.

14  Q.  Someone told you that Ari was doing credit card scams as

15  well?

16          MS. MOE:  Objection, your Honor.

17          THE COURT:  Ground?

18          MS. MOE:  Relevance.

19          THE COURT:  I'll permit it.

20  A.  I'm not sure about that.

21  Q.  You spoke with the government regarding this case?

22  A.  Yes.

23  Q.  Do you remember telling the government that someone told

24  you at one point that Ari was doing credit card scams?

25          MS. MOE:  Objection, your Honor.

1           THE COURT:  Sustained.  That's hearsay.

2   A.  Yes.

3           THE COURT:  If I sustain an objection, you shouldn't

4   answer.  I'll tell you next time.

5           MS. MOE:  Your Honor, I'd move to strike.

6           THE COURT:  Yes, that will be stricken from the

7   record.  The jury should completely disregard it.

8   BY MS. LOUIS-JEUNE:

9   Q.  At times Ari would go to live at places and you didn't know

10  where she was?

11  A.  Yes.

12  Q.  After she left home, you followed her on social media?

13  A.  Yes, I did.

14  Q.  On Facebook?

15  A.  Yes.

16  Q.  On Instagram?

17  A.  Yes.

18  Q.  You called her on her phone?

19  A.  Yes.

20  Q.  You tried to stay in touch with her about where she was?

21  A.  Yes.

22  Q.  And she lied to you about where she was?

23  A.  Yes.

24  Q.  You've had several phone calls with a woman you called

25  Soly?

HBMHALM1                        Sanchez - Cross

1   A.  Only two.

2   Q.  The first call was a few months after Ari left home?

3   A.  Yes, it was.

4   Q.  In 2015?

5   A.  Yes.

6           THE COURT:  I'm going to ask you to pause after the

7   answer so that the court reporter can keep up with you more

8   easily.

9           MS. LOUIS-JEUNE:  Thank you, your Honor.

10  Q.  The first time you spoke with Soly, Ari told you that she

11  was living in the Bronx?

12  A.  Yes, she did.

13  Q.  She told you that she was OK?

14  A.  Yes.

15  Q.  She told you not to worry; right?

16  A.  Yes, she did.

17  Q.  She didn't sound scared?

18  A.  No, she didn't.

19  Q.  She said she wanted to continue staying where she was?

20  A.  Yes, she did.

21          THE COURT:  I'm sorry.  You do need to pause after

22  each answer.

23  Q.  And during that phone call, Ari gave the phone to the woman

24  she was staying with?

25  A.  I don't recall.

1   Q.  You spoke with the woman Ari was staying with at that time?

2   A.  Yes, because my daughter had the phone, so she passed it

3   over to her.

4   Q.  The woman told you that Ari was fine?

5   A.  Yes, that she was treating her like a daughter.

6   Q.  She told you that Ari had permission to stay with her and

7   her mother?

8   A.  I don't remember anything about a mother.  Sorry.

9   Q.  She told you that Ari had permission to stay with her?

10  A.  Yes.

11  Q.  You didn't tell that woman how old Ari was?

12  A.  Yes, I did.

13  Q.  When that call was over, Ari didn't come home, did she?

14  A.  No.

15  Q.  A few months later, in September 2015, Ari was arrested?

16  A.  Yeah.

17  Q.  You received a phone call from Soly that day?

18  A.  No.

19  Q.  When you found out that Ari was arrested, you went to the

20  courthouse?

21  A.  Yes.

22  Q.  You went to her arraignment?

23  A.  Yes.

24  Q.  And you found out she was charged with prostitution?

25  A.  Yes, I did.

HBMHALM1                           Sanchez - Cross

1    Q.  And she was 18 at that time?

2    A.  Yes.

3    Q.  She was released on bail?

4    A.  Yes, she was -- no, no bail.

5    Q.  On her own recognizance?

6    A.  Yes.

7    Q.  And she insisted on going to 1408 Webster?

8    A.  Yes, she did.

9    Q.  She said she was going to get some of her clothes?

10   A.  Yes, she did.

11   Q.  You took her there?

12   A.  Yes.

13   Q.  And you didn't go inside?

14   A.  No, I did not.

15   Q.  You waited outside?

16   A.  In the front, yes.

17   Q.  While you were waiting, Ari called you?

18   A.  Yes, she did.

19   Q.  You asked her to come down?

20   A.  Yes.

21   Q.  She said she was going to stay at 1408?

22   A.  She didn't tell me that, no.

23   Q.  She didn't say she was scared?

24   A.  No, she didn't.

25   Q.  While you were talking to Ari, she handed the phone to

1    Soly?

2    A.  Yes.

3    Q.  You spoke with this woman named Soly?

4    A.  Yes, I did.

5    Q.  This was the second time you spoke with her?

6    A.  Yes.

7    Q.  She said Ari could stay if she wanted to?

8    A.  No, she didn't.  She said that she's going to keep her a

9    day.

10   Q.  She didn't threaten Ari in any way that you heard?

11   A.  No, I did not.

12   Q.  She didn't threaten you?

13   A.  No, she didn't.

14   Q.  Then you spoke with Ari again?

15   A.  Yes.

16   Q.  And she said she was going to stay?

17   A.  No, she didn't.  She said she was coming down.

18   Q.  And she came down 40 minutes later?

19   A.  Give or take.

20   Q.  And she went home with you?

21   A.  Yes, she did.

22   Q.  But she left the next day?

23   A.  The next day when -- I'm sorry?

24   Q.  She came home with you and left the next day?

25   A.  Yeah.  She had a boyfriend at the time.

HBMHALM1                          Sanchez - Redirect

1    Q.  She went to stay with her boyfriend?

2    A.  Yes.

3    Q.  Ms. Sanchez -- one moment.

4           Ms. Sanchez, you said that Ari was insistent on going

5    back to 1408; correct?

6    A.  Yes, she was.

7    Q.  And in your experience, Ari does what she wants to do;

8    correct?

9    A.  Sometimes, yes.

10   Q.  No one's going to make her do anything she doesn't want to

11   do?

12          MS. MOE:  Objection.

13          THE COURT:  Sustained.

14          MS. LOUIS-JEUNE:  One moment, Your Honor.

15   Q.  Ms. Sanchez, do you know where Ari's living right now?

16   A.  Yes.

17   Q.  Have you given that information to the government?

18          MS. MOE:  Objection, your Honor.

19          THE COURT:  Sustained.

20          MS. LOUIS-JEUNE:  No further questions.

21          MS. MOE:  Just very brief redirect, your Honor.

22          THE COURT:  Certainly.

23   REDIRECT EXAMINATION

24   BY MS. MOE:

25   Q.  Ms. Sanchez, after Arianna first left home and you got a

1    call from her and you spoke with a woman named Soly who told

2    you that your daughter was staying with her like she was a mom

3    to her --

4    A.  Yes.

5    Q.  -- was that OK with you?

6    A.  No.

7    Q.  Did you say that?

8    A.  Yes, I did.

9    Q.  What did you say?

10   A.  I -- I made a police report because she was a minor.  I

11   have several police reports of when Arianna left and have it on

12   documents.

13   Q.  When she said this to you, what did you say to her?

14   A.  I want her to come home.

15             MS. MOE:  Nothing further, your Honor.

16             THE COURT:  Anything further?

17             MS. LOUIS-JEUNE:  No, your Honor.

18             THE COURT:  Thank you very much, Ms. Sanchez.  You may

19   step down.

20             And we are ready for the next witness.

21             (Witness excused)

22             MS. LAKE:  Your Honor, may I read two stipulations?

23             THE COURT:  Yes.  The government is about to read two

24   stipulations.  Stipulations are agreements between both sides

25   that what is said in the stipulation is true and can be taken

HBMHALM1                    Sanchez - Redirect

1    by you as true.

2                MS. LAKE:  It is hereby stipulated and agreed by and

3    among the parties that if called as a witness, a records

4    custodian from Backpage.com LLC, or Backpage, would testify

5    that Government Exhibit 901 and its subparts are true and

6    correct copies of records from Backpage.  The records reflected

7    in Government Exhibit 901 and its subparts were retrieved from

8    the computer archive system of Backpage.  The records reflected

9    on Government Exhibit 901 and its subparts were created by a

10   person with knowledge of or created from information

11   transmitted by a person with knowledge of the information shown

12   or created at or near the time the information became available

13   to Backpage and were created and maintained by Backpage as part

14   of its regularly conducted business activities.

15               It is further stipulated and agreed that if called to

16   testify, a witness employed by Backpage with direct knowledge

17   of the business practices of Backpage would testify, in

18   substance and in part, that the computer server for Backpage is

19   located in Arizona and that the payments for ads posted on

20   Backpage are processed in Massachusetts.

21               It is further stipulated and agreed that this

22   stipulation as Government Exhibit 1002 may be received in

23   evidence at trial.  The defendant reserves her right to object

24   to the admissibility of Government Exhibit 901 and its subparts

25   pursuant to Rule 401 and 403.

1              At this time the government offers this stipulation as

2    Government Exhibit 1002.

3              THE COURT:  Do you need a ruling on the objection?

4              MS. LOUIS-JEUNE:  No objection.

5              THE COURT:  All right.  Government Exhibit 1002 is

6    received without objection.

7              (Government's Exhibit 1002 received in evidence)

8              MS. LAKE:  Just one more of these stipulations for

9    right now.

10             It is hereby stipulated and agreed by and among the

11   parties that Government Exhibits 800, 805, 810, 815, 820, 825,

12   826, 830, including the subdivisions thereof, contain true and

13   accurate copies of statements and photographs shared on the

14   social networking website Facebook.

15             Government Exhibit 800, including the subdivisions

16   thereof, contains true and accurate copies of statements and

17   photographs from the Facebook account with username "SoSo

18   Wavy."

19             Government Exhibit 805, including the subdivisions

20   thereof, contains true and accurate copies of statements and

21   photographs from the Facebook account with the username

22   "Bighomie BiBi."

23             Government Exhibit 810, including the subdivisions

24   thereof, contains true and accurate copies of statements and

25   photographs from the Facebook account with username "GabrieLa

1    Vuitton."

2              Government Exhibit 815, including the subdivisions

3    thereof, contains true and accurate copies of statements and

4    photographs from the Facebook account with the username "La

5    Rana."

6              Government Exhibit 820, including the subdivisions

7    thereof, contains true and accurate copies of statements and

8    photographs from the Facebook account with the username

9    "Bighomie N."

10             Government Exhibit 825, including the subdivisions

11   thereof, contains true and accurate copies of statements and

12   photographs from the Facebook account with username "Theiya

13   DTN."

14             Government Exhibit 826, including the subdivisions

15   thereof, contains true and accurate copies of statements and

16   photographs from the Facebook account with the username "Tee

17   Lashawn."

18             Government Exhibit 830, including the subdivisions

19   thereof, contains true and accurate copies of statements and

20   photographs from the Facebook account with username "Daweezy

21   Gzz."

22             It is further stipulated and agreed that this

23   stipulation as Government Exhibit 1003 may be received in

24   evidence as a Government Exhibit at trial.  The defendant

25   reserves her right to object to the admissibility of Government

1   Exhibits 800, 805, 810, 815, 820, 825, 826, and 830 and their

2   subparts pursuant to Rule 401 and 403.

3          At this time the government offers this stipulation as

4   Government Exhibit 1003.

5          THE COURT:  Does defendant contest the admissibility?

6          MS. LOUIS-JEUNE:  No objection, your Honor.

7          THE COURT:  Government Exhibit 1003 is received

8   without objection.

9          (Government's Exhibit 1003 received in evidence)

10         MS. LAKE:  The government now calls Gabriely Jose.

11         THE COURT:  Thank you.

12         Members of the jury, I want to note something for you.

13   The defendant is wearing headphones.  That is simply so that

14   the sound is amplified to help her hearing in the courtroom.

15   GABRIELY JOSE,

16      called as a witness by the Government,

17      having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MS. LAKE:

20   Q.  Good morning, Ms. Jose.

21   A.  Good morning.

22   Q.  How old are you?

23   A.  I'm 21.

24   Q.  Where were you born?

25   A.  Bronx, New York.

HBMHALM1                          Jose - Direct

1   Q.   Where did you grow up?

2   A.   Bronx, New York.

3   Q.   Where are you living now?

4   A.   MDC.

5   Q.   What's MDC?

6   A.   Detention center.

7   Q.   What kind of facility is that?

8   A.   It's jail.

9   Q.   How long have you been at jail?

10  A.   Approximately 14 months now.

11  Q.   Why are you living at the MDC?

12  A.   Due to charges that were against me.

13  Q.   What are your charges for?

14  A.   Sex trafficking of a minor.

15  Q.   Generally speaking, what did you do in connection with sex

16  trafficking of a minor?

17  A.   I was part of a prostitution gang.

18  Q.   What did that prostitution gang do?

19  A.   We prostituted people from under 18 and over.

20  Q.   What is the status of your case?

21  A.   Pending.

22  Q.   Have you pled guilty?

23  A.   Yes.

24  Q.   Did you plead guilty under a cooperation agreement?

25  A.   Yes.

HBMHALM1                              Jose - Direct

1    Q.  When were you involved in this prostitution business?

2    A.  Ending of 2014, beginning of 2015.

3    Q.  For approximately how long were you involved?

4    A.  Six to seven months, to be exact.

5    Q.  How did you become involved?

6    A.  My childhood friend Daniela put me on.

7    Q.  When you say "put me on," what does that mean?

8    A.  She told me about this whole prostitution thing.

9    Q.  Did there come a time when you learned who ran this

10   prostitution business?

11   A.  Yes.

12   Q.  How did you learn who ran the business?

13   A.  Through Daniela, which is Soly's sister.

14   Q.  Who's Soly?

15   A.  Some girl I met.

16   Q.  Who ran the prostitution business?

17   A.  Soly.

18   Q.  Do you see the person known as Soly in the courtroom today?

19   A.  Yes.

20   Q.  Could you please identify her by an article of clothing

21   she's wearing.

22   A.  Blues.

23            THE COURT:  She's wearing a blue top?

24            THE WITNESS:  Yes.

25            THE COURT:  OK.  Indicating the defendant.

HBMHALM1                          Jose - Direct

 1   BY MS. LAKE:

 2   Q.  What is Soly's full name, if you know?

 3   A.  Maria Almonte.

 4   Q.  Where did you first meet Soly?

 5   A.  On -- in Boynton and Elder.

 6   Q.  What is Boynton and Elder?

 7   A.  Elder is the street.  Boynton is, like, the cross.

 8   Q.  What was at Boynton and Elder?

 9   A.  Her mother's house.

10   Q.  When did you first meet her?

11   A.  In 2014.

12   Q.  Do you recall what time of year it was?

13   A.  It was summer.

14   Q.  You testified that you first became involved in this

15   prostitution business through Daniela.  When did that happen?

16   A.  In 2015.

17   Q.  What time of year was that?

18   A.  Beginning of 2015.

19   Q.  How did you first learn that Daniela was involved in

20   prostitution?

21   A.  Because she had told me that there was a guy that wanted

22   to, like, give her -- the guy hit her up through WhatsApp, and

23   that's an app that's used on the phone, and he wanted to have

24   sex with her in exchange of money.

25   Q.  After she told you that, what happened?

1  A.  After she told me that, we -- she asked me if I'm OK, if I

2  would join her and go with her.  I said yes, but then it never

3  happened.

4  Q.  Why did you say yes?

5  A.  Because I wanted to go with her.  She was my friend at that

6  point.

7  Q.  When was the next time you and Daniela talked about

8  prostitution?

9  A.  About two weeks after she had told me to -- if I'm -- if I

10  was OK with the whole WhatsApp situation with the guy, and I

11  said yeah.  And she said that she does prostitution with her

12  sisters, but it's between the family.

13  Q.  Did Daniela tell you where she and her sisters were working

14  out of?

15  A.  Yes.

16  Q.  Where were they working?

17  A.  At that point they were working in Boynton.

18  Q.  And did there come a time when they moved locations?

19  A.  Yes.  They moved to 149th Street, which is near my house,

20  and then they moved again to 211 West 145th Street.

21  Q.  Did there come a time when you went to 211 West 145th

22  Street?

23  A.  Yes.

24  Q.  Approximately when was that?

25  A.  2015.

HBMHALM1                          Jose - Direct

1   Q.  Who, if anyone, did you go with?

2   A.  I went with Daniela.

3   Q.  And who, if anyone, was in that apartment when you arrived?

4   A.  When I got there, Maria was there, Soly was, Bibi was

5   there, IF was there, Maribel was there, and Rosa was there.

6   Q.  I'm showing you what has been marked for identification as

7   Government Exhibit 501.  Do you recognize this?

8   A.  Yes.

9   Q.  What is this?

10  A.  Soly.

11  Q.  Does this fairly and accurately depict Soly?

12  A.  Yes.

13          MS. LAKE:  Your Honor, the government moves to admit

14  Government Exhibit 501.

15          MR. CECUTTI:  No objection.

16          THE COURT:  Government Exhibit 501 is received without

17  objection.

18          (Government's Exhibit 501 received in evidence)

19          MS. LAKE:  Ms. Geier, can you please publish the

20  exhibit.

21  BY MS. LAKE:

22  Q.  Approximately how old was Soly when you met her?

23  A.  Thirty-two.

24  Q.  I'd like to show you what has been marked for

25  identification as Government Exhibit 502.  Do you recognize

1    this?

2    A.  Yes.

3    Q.  What is this?

4    A.  Maria Soly's mother.

5    Q.  Does this fairly and accurately depict Maria?

6    A.  Yes.

7            MS. LAKE:  Your Honor, the government moves to admit

8    Government Exhibit 502.

9            MR. CECUTTI:  No objection.

10           THE COURT:  Government Exhibit 502 is received without

11   objection.

12           (Government's Exhibit 502 received in evidence)

13           MS. LAKE:  Ms. Geier, would you please publish

14   Government Exhibit 502.

15   BY MS. LAKE:

16   Q.  I'm showing you what has been marked for identification as

17   Government Exhibit 507.  Do you recognize this?

18   A.  Yes.

19   Q.  What is it?

20   A.  Daniela, Soly's sister.

21   Q.  Does this fairly and accurately depict Daniela?

22   A.  Yes.

23           MS. LAKE:  Your Honor, the government offers

24   Government Exhibit 507.

25           MR. CECUTTI:  No objection.

1          THE COURT:  Government Exhibit 507 is received without

2     objection.

3          (Government's Exhibit 507 received in evidence)

4          MS. LAKE:  Ms. Geier, can you please publish this

5     exhibit.

6     BY MS. LAKE:

7     Q.  How old was Daniela at this time?

8     A.  Twenty years old.

9     Q.  What, if any, relationship did Daniela have to Soly?

10    A.  She was Soly's sister.

11    Q.  I'm showing you what's been marked for identification as

12    Government Exhibit 508.  Do you recognize this?

13    A.  Yes.

14    Q.  What is this?

15    A.  Rosa.

16    Q.  Does this fairly and accurately depict Rosa?

17    A.  Yes.

18          MS. LAKE:  The government moves to admit Government

19    Exhibit 508.

20          MR. CECUTTI:  No objection.

21          THE COURT:  Government Exhibit 508 is received without

22    objection.

23          (Government's Exhibit 508 received in evidence)

24          MS. LAKE:  Ms. Geier, can you please publish.

25    BY MS. LAKE:

HBMHALM1                         Jose - Direct

1    Q.  How old was Rosa at this time?

2    A.  Nineteen.

3    Q.  What, if any, relationship did Rosa have to Soly?

4    A.  That was Soly's sister.

5    Q.  Now I'm showing you what has been marked for identification

6    as Government Exhibit 510.  Do you recognize this?

7    A.  Yes.

8    Q.  What is it?

9    A.  Maribel.

10   Q.  Does this fairly and accurately depict Maribel?

11   A.  Yes.

12           MS. LAKE:  Your Honor, the government moves to admit

13   Government Exhibit 510.

14           MR. CECUTTI:  No objection.

15           THE COURT:  Government Exhibit 510 is received without

16   objection.

17           (Government's Exhibit 510 received in evidence)

18           MS. LAKE:  Ms. Geier, can you please publish this

19   exhibit.

20   BY MS. LAKE:

21   Q.  Approximately how old was Maribel at this time?

22   A.  Sixteen.

23   Q.  What, if any, relationship did Maribel have to Soly?

24   A.  She's Soly's sister.

25   Q.  I'm showing you what has been marked for identification as

HBMHALM1                           Jose - Direct

1   Government Exhibit 511.  Do you recognize this?

2   A.  Yes.

3   Q.  What is this?

4   A.  Bibi.

5   Q.  Does this fairly and accurately depict Bibi?

6   A.  Yes.

7           MS. LAKE:  The government moves to admit Government

8   Exhibit 511.

9           MR. CECUTTI:  No objection.

10          THE COURT:  Government Exhibit 511 is received without

11  objection.

12          (Government's Exhibit 511 received in evidence)

13          MS. LAKE:  Ms. Geier, can you please publish.

14  BY MS. LAKE:

15  Q.  Approximately how old was Bibi at this time?

16  A.  Fourteen or 15, to be exact.

17  Q.  And what, if any, relationship did Bibi have to Soly?

18  A.  That's Soly's sister.

19  Q.  If you know, was Bibi this person's real name?

20  A.  No.

21  Q.  What was her real name, excluding her last name?

22  A.  Gladys, but we call her Taisha.

23  Q.  Did she go by any other names?

24  A.  No.

25  Q.  I'm showing you what has been marked for identification as

1    Government Exhibit 512.  Do you recognize this?

2    A.  Yes.

3    Q.  What is this?

4    A.  IF.

5    Q.  Does this fairly and accurately depict IF?

6    A.  Yes.

7          MS. LAKE:  The government moves to admit Government

8    Exhibit 512.

9          MR. CECUTTI:  No objection.

10          THE COURT:  Government Exhibit 512 is received without

11    objection.

12          (Government's Exhibit 512 received in evidence)

13          MS. LAKE:  Ms. Geier, could you please publish

14    Government Exhibit 512.

15    BY MS. LAKE:

16    Q.  Approximately how old was IF at this time?

17    A.  Fourteen.

18    Q.  What, if any, relationship did IF have to Soly?

19    A.  She's Soly's youngest sister.

20    Q.  I'm showing you what's been marked for identification as

21    Government Exhibit 800D.  Do you recognize this?

22    A.  Yes.

23    Q.  What is this document?

24    A.  A picture that's posted on Facebook.

25    Q.  Do you recognize the individuals in the photograph?

1    A.  Yes.

2    Q.  Who are they?

3    A.  Maribel and Soly.

4           MS. LAKE:  The government offers Government

5    Exhibit 800D.

6           MR. CECUTTI:  No objection.

7           THE COURT:  Government Exhibit 800D is received

8    without objection.

9           (Government's Exhibit 800D received in evidence)

10          MS. LAKE:  Ms. Geier, can you please publish

11   Government Exhibit 800D.

12   BY MS. LAKE:

13   Q.  Where in the photograph is Soly?

14   A.  On the right side.

15   Q.  Where in the photograph is Maribel?

16   A.  On the left side.

17   Q.  Which one is taller, just so we're clear about who's who?

18   A.  Soly's taller.

19          MS. LAKE:  Ms. Geier, you can take this down.

20          THE COURT:  I'll note for the jury that from time to

21   time groups of spectators come in.  It has no relevance to our

22   case.

23   Q.  Now, after you arrived at 211 West 145th Street for the

24   first time, who, if anyone, did you talk to?

25   A.  I first talked to Maria, which is Soly's mother.

1    Q.  What, if anything, did Maria tell you?

2    A.  That she -- that they post to a -- post an ad on a website

3    and that brings men in as in clients.

4    Q.  Clients for what?

5    A.  To have sex with them in exchange for money.

6    Q.  What, if anything, did Soly tell you?

7    A.  Soly just told me how it goes and after that, whenever a

8    guy would come in, if it's $60 for a half-hour or an hour -- or

9    150 for an hour, I have to give her $40 for the hour and $20

10   for half-hour.

11   Q.  Did anyone else explain to you how this all worked other

12   than the two of them?

13   A.  No.

14   Q.  You talked about posting.  What does "posting" mean?

15   A.  Posting is when you get on a website and you place pictures

16   and the address and the number to contact the person.

17   Q.  What is the website that's used?

18   A.  Backpage.

19   Q.  What is Backpage?

20   A.  Backpage is a website where men get on to have sexual

21   exchanges for money.

22   Q.  That day did you take a picture?

23   A.  Yes.

24   Q.  Who took the picture?

25   A.  Maria Soly's mother.

HBMHALM1                           Jose - Direct

1    Q.  What happened with that picture?

2    A.  She gave the phone to Bibi, and Bibi posted the ad.

3    Q.  That day did any men come to the apartment?

4    A.  Yes.

5    Q.  How many?

6    A.  Three to be exact.

7    Q.  What happened after the men arrived?

8    A.  When the men arrived, Maribel and Rosa was there, and they

9    had picked Maribel and Rosa to get on a date with.

10   Q.  Who picked Maribel and Rosa?

11   A.  The client.

12   Q.  You just said "date."  What's a date?

13   A.  Date is when the person that is having -- that you're

14   having sex with is giving -- you're having sex with them over a

15   period of time.

16   Q.  So you said that Maribel and Rosa were chosen by the men.

17   What happened after they were chosen?

18   A.  After they were chosen, the men gave them the money, and

19   then they split a part with Soly and took the rest.

20   Q.  When you say "split a part with Soly," can you explain

21   that.

22   A.  The men were there for a half-hour, so they gave Soly $20

23   and took the rest of the money.

24   Q.  How do you know that Soly got $20 of the money?

25   A.  Because I saw it.

HBMHALM1                          Jose - Direct

1    Q.  Did there come a time when you got an understanding of why

2    Soly got $20?

3    A.  Yes.

4    Q.  Who told you the reason?

5    A.  She -- Soly told me that since she's the one that's

6    bringing the clients out, that she gets a part of the money.

7    Q.  What were some of the things you saw Soly do to run the

8    prostitution business in the time that you were involved?

9    A.  She would post on Backpage.

10   Q.  What about the phones?

11   A.  She was -- she had always post through her -- through her

12   cell phone number.

13   Q.  When a client responded to an ad, who would they call?

14   A.  They would call the number that's on the ad.

15   Q.  Whose phone number was that?

16   A.  Soly's.

17   Q.  Generally speaking, what was your role in this?

18   A.  I used to pick up the phone and answer the phone, I will do

19   dates, and I would hold her money every time Soly wasn't there.

20   Q.  At what locations did the prostitution business operate out

21   of in the time that you were aware of its activities?

22   A.  211 West 145th Street, 1408 Webster, 169 and Grand

23   Concourse, and 1329 Clinton Avenue.

24   Q.  I'm showing you what has been marked as Government

25   Exhibit 210.  Do you recognize this?

1   A.  Yes.

2   Q.  What is it?

3   A.  A map where all the businesses was ran.

4   Q.  Does this fairly and accurately depict the locations where

5   the prostitution business operated out of in the time you were

6   involved?

7   A.  Yes.

8           MS. LAKE:  The government moves to admit Government

9   Exhibit 210.

10          MR. CECUTTI:  No objection.

11          THE COURT:  Government Exhibit 210 is received without

12   objection.

13          (Government's Exhibit 210 received in evidence)

14          MS. LAKE:  Ms. Geier, can you please publish this

15   exhibit.

16   BY MS. LAKE:

17   Q.  Can you just indicate on the map where 211 West 145th

18   Street is.

19   A.  (Witness indicates.)

20   Q.  What about the 169th Street and Grand Concourse?

21   A.  (Witness indicates.)

22   Q.  What about 1408 Webster Avenue?  And Clinton Avenue?

23          THE COURT:  How do you want her to indicate that?

24          MS. LAKE:  I think she's made a mark on the screen,

25   your Honor.

1              THE COURT:  I see.

2              MS. LAKE:  Just noting, for the record, that in order

3     the witness marked 211 West 145th Street, 121 East 169th

4     Street, 1408 Webster Avenue, and 1329 Clinton Avenue.

5              THE COURT:  Thank you.

6              MS. LAKE:  Ms. Geier, you can take this exhibit down.

7     Q.  Let's talk a little bit about the way the prostitution

8     worked while you were involved.  How did the business

9     advertise?

10    A.  Through Backpage.

11    Q.  What is Backpage?

12    A.  A website that we post in.

13    Q.  When you first joined the business, who posted to Backpage?

14    A.  Bibi and Soly.

15    Q.  As time went on, did anybody else post to Backpage?

16    A.  Yes.

17    Q.  Who?

18    A.  Me, Ari, Theiya, Bibi.

19    Q.  I'm showing you what has been marked for identification as

20    Government Exhibit 901K.  Do you recognize this?

21    A.  Yes.

22    Q.  What is this?

23    A.  An ad on Backpage.

24    Q.  Are you familiar with this ad?

25    A.  Yes.

1    Q.  Is it an ad for the prostitution business that we've been

2    discussing?

3    A.  Yes.

4              MR. IMPERATORE:  Your Honor, the government moves to

5    admit Government Exhibit 901K.

6              MR. CECUTTI:  No objection.

7              THE COURT:  Government Exhibit 901K is received

8    without objection.

9              (Government's Exhibit 901K received in evidence)

10             MS. LAKE:  Before we publish, I want to note for the

11   Court, it does contain somewhat explicit images.

12             THE COURT:  I understand.

13             MS. LAKE:  Ms. Geier, can you please publish this

14   exhibit.

15   BY MS. LAKE:

16   Q.  Now, focusing on the title of the ad, "BBWs and skinny nice

17   weather specials," what is a "BBW"?

18   A.  Big beautiful women.

19   Q.  And what is $60 HH?

20   A.  $60 half-hour.

21   Q.  What does the number 23 signify?

22   A.  The age of the person that's posting.

23   Q.  Is there a minimum age required to say that you are in

24   order to post on Backpage?

25   A.  Yes.

HBMHALM1                          Jose – Direct

1   Q.   What's the minimum age?

2   A.   Eighteen.

3   Q.   Do you have to post your true age when you put an ad on

4   Backpage?

5   A.   Yes, but we don't.

6   Q.   What do you mean, "yes, but we don't"?

7   A.   As in whenever you post an ad, people supposed to put their

8   right age, but we never put our right age.

9   Q.   Looking at the first photograph in this ad, do you know who

10  that is?

11  A.   Yes.

12  Q.   Who is it?

13  A.   IF.

14  Q.   What's the date on this ad?

15  A.   March 15 -- March 16.

16  Q.   Of what year?

17  A.   2015.

18        MS. LAKE:   If we can -- thank you.  Ms. Geier, if we

19  can turn to the second page.

20  Q.   I'm looking at the second photograph.  Do you know who that

21  is?

22  A.   Yes.

23  Q.   Who is that?

24  A.   IF.

25        MS. LAKE:   Can we turn to the next page, please.

HBMHALM1                          Jose - Direct

1    Q.   Who is that?

2    A.   Maria.

3         MS. LAKE:  Can we turn to the next page, please.

4    Q.   Looking at the text of the ad, what is a Spanish *mamis*?

5    A.   Spanish *mamis* is like a Spanish woman.

6    Q.   Do you recognize that language?

7    A.   Yes.

8    Q.   How do you recognize it?

9    A.   'Cause that's how Soly used to post.

10   Q.   What is an in call?

11   A.   "In call" is when the client comes to your house.

12   Q.   And what's an out call?

13   A.   "Out call" is when you go to the client's house.

14   Q.   What is the phone number that's listed in this ad?

15   A.   347-982-1528.

16   Q.   Do you recognize that phone number?

17   A.   Yes.

18   Q.   How do you recognize it?

19   A.   During the ad I used to -- that's Soly's number to post.

20   Q.   Whose phone did that phone number belong to?

21   A.   Soly.

22   Q.   What is a *flaca y gorditas.*

23   A.   *Flaca* is skinny and *gorditas* is chubby or like heavyweight.

24   Q.   And directing your attention to the location 211 West 145th

25   Street, are you familiar with that address?

1    A.  Yes.

2    Q.  Who lived there?

3    A.  Soly's mother.

4          MS. LAKE:  Can we zoom out of this, please, Ms. Geier.

5    Q.  Focusing in on the email, hulknsoly@gmail.com, who is Hulk?

6    A.  Hulk is Soly's ex-boyfriend.

7    Q.  Did he go by any other names?

8    A.  HD.

9    Q.  Do you know who posted this ad?

10   A.  By the name of the ad, I'll be -- I'll think it's Soly

11   because Spanish *mamis*.

12         MR. CECUTTI:  Objection, your Honor.

13         THE COURT:  All right.  Sustained.

14         Could you pause a little more often.  Thank you.

15         MS. LAKE:  Yes, your Honor.

16         Ms. Geier, can you please take down this exhibit and

17   show the witness what has been marked for identification as

18   Government Exhibit 901M.

19   Q.  Ms. Jose, do you recognize this?

20   A.  Yes.

21   Q.  What is it?

22   A.  An ad on Backpage.

23   Q.  Are you familiar with this ad?

24   A.  Yes.

25   Q.  Is it an ad for the prostitution business that we've been

1    discussing?

2    A.  Yes.

3           MS. LAKE:  Your Honor, the government moves to admit

4    Government Exhibit 901M.

5           MR. CECUTTI:  No objection.

6           THE COURT:  Government Exhibit 901M is received

7    without objection.

8           (Government's Exhibit 901M received in evidence)

9           MS. LAKE:  Ms. Geier, can you please publish this

10   exhibit.

11   BY MS. LAKE:

12   Q.  Ms. Jose, do you know who's depicted in the first

13   photograph here?

14   A.  IF.

15   Q.  How do you know?

16   A.  Due to the picture, how she was taking it.

17          MS. LAKE:  Ms. Geier, could you turn to the second

18   page of the ad.

19   Q.  And what about this photo?

20   A.  IF.

21   Q.  And can we please turn to the next --

22          THE COURT:  I'm not sure that was displayed correctly.

23          MS. LAKE:  Ms. Geier, is this page 2?  I think we're

24   on page 2.

25          THE COURT:  OK.

HBMHALM1                           Jose - Direct

1              MS. LAKE:  Can we please turn to the next page of

2     Government Exhibit 901M.

3     Q.  Who is this?

4     A.  Me.

5     Q.  And turning to the next page?

6     A.  Me again.

7     Q.  And where was this?

8     A.  Clinton Avenue.

9              MS. LAKE:  Ms. Geier, can you please zoom in on the

10    text of the ad.

11    Q.  What is the phone number associated with this ad?

12    A.  Soly's cell phone number.

13    Q.  What is the address associated with this ad?

14    A.  1329 Clinton Avenue.

15    Q.  Whose address is that?

16    A.  Daniela's.

17             MS. LAKE:  Ms. Geier, you can take down Government

18    Exhibit 901M.

19    Q.  Now, you testified before that there were times that you

20    posted to Backpage.  When you posted, whose photographs would

21    you use?

22    A.  When I posted, the photographs that I'll use are fake

23    photographs that I'll get off Google or social media.

24    Q.  When Soly posted to Backpage, whose photographs did she

25    use?

1   A.  At that given point, I was thinking she was only posting

2   fake pictures as in Google or social media as well.

3   Q.  Now do you have a different understanding?

4   A.  Yes.

5   Q.  What is the understanding?

6   A.  That she'll post her sister's pictures, and she posted my

7   pictures as well.

8   Q.  How would clients respond to an advertisement on Backpage?

9   A.  The number that's posted on the ad.

10  Q.  In the time you worked with Soly, approximately how many

11  different phones did you see used to take calls from clients?

12  A.  Two phones.

13  Q.  Whose phones were they?

14  A.  Well, when a phone would break, she'll buy another phone.

15  So they both -- both was her phones.

16  Q.  Who generally had the phone?

17  A.  I did.

18  Q.  When a client called, who answered the phone?

19  A.  I did.

20  Q.  What did you discuss with the client when a client called?

21  A.  What he was looking for, as in half-hour or an hour; what

22  he was interested in, as in a skinny girl or a big girl; and

23  how he would get there, as in instructions as in getting to the

24  place.

25              (Continued on next page)

1   BY MS. LAKE:

2   Q.  And so what if any instructions would you give to the

3   client?

4   A.  Let's see.  If I was posted at 145th Street in Harlem,

5   getting directions in getting to Harlem.

6   Q.  And when a client arrived at the general area, what would

7   happen?

8   A.  I would -- every time the client would get to around the

9   area, I'll tell them to call me once they're in front of the

10  building, so I could direct them to the apartment.

11  Q.  And what happened once a client arrived in the apartment?

12  A.  He will pick the person he wants to go on a date with.

13  Q.  And what happened after the client chose the date?

14  A.  The client will give the person that he wants to go on a

15  date with the money, and from there, whoever is going on a date

16  with the person would take their part and give Soly the rest.

17  Q.  Did girls taking dates use condoms?

18  A.  Yes.

19  Q.  Who supplied the condoms?

20  A.  Soly.

21  Q.  And when would the money change hands between the client

22  and the girl who was going to take the date?

23  A.  The beginning of the date.

24  Q.  And when would money change hands between the girl taking

25  the date and Soly?

Hbm1alm2                    Jose - Direct

1    A.  It all depends.  It could have happened -- it happened

2    sometimes in the -- before the date started or when the date

3    was over, we would sit there and give Soly the part.

4    Q.  And how much was her cut?

5    A.  Depending on whether the date was -- how long the date

6    lasted.

7    Q.  So what if the date was half an hour?

8    A.  If the date was half an hour, we just give Soly $20.  If

9    the date was an hour, we give Soly $40.

10   Q.  And how much would the girl taking the date get if it was

11   half an hour?

12            MR. CECUTTI:  Objection, your Honor, as to form.

13            THE COURT:  Sustained.  "Would."

14   Q.  How much did girls taking the date get, if they took a

15   half-hour date?

16   A.  Forty dollars.

17            MR. CECUTTI:  Objection, your Honor, as to form of the

18   question.

19            THE COURT:  Could I hear the question again.

20   Q.  It was:  How much did a girl who took a half-hour date get

21   from the client?

22            THE COURT:  Is the objection to overbreadth?

23            MR. CECUTTI:  I actually think that that question was

24   worded correctly.

25            THE COURT:  Okay.  Thank you.

1   A.  If it's a half hour, the girl would take $40.

2   Q.  And what if it was an hour?

3   A.  A hundred ten.

4   Q.  Was Soly always at the location where the clients came at

5   the time that they arrived?

6   A.  Sometimes.

7   Q.  If she wasn't there, how would she get her cut?

8   A.  Through me.

9   Q.  Did you always give Soly her cut?

10  A.  Yes.

11  Q.  Why?

12  A.  Because it was her money.

13  Q.  Why was it her money?

14  A.  Because I was taught that that was her money.

15  Q.  Who taught you that?

16  A.  Soly did.  Soly said, if I'm bringing clients in, when a

17  client comes, I have to get a part.  So that was always the

18  rule to me.

19  Q.  Did you ever see anyone else take a cut?

20  A.  No.

21  Q.  If you know, what did Soly spend the money she was making

22  on?

23  A.  On living, actually, like drugs or keeping herself going,

24  as in like doing her hair or doing her nails, she would spend

25  it on her boyfriend.

Hbm1alm2                    Jose - Direct

1   Q.  You mentioned working out of 1329 Clinton Avenue.  What was

2   at that location?

3   A.  Daniela's house.

4   Q.  Showing you what's been marked for identification as

5   Government Exhibit 217.  Do you recognize this?

6   A.  Yes.

7   Q.  What is it?

8   A.  A map with Daniela's, the address.

9   Q.  Does this fairly and accurately depict the area of

10  Daniela's?

11  A.  Yes.

12          MS. LAKE:  Your Honor, the government moves to admit

13  Government Exhibit 217.

14          MR. CECUTTI:  No objection.

15          THE COURT:  Government Exhibit 217 is received without

16  objection.

17          (Government's Exhibit 217 received in evidence)

18          MS. LAKE:  Ms. Geier, can you please publish this.

19  BY MS. LAKE:

20  Q.  And where specifically on this map, for the jury, is

21  Daniela's?

22          MS. LAKE:  Note for the record that the witness has

23  indicated on the screen the area marked 1329 Clinton Avenue.

24          Ms. Geier, you can take this down.

25          And can you please show the witness what has been

1    marked Government Exhibit 219.

2    BY MS. LAKE:

3    Q.  Do you recognize this, Ms. Jose?

4    A.  Yes.

5    Q.  What is it?

6    A.  A picture of Daniela's building.

7    Q.  Does this fairly and accurately depict Daniela's apartment

8    building?

9    A.  Yes.

10          MS. LAKE:  Your Honor, the government offers

11   Government Exhibit 219.

12          MR. CECUTTI:  No objection.

13          THE COURT:  Government Exhibit 219 is received without

14   objection.

15          (Government's Exhibit 219 received in evidence)

16          MS. LAKE:  Ms. Geier, can you please publish

17   Government Exhibit 219.

18   BY MS. LAKE:

19   Q.  Now approximately when did you work out of Daniela's

20   apartment?

21   A.  Approximately February 2015.

22   Q.  Why did you start working out of that apartment?

23   A.  Because Maria's house got hot.

24   Q.  When you say got hot, what does that mean?

25   A.  As in like the -- the police arrived, to her house.

Hbm1alm2                         Jose - Direct

1   Q.  And which house was that that you're referring to?

2   A.  211 West.

3   Q.  Was that West 145th Street?

4   A.  Correct.

5   Q.  Were you there when the police arrived?

6   A.  Yes.

7   Q.  And what happened when they got there?

8   A.  When the police got there, the police said, If you don't

9   live here, please get out, and I did what I was told.

10  Q.  Did you have an understanding of why people who didn't live

11  there weren't supposed to be there?

12  A.  Yes.

13  Q.  And who told you the reason?

14  A.  The police.

15  Q.  What did they tell you?

16  A.  That if you don't live there, to get out, 'cause this is a

17  shelter building.

18  Q.  So in the time you worked out of Daniela's apartment, who

19  else worked there?

20  A.  Me, Daniela, Maribel at times, IF at times.

21  Q.  Did Soly work out of Daniela's apartment?

22  A.  No.

23  Q.  Who, if anyone, got a cut of the money that girls made

24  working as prostitutes at Daniela's apartment?

25  A.  Soly did.

Hbm1alm2                    Jose - Direct

1              MS. LAKE:  Your Honor, can I just have one moment.

2              THE COURT:  Yes.

3              MS. LAKE:  Thank you.

4              Ms. Geier, you can take down Government Exhibit 219.

5    Q.  You also mentioned working out of 1408 Webster Avenue.

6    Approximately when did you start working out of 1408 Webster

7    Avenue?

8    A.  Ending of February.

9    Q.  Of what year?

10   A.  2015.

11   Q.  I'm showing you what has been marked as Government

12   Exhibit 220.

13             Do you recognize this?

14   A.  Yes.

15   Q.  What is this?

16   A.  A map with 1408 Webster Avenue.

17   Q.  Does this fairly and accurately depict the location of 1408

18   Webster Avenue?

19   A.  Yes.

20             MS. LAKE:  The government moves to admit Government

21   Exhibit 220 to the extent it's not already in evidence, which I

22   realize it may be.

23             MR. CECUTTI:  Your Honor, it's already in evidence.

24             THE COURT:  Okay.  If it were not, I would admit it.

25             MS. LAKE:  Ms. Geier, can you please publish

Hbm1alm2                        Jose - Direct

1   Government Exhibit 220.

2   BY MS. LAKE:

3   Q.  Can you just describe where on the map 1408 Webster Avenue

4   is located.

5              Thank you.

6              MS. LAKE:  Note for the record that the witness has

7   indicated the red lettering that reads "1408 Webster Avenue."

8              THE COURT:  Yes.

9              MS. LAKE:  Ms. Geier, can you take down Government

10  Exhibit 220 and please publish what is in evidence as

11  Government Exhibit 223.

12  BY MS. LAKE:

13  Q.  Ms. Jose, do you recognize this building?

14  A.  Yes.

15  Q.  What is it?

16  A.  1408 Webster Avenue.

17  Q.  What kind of building was this?

18  A.  A project building.

19  Q.  Where in 1408 Webster Avenue did you work?

20  A.  19G.

21  Q.  Whose apartment was that?

22  A.  Daniela's and Soly.

23  Q.  I'm showing you what has been marked for identification as

24  Government Exhibit 503.  Do you recognize this?

25  A.  Yes.

Hbm1alm2                          Jose - Direct

1    Q.  What is this?

2    A.  Darleny.

3    Q.  Does this fairly and accurately depict Darleny?

4    A.  Yes.

5              MS. LAKE:  Government offers Government Exhibit 503.

6              MR. CECUTTI:  No objection.

7              THE COURT:  Government Exhibit 503 is received without

8    objection.

9              (Government's Exhibit 503 received in evidence)

10             MS. LAKE:  Ms. Geier, can you please publish

11   Government Exhibit 503.

12   BY MS. LAKE:

13   Q.  What, if any other names, did Darlene go by?

14   A.  La Rana.

15   Q.  Who lived in Apartment 19G?

16   A.  Darlene, her kids, and Soly.

17   Q.  How many kids did Darlene have?

18   A.  Three.

19   Q.  Were they boys or girls?

20   A.  Boys.

21   Q.  Approximately how old were they?

22   A.  From ages 6 to 9.

23   Q.  And if you know, where did Soly live before she moved into

24   Apartment 19G?

25   A.  She was in a halfway house.

1   Q.  Where was that?

2   A.  In Brooklyn, to be exact.

3   Q.  Do you know what rules the halfway house had?

4   A.  I know they had curfew.

5   Q.  How do you know about the rules?

6   A.  'Cause Soly used to have to go home at a certain time.

7   Q.  Did she tell you that?

8   A.  Yes.

9   Q.  And what time did she have to go home?

10  A.  By 12:00.

11  Q.  Did she explain why she was able to stay out until 12:00?

12          MR. CECUTTI:  Objection, your Honor.  Hearsay.

13          THE COURT:  I'll sustain.

14  Q.  Who explained to you the rules of the halfway house?

15  A.  Soly told me that she has to be home by 12:00.

16          MR. CECUTTI:  Objection, your Honor.

17          THE COURT:  I'll permit it.

18  Q.  And did she explain to you why she was allowed to stay out

19  until 12:00?

20  A.  Because she had a paperwork that she was working.

21  Q.  Was she working?

22  A.  No.

23  Q.  And when did Soly move out of the halfway house, if you

24  know?

25  A.  In February.

Hbm1alm2                    Jose - Direct

1   Q.  Did she tell you why she left the halfway house?

2   A.  Because one night she just didn't get back.  She missed her

3   curfew and stood in 1408.

4   Q.  Now returning to Apartment 19G, can you describe the

5   general layout of that apartment.

6   A.  When you walk in, the first thing that's on the right is

7   the kitchen; going forward, it's the long hallway; and on the

8   right side again is the living room; now going down the living

9   room, it's Darlene's room; the bathroom's on the left side;

10  there's a closet; and going straight down is Soly's room; and

11  next to Soly's room is Darlene's kids' room.

12  Q.  What, if anything, did Soly tell you about the arrangement

13  she had with Darlene to stay in 19G?

14  A.  She was paying for a bedroom.

15  Q.  And at this time how many days per week did you spend at

16  Apartment 19G?

17  A.  Four to five days a week.

18  Q.  And how many nights per week did you spend at 19G?

19  A.  Four to five nights.

20  Q.  Where did you sleep?

21  A.  In the living room.

22  Q.  After Soly moved into Apartment 19G, what did you see her

23  do there?

24  A.  She'll post on Backpage there.

25  Q.  What did you do there?

Hbm1alm2                         Jose - Direct

1   A.  I'll take calls, I'll do dates, and I'll stay there.

2   Q.  When you say do dates, what do you mean?

3   A.  As in when a client comes and I was chosen, I'll do a date.

4   Q.  Now I'm showing you what has been marked for identification

5   as Government Exhibit 810B.  Do you recognize this?

6   A.  Yes.

7   Q.  What is it?

8   A.  A Facebook conversation.

9   Q.  Who is it between?

10  A.  Me and IF.

11  Q.  What's the date of these messages?

12  A.  March 15, 2015.

13  Q.  I believe it's 5/15.  Is that May 15?

14  A.  Yes, May.  My bad.

15  Q.  Generally speaking, what were you discussing?

16  A.  Getting ready to go to Soly's house.

17          MS. LAKE:  Your Honor, the government moves to admit

18  Government Exhibit 810B.

19          MR. CECUTTI:  No objection.

20          THE COURT:  Government Exhibit 810B is received

21  without objection.

22          (Government's Exhibit 801B received in evidence)

23          MS. LAKE:  Ms. Geier, can you please publish this

24  exhibit.

25          Can you please zoom in on the bottom portion of the

Hbm1alm2                         Jose - Direct

1    page, the last full message that you see.

2    BY MS. LAKE:

3    Q.  Now, Ms. José, when IF said, can you go into Soly's crib,

4    do you have an understanding of what she was referring to when

5    she said Soly's crib?

6    A.  Yes.

7    Q.  What was that?

8    A.  To work.

9    Q.  What location was that?

10   A.  1408 Webster.

11   Q.  What apartment?

12   A.  19G.

13   Q.  Generally speaking, how did you refer to 19G?

14   A.  Soly's house.

15   Q.  I'm showing you what has been marked for identification as

16   Government Exhibit 810E.  Do you recognize this?

17   A.  Yes.

18   Q.  What is it?

19   A.  A conversation that I'm having with IF.

20   Q.  And when did this conversation take place?

21   A.  June 20th.

22   Q.  And generally speaking, what were you discussing?

23   A.  Me and IF were talking about as in to who was there at

24   Soly's house and what was we doing, as in like are we chilling

25   or what's going on.

1           MS. LAKE:  Your Honor, the government moves to admit

2     Government Exhibit 810E.

3           MR. CECUTTI:  No objection.

4           THE COURT:  Government Exhibit 810E is received

5     without objection.

6           (Government's Exhibit 810E received in evidence)

7           MS. LAKE:  Ms. Geier, can you please publish the

8     exhibit.

9     BY MS. LAKE:

10    Q.  Focusing on the third message, IF said, "I'm in Soly's

11    crib."  Do you know what location she was referring to?

12    A.  1408 Webster.

13    Q.  What apartment?

14    A.  19G.

15    Q.  And who was in Soly's crib?

16    A.  Daniela, Soly, Ari, Bibi, Darlene, and her kids.

17    Q.  Thank you.  I'd like to show you what's been marked for

18    identification as Government Exhibit 810F.  Do you recognize

19    this?

20    A.  Yes.

21    Q.  What is it?

22    A.  A conversation with me and IF.

23    Q.  And when did this conversation take place?

24    A.  June 27th.

25    Q.  And generally speaking, what were you discussing?

Hbm1alm2                          Jose - Direct

```
 1   A.  We were talking about going on our way to Soly's, as in
 2   meeting up and going to Soly's house.
 3           MS. LAKE:  Your Honor, the government moves to admit
 4   Government Exhibit 810F.
 5           MR. CECUTTI:  No objection.
 6           THE COURT:  Government Exhibit 810F is received
 7   without objection.
 8           (Government's Exhibit 810F received in evidence)
 9           MS. LAKE:  Ms. Geier, can you please publish this
10   exhibit and zoom in on the message in the middle.  That one.
11   Thank you.
12   BY MS. LAKE:
13   Q.  Now when IF said, "I'm working with my moms right now," do
14   you know who she was referring to as "my moms"?
15   A.  Her mother Maria.
16   Q.  And what did she mean by "I'm working with" her?
17   A.  As in prostituting herself.
18   Q.  And when she talked about going to Soly's, what location
19   was she referring to?
20   A.  1408 Webster.
21   Q.  What apartment?
22   A.  19G.
23   Q.  And do you recall what was going on at Soly's at that time?
24   A.  We used to work there as well.
25           MS. LAKE:  Ms. Geier, you can take down this exhibit.
```

Hbm1alm2                    Jose - Direct

1    Q.  Why did you refer to Apartment 19G as Soly's and not as

2    Darleny's?

3    A.  Because we was basically there for Soly more.

4    Q.  Who, if anyone, engaged in prostitution out of Apartment

5    19G in the time that you spent there?

6    A.  Myself, Daniela, Ari, Theiya, Nikki, IF, Bibi at times,

7    Darleny at times.  Maria at times.

8    Q.  Did Soly?

9    A.  Soly never really took dates.

10   Q.  Ever, or just at 19G?

11   A.  No, she would take dates but not all the time.

12   Q.  Now you mentioned Ari.  Who is Ari?

13   A.  Some girl I met off IF.

14   Q.  Where did you first meet Ari?

15   A.  In 19G.

16   Q.  Approximately when was that?

17   A.  2015.

18   Q.  Do you remember around the time of year?

19   A.  Summertime.

20          MS. LAKE:  Ms. Geier, can you please publish

21   Government Exhibit 513, which is in evidence.

22   Q.  Who is this, Ms. José?

23   A.  Ari.

24   Q.  How old was Ari when you met her?

25   A.  Seventeen.

Hbm1alm2                          Jose - Direct

1   Q.  You said you met her through IF.  How old was IF at that

2   time?

3   A.  Fourteen.

4   Q.  After you met her, where did Ari sleep?

5   A.  In the living room of 19G.

6   Q.  Do you know who, if anyone, told her she could live in 19G?

7   A.  Soly did.

8   Q.  How do you know that?

9   A.  Because Soly told me that she could live there, as long as

10  she worked.

11  Q.  When you say as long as she worked, what do you mean?

12  A.  As in prostituting.

13  Q.  What, if anything, did you hear Ari call Soly in the time

14  that Ari lived in Apartment 19G?

15  A.  Ma.

16  Q.  Now you also mentioned Theiya.  Who is Theiya?

17  A.  A girl I met off Ari.

18  Q.  And where did you meet her?

19  A.  In 19G.

20        MS. LAKE:  Ms. Geier, can you please publish

21  Government Exhibit 506, which is in evidence.

22  Q.  Who is this?

23  A.  Theiya.

24  Q.  How old was Theiya when you met her?

25  A.  Twenty years old.

Hbm1alm2                         Jose - Direct

1           MS. LAKE:  Ms. Geier, you can take this down.

2      Q.   You mentioned Nikki.  Who is Nikki?

3      A.   A girl I met off Ari.

4      Q.   Where did you meet Nikki?

5      A.   In 19G.

6      Q.   Approximately when was that?

7      A.   Approximately June 2015.

8      Q.   And what did Nikki do in Apartment 19G?

9      A.   She worked there.

10     Q.   How old was she?

11     A.   Sixteen.

12     Q.   Who posted to Backpage for Apartment 19G?

13     A.   Soly.

14     Q.   Anybody else?

15     A.   Ari, Theiya.

16     Q.   Did you post to Backpage for Apartment 19G?

17     A.   Not that I recall.

18     Q.   Where in the apartment would dates happen?

19     A.   In the living room and in the bathroom.

20     Q.   During what times of day did dates come to Apartment 19G?

21     A.   All times of day.

22     Q.   Generally speaking, what were the ages of the clients who

23     came?

24     A.   Twenty to late 40s.

25     Q.   What, if any, rules were there for prostituting in

Hbm1alm2                          Jose - Direct

1   Apartment 19G?

2   A.  We couldn't give our personal numbers.

3   Q.  Couldn't give them to whom?

4   A.  To the clients.

5   Q.  Who told you that rule?

6   A.  Soly told me that.

7   Q.  Did everybody follow that rule?

8   A.  No.

9   Q.  Did you follow that rule?

10  A.  No.

11  Q.  Why not?

12  A.  Because I felt like if I was doing the date, why -- I can

13  just take the client's number and do out calls and keep the

14  money for myself.

15  Q.  So what would it mean or what did it mean for you if you

16  gave a client your phone number?

17  A.  That means that if the client would want to reach out to me

18  again, they'll reach out to me with my number, and not -- they

19  didn't have to reach out to me through Soly.

20  Q.  Did you ever see any of the other girls work without Soly

21  knowing?

22  A.  Yes.

23  Q.  Who?

24  A.  IF, Daniela, Ari, Theiya, myself.

25  Q.  I'm showing you what has been marked for identification as

Hbm1alm2                        Jose - Direct

1   Government Exhibit 810C.

2             MS. LAKE:  Can we turn to the second page, or pull up

3   both page 1 and 2 alongside each other.  Thank you very much,

4   Ms. Geier.

5   Q.  Ms. José, what is this?

6   A.  A picture that was taken.

7   Q.  And where is it located?

8   A.  In Facebook.

9   Q.  And is this a Facebook message?

10  A.  Yes.

11  Q.  Who sent it?

12  A.  I sent it.

13  Q.  Who did you send it to?

14  A.  To Ari.

15            MS. LAKE:  Your Honor, the government offers

16  Government Exhibit 810C.

17            MR. CECUTTI:  No objection.

18            THE COURT:  Government Exhibit 810C is received

19  without objection.

20            (Government's Exhibit 810C received in evidence)

21            MS. LAKE:  Ms. Geier, can you please publish this

22  exhibit.

23  BY MS. LAKE:

24  Q.  What was Ari's Facebook name at the time?

25  A.  Skylin Bando.

Hbm1alm2                        Jose - Direct

1   Q.  What was yours?

2   A.  GabrieLa Vuitton.

3   Q.  What's the date of this message?

4   A.  July 12.

5   Q.  And focusing on the photograph, who is depicted in the

6   photograph?

7   A.  Ari, and Soly's in the background.

8   Q.  Who, if you know, took the photograph?

9   A.  I did.

10  Q.  Where did you take the photograph?

11  A.  In Soly's bedroom.

12  Q.  Where was Soly's bedroom?

13  A.  In 19G.

14  Q.  And what happened before you took this photograph?

15  A.  We did tattoos, we got tattoos.

16  Q.  Who got tattoos?

17  A.  Me, Ari, and Soly.

18  Q.  And where were you when you got the tattoos?

19  A.  In the kitchen.

20  Q.  Who gave you the tattoos?

21  A.  A guy, a random guy there.

22  Q.  What tattoo did Soly get?

23  A.  A cupcake, and a gun to cover up Judy's name.

24          MR. CECUTTI:  Objection, your Honor.

25          THE COURT:  To the purpose?

1             MR. CECUTTI:  Your Honor, could we have a sidebar?

2             THE COURT:  Yes.

3             (At the sidebar)

4             MR. CECUTTI:  Your Honor, I'm objecting under 401,

5     relevance.  I don't see the relevance of any of these

6     questions.  Secondly --

7             THE COURT:  When you say any of these, how far back

8     does it go?

9             MR. CECUTTI:  I'm sorry.  The past few questions

10    relating to the tattooing specifically.

11            THE COURT:  Okay.

12            MR. CECUTTI:  And I'm also objecting under 401 and 403

13    to the witness' answer referring to a firearm.

14            THE COURT:  On what ground on the firearm?

15            MR. CECUTTI:  401 and 403.

16            MS. LAKE:  The purpose of the question is simply

17    because there were photographs of the defendant where you can

18    very clearly see a tattoo that says "Judy" on her arm, and

19    there are later photographs of the defendant where the tattoo

20    is different.  We're simply trying to elicit information about

21    what the tattoo was and that it changed.  We don't need to get

22    into what it changed into if you want to strike the information

23    about the gun from the record.

24            MR. CECUTTI:  Yes.  I believe that that should be

25    stricken from the record.  Other testimony regarding changing

Hbm1alm2                              Jose - Direct

1    of tattoos is one thing, but eliciting testimony related to a

2    firearm is highly prejudicial.

3              THE COURT:  I will strike it.  I will tell the jurors

4    not to consider that.

5              MR. CECUTTI:  Thank you.

6                  (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hbm1alm2                         Jose - Direct

1              (In open court)

2              THE COURT:  I am striking from the record the word

3     "gun," and the jurors should not consider the reference to a

4     gun.

5              You may continue.

6     BY MS. LAKE:

7     Q.  Ms. José, without discussing the replacement tattoo, what

8     tattoo did Soly originally have on her arm?

9     A.  Judy's name.

10    Q.  Who is Judy?

11    A.  Her ex-wife.

12    Q.  Do you recall how long after you took this photograph that

13    you sent it to Ari on Facebook?

14    A.  I don't recall.

15             MS. LAKE:  Ms. Geier, you can take down this exhibit.

16    Q.  Switching gears, I want to direct your attention to late

17    June 2015.  Where, if anywhere, did you go around that time?

18    A.  We took a trip to Allentown, PA.

19    Q.  Who did you go with?

20    A.  Me, Ari, Nikki, Soly, and her boyfriend.

21    Q.  Whose boyfriend?

22    A.  Soly's boyfriend.

23    Q.  Who was that?

24    A.  HD.

25    Q.  What did Soly call HD?

Hbm1alm2                          Jose - Direct

1   A.  Carl.

2   Q.  Who first mentioned the trip to you?

3   A.  Soly.

4   Q.  Did she tell you whose idea the trip was?

5   A.  It was her idea to spend time with her family and make some

6   money over there.

7   Q.  And how were you going to make money?

8   A.  As in posting to Backpage.

9   Q.  How did you get to Pennsylvania?

10  A.  Through Soly's cousin.  She drove us over there.

11  Q.  How long did you stay there?

12  A.  Approximately a week.

13  Q.  While you were in Pennsylvania, what did you do?

14  A.  Posted to Backpage.

15  Q.  Who posted to Backpage?

16  A.  Myself, Ari, Soly, Nikki.

17  Q.  So what was your role during the trip?

18  A.  I would take clients and I'll pick up the phone.

19  Q.  What was HD's role?

20  A.  Nothing.

21  Q.  What was Soly's role?

22  A.  Nothing.

23  Q.  Did Soly take dates?

24  A.  No.

25  Q.  What was Ari's role?

Hbm1alm2                    Jose - Direct

1    A.  The same one as mine's, to take clients.

2    Q.  What about Nikki?

3    A.  The same.

4    Q.  I'm showing you what has been marked for identification as

5    Government Exhibit 901H.

6              Do you recognize this?

7    A.  Yes.

8    Q.  What is it?

9    A.  It's the ad on Backpage.

10   Q.  Are you familiar with this ad?

11   A.  Yes.

12   Q.  Is it an ad for the prostitution business that we've been

13   discussing?

14   A.  Yes.

15             MS. LAKE:  The government moves to admit Government

16   Exhibit 901H.

17             MR. CECUTTI:  No objection.

18             THE COURT:  Government Exhibit 901H is received

19   without objection.

20             (Government's Exhibit 901H received in evidence)

21             MS. LAKE:  Ms. Geier, can you please publish

22   Government Exhibit 901H.

23   BY MS. LAKE:

24   Q.  Focusing on the text of this ad, who is Emily?

25   A.  Emily's a girl that we'll use to refer to any one of us.

Hbm1alm2                          Jose - Direct

1    It was not -- it was really nobody's name.

2    Q.  Was it a real person?

3    A.  No.

4    Q.  Who made up the name Emily?

5    A.  Maribel.

6    Q.  Who is Soso?

7    A.  Soly.

8    Q.  Who, if you know, is depicted in the first photograph in

9    this ad?

10   A.  Ari.

11          MS. LAKE:  Ms. Geier, can you turn to page 2.

12   Q.  And do you know who this is in the continuation of the

13   photograph on page 2?

14   A.  Yes.  It's Ari.

15          MS. LAKE:  Ms. Geier, can you turn to page 3.

16   Q.  Do you recognize this photograph?

17   A.  No.

18   Q.  Is that anybody you know?

19   A.  No.

20          MS. LAKE:  Ms. Geier, can you turn to the next page.

21   Q.  Do you recognize the person in the top photograph?

22   A.  No.

23   Q.  If you know, is that a real person?

24   A.  No.

25   Q.  Who's the person in the second photograph?

1   A.  Ari.

2   Q.  How can you tell that's Ari?

3   A.  'Cause I know what Ari looks like.

4           MS. LAKE:  Ms. Geier, can you turn to the next page.

5   Q.  And who is the individual in the bottom photograph?

6   A.  Nikki.

7   Q.  How do you know that's Nikki?

8   A.  'Cause I know how Nikki looks like.

9           MS. LAKE:  Ms. Geier, can you turn to the next page.

10  Q.  Now directing your attention to the text of the ad, do you

11  recognize the phone number that's posted in this ad?

12  A.  Yes.

13  Q.  Whose phone number is that?

14  A.  Soly's cellphone number.

15  Q.  Do you see where it says "Dominican del Bronx"?

16  A.  Yes.

17  Q.  What does that mean?

18  A.  Dominican girls from the Bronx.

19  Q.  And directing your attention to where it says "Spanish

20  Mommies," do you see that?

21  A.  Yes.

22  Q.  Now directing your attention to the location, what was the

23  location posted for this ad?

24  A.  Soly's cousin's house.

25  Q.  And where was that?

Hbm1alm2                       Jose - Direct

1    A.  Sixth and Oak, Allentown.

2    Q.  Do you know with certainty who posted this ad?

3    A.  Come again?

4    Q.  Do you know who posted this ad to Backpage?

5    A.  Yes.

6    Q.  Who posted it?

7    A.  Soly.

8          MS. LAKE:  Ms. Geier, you can take down Government

9    Exhibit 901H, and can you please show the witness what has been

10   marked for identification as Government Exhibit 901I.

11   Q.  Do you recognize this?

12   A.  Yes.

13   Q.  What is this?

14   A.  A ad on Backpage.

15   Q.  Are you familiar with this ad?

16   A.  Yes.

17   Q.  Is it an ad for the prostitution business that we've been

18   discussing?

19   A.  Yes.

20         MS. LAKE:  Your Honor, the government moves to admit

21   Government Exhibit 901I.

22         MR. CECUTTI:  No objection.

23         THE COURT:  Government Exhibit 901I is received

24   without objection.

25         (Government's Exhibit 901I received in evidence)

1          MS. LAKE:  Ms. Geier, can you please publish

2     Government Exhibit 901I.

3     BY MS. LAKE:

4     Q.  Ms. José, what's the date on this ad?

5     A.  June 24th.

6     Q.  Of what year?

7     A.  2015.

8     Q.  Who, if you know, is depicted in the first photograph of

9     the ad?

10    A.  Ari.

11         MS. LAKE:  And can we turn to the second page.

12    Q.  Who is in the second photograph?

13    A.  Nikki.

14         MS. LAKE:  Ms. Geier, can you please turn to the next

15    page.

16    Q.  And who is in the middle photograph?

17    A.  Ari.

18         MS. LAKE:  Ms. Geier, can you turn to the fourth page,

19    please.

20    Q.  And who is that?

21    A.  Me.

22         MS. LAKE:  Ms. Geier, can you zoom in on the text of

23    the ad, please.

24    Q.  Now what does *"una flaca"* refer to?

25    A.  A skinny girl.

1    Q.  Does that refer to anybody in particular?

2    A.  Ari.

3    Q.  What about *"una gordita"*?

4    A.  A big girl.

5    Q.  Did that refer to anyone in particular?

6    A.  Me.

7    Q.  And how about *"una mediana"*?

8    A.  Nikki.

9    Q.  And do you recognize the phone number in this ad?

10   A.  Yes.

11   Q.  Whose phone number is that?

12   A.  Soly's phone number.

13   Q.  And what was the location of this ad?

14   A.  Sixth and Oak, Allentown.

15   Q.  And what was at Sixth and Oak in Allentown?

16   A.  Soly's cousin's house.

17           MS. LAKE:  Ms. Geier, can you please take this exhibit

18   down.

19   Q.  While you were in Pennsylvania, did anybody call in

20   response to the Backpage ad?

21   A.  Yes.

22   Q.  And did dates result from those calls?

23   A.  Yes.

24   Q.  Approximately how many dates were there?

25   A.  Ten to thirteen.

Hbm1alm2                        Jose - Direct

1    Q.   Who took the dates?

2    A.   Me, Ari, and Nikki.

3    Q.   Did you go on any out calls?

4    A.   Yes.

5    Q.   Who, if anyone, did you go with?

6    A.   Me and Ari.

7    Q.   Can you describe what happened on that out call.

8    A.   We did a two-girl special and we ended up robbing the

9    client.

10   Q.   Whose idea was it to rob the client?

11   A.   Me and Ari's.

12   Q.   What, if anything, did Ari say about the money she was

13   making on this trip?

14   A.   She started bragging about it.

15   Q.   Who did she brag to?

16   A.   To everyone.

17   Q.   And what, if anything, did Soly say in response to the

18   bragging?

19   A.   Soly and I just --

20             MR. CECUTTI:  Objection, your Honor.

21             THE COURT:  This is what this witness heard.

22             MR. CECUTTI:  Withdrawn.

23             THE COURT:  Okay.  You may reask the question.

24   Q.   What, if anything, did Soly say, that you heard, in

25   response to Ari's bragging?

1    A.  That she's bragging too much, and then me and her decided

2    to rob her.

3    Q.  You and who decided to rob who, just to be clear?

4    A.  Me and Soly decided to rob Ari.

5    Q.  So you agreed to rob Ari?

6    A.  Yes.

7    Q.  And what happened next?

8    A.  After that -- Ari used to leave her money in my bag, so we

9    took Ari -- so I took Ari's money and my money and I gave it to

10   Soly to hold.

11   Q.  And what was the plan you had with Soly?  What were you

12   going to do with the money?

13   A.  That when we would get back to New York, we'll split Ari's

14   half.

15   Q.  And what would happen with your money?

16   A.  I would get my money back from my bag and I'll take half of

17   So -- Ari's money and Soly would take the other half.

18   Q.  And what ultimately happened with that money?

19   A.  Soly ended up taking her money and mine's.

20   Q.  Did you confront her about that?

21   A.  Yes.

22   Q.  What did she say?

23   A.  She said that HD got in her bag and took a hundred dollars

24   and she didn't have enough money to get back, so she gave me a

25   percentage of a hundred something dollars and she told me that

Hbm1alm2                         Jose - Direct

1    she'll pay me back whenever she -- whenever she'll get the

2    money back.

3    Q.  After returning from Pennsylvania, did you continue working

4    with Soly out of Apartment 19G?

5    A.  No.

6    Q.  Why not?

7    A.  Because I felt some way about what happened.

8    Q.  What do you mean you felt some way?

9    A.  Because Nikki and Ari's friend thought I took the money and

10   she kept on antagonizing me, that I took the money, and I ended

11   up, yeah, I did take the money, and I gave it to Soly, and I

12   didn't even end up taking the money at all 'cause Soly ended up

13   keeping the money.

14   Q.  What, if anything, did you tell Soly about why you were

15   staying away from 19G?

16   A.  That I was pregnant.

17   Q.  Was that true?

18   A.  No.

19   Q.  Why did you say you were pregnant?

20   A.  Because I didn't want to be around Soly, you know, and none

21   of them at that time.

22   Q.  What, if anything, did you do for money while you were

23   staying away from Soly?

24   A.  I started prostituting by myself.

25   Q.  Did you ever work with anybody else in that time?

1    A.  Yes.

2    Q.  Who?

3    A.  Yaya.

4    Q.  Who's Yaya?

5    A.  A high school friend of mine.

6    Q.  How old was Yaya?

7    A.  Nineteen.

8    Q.  And when you say that you worked with her, what did that

9    mean?

10   A.  As in we both took dates but we kept the money to

11   ourselves.

12   Q.  Did there come a time when you and Soly made up?

13   A.  Yes.

14   Q.  What happened?

15   A.  We squashed it and we just kept it moving.

16   Q.  When you say "we squashed it," what does that mean?

17   A.  Like we let it go, as in we spoke about it and we let it

18   go.

19   Q.  Now I'm showing you what has been marked for identification

20   as Government Exhibit 810D.

21        MS. LAKE:  Ms. Geier, can you pull up the second page

22   alongside the first page.

23        Thank you.

24   Q.  Ms. José, do you recognize this?

25   A.  Yes.

Hbm1alm2                        Jose - Direct

1   Q.  What is it?

2   A.  A conversation with me and Ari.

3   Q.  And when did this conversation take place?

4   A.  July 14.

5   Q.  And generally speaking, what was the conversation about?

6   A.  About smoking weed.

7   Q.  Where?

8   A.  In Soly's house.

9          MS. LAKE:  Your Honor, the government offers

10  Government Exhibit 810D.

11         MR. CECUTTI:  No objection.

12         THE COURT:  Government Exhibit 810D is received

13  without objection.

14         (Government's Exhibit 810D received in evidence)

15         MS. LAKE:  Now, Ms. Geier, can you please publish the

16  exhibit and zoom in on the middle portion of the second page,

17  the message at 3:11.

18  BY MS. LAKE:

19  Q.  Ms. José, can you explain this message that Ari sent you

20  saying, "Soly said she got five on it, but if you want, wait

21  for me to get a pop."

22  A.  She was trying to say that Soly had a five on it, as in is

23  she willing to smoke weed, but if I wanted to wait for her to

24  get a pop, as in working and getting a client, so only me and

25  her could smoke.

1    Q.  Wait for who to get a pop?

2    A.  Ari to get a pop.

3    Q.  Where was Ari, if you know?

4    A.  In 1408.

5    Q.  What's a "pop"?

6    A.  A "pop" is when you do a date with a client.

7           MS. LAKE:  Ms. Geier, you can take this exhibit down.

8    Q.  Now switching gears, I'm going to show you what's been

9    marked for identification as Government Exhibit 216.

10          Do you recognize this?

11   A.  Yes.

12   Q.  What is it?

13   A.  James's house.

14   Q.  Does this fairly and accurately depict James' house?

15   A.  Yes.

16   Q.  What was James' house?

17   A.  Come again?

18   Q.  What happened at James' house?

19   A.  We used to -- well, not I, I didn't work there, but Ari,

20   Theiya, IF, and Bibi were staying there, working.

21          MS. LAKE:  Your Honor, the government offers

22   Government Exhibit 216.

23          MR. CECUTTI:  No objection.

24          THE COURT:  Government Exhibit 216 is received without

25   objection.

1          (Government's Exhibit 216 received in evidence)

2          MS. LAKE:  Ms. Geier, can you please publish this

3    exhibit.

4    BY MS. LAKE:

5    Q.  During what period of time did they work there?

6    A.  Summer 2015.

7    Q.  I'd like to show you what's been marked as Government

8    Exhibit 214.  What is this?

9    A.  A map with James' address.

10   Q.  Does this fairly and accurately depict the location of

11   James' house?

12   A.  Yes.

13          MS. LAKE:  Your Honor, the government offers

14   Government Exhibit 214.

15          MR. CECUTTI:  No objection.

16          THE COURT:  Government Exhibit 214 is received without

17   objection.

18          (Government's Exhibit 214 received in evidence)

19          MS. LAKE:  Ms. Geier, can you please publish

20   Government Exhibit 214.

21   BY MS. LAKE:

22   Q.  Ms. José, can you indicate on the screen the general

23   location of James' house.

24          And what was the -- what are the cross streets there?

25   A.  Walton and Grand Concourse.

Hbm1alm2                        Jose - Direct

1  Q.  And on what street is his house?

2  A.  169th.

3          MS. LAKE:  Ms. Geier, you can take this down.

4          Thank you.

5  Q.  Did there come a time when you went to James' house?

6  A.  Yes.

7  Q.  Approximately when was that?

8  A.  Summer 2015.

9  Q.  How many times did you go there?

10  A.  Three times.

11  Q.  Who was there the first time you went there?

12  A.  Ari, Theiya, IF, and Bibi, and James, and then Soly arrived

13  later on.

14  Q.  And what did you see them do at James' house?

15  A.  They'll work there.

16  Q.  And who, if anyone, explained why they were working out of

17  James' house?

18  A.  IF and Soly.

19  Q.  What did they tell you?

20  A.  That ACS came to Darleny's house and they was telling

21  Darleny that a complaint was filed that there was prostitution

22  going on in Darleny's house.

23  Q.  So what happened as a result of that issue with ACS?

24  A.  Darleny said she didn't want nobody working there anymore

25  because she wasn't gonna have her kids taken away from her.

Hbm1alm2                          Jose - Direct

1    Q.  What, if anything, did Soly tell you about the arrangement

2    she had with James?

3    A.  That the girls would work there, she'll give James a

4    percentage of what she'll get.

5    Q.  So who got paid for work at James' house?

6    A.  The person that's going on a date, Soly, and James.

7    Q.  What did you do when you went to that house?

8    A.  I just chilled with them.

9    Q.  Now at approximately the same time the business was working

10   out of James' house, did you learn about a girl who I'm going

11   to refer to with her initials as JF?

12   A.  Yes.

13   Q.  How did you learn about JF?

14   A.  My high school friend Yaya told me about JF, that she

15   needed -- that she wanted to work, so I had told Yaya to give

16   JF -- I told Yaya to give JF my number for her to reach out to

17   me.

18   Q.  And when Yaya said JF wanted to work, what did you

19   understand that to mean?

20   A.  As in prostituting.

21   Q.  So what happened after that conversation with Yaya?

22   A.  JF ended up hitting me up on iMessage that she wanted to

23   work and I told her okay.

24   Q.  What did you do then?

25   A.  Then I let Soly know that a girl wanted to work.

Hbm1alm2                         Jose - Direct

1    Q.   Why did you tell Soly?

2    A.   Because at that time I wasn't dealing with none of that

3    anymore.

4    Q.   Why did you tell Soly versus some other person?

5    A.   Because I know that that was what Soly and her sisters do.

6    Q.   And what did Soly say in response to your message?

7    A.   That she has to see the girl and that, okay.

8    Q.   So what happened next?

9    A.   After that two weeks passed and JF ended up hitting me up

10   again and she told me what was going on with the whole work

11   thing, so I let Soly know that JF hit me up again, and then she

12   just told me to give her the address where James -- where James

13   was at.

14   Q.   I'm sorry.  Who told you to give who the address where

15   James was?

16   A.   Soly told me to give -- Soly told me to give JF the address

17   so that -- where Ari, Theiya, and Bibi and IF were at, which

18   was James' house, and then I got -- I went over there that day

19   and I waited for JF to come.

20   Q.   And did JF come?

21   A.   Yes.

22   Q.   How do you know?

23   A.   Because I was there.

24   Q.   And what happened when JF arrived?

25   A.   I introduced her to Soly and everybody that was there.

Hbm1alm2                    Jose - Direct

1  Q.  And did you hear any conversation between JF and Soly?

2  A.  Soly asked JF if she knew what she was doing and JF said

3  yes and -- she knew, and then she told her how it worked as in

4  getting a pop and having to give her a percentage.

5  Q.  I'm sorry.  Who told JF how it worked?

6  A.  Soly told JF how the business worked, as in getting a pop,

7  and if she knew how to work, etc.

8  Q.  And what, if anything, did you hear Soly tell JF about the

9  money?

10  A.  As in when she got a pop, she would have to give Soly a

11  part and take the rest, and JF said okay.

12  Q.  And when you say a pop, what do you mean?

13  A.  A date.

14  Q.  And when you say a date, again, what do you mean?

15  A.  A date is when you have sexual exchange with a client,

16  which is a male, for money.

17  Q.  After that day did you ever see JF again?

18  A.  No.

19  Q.  Do you know how old JF was at that time?

20  A.  No.

21  Q.  Did you hear her tell anyone her age?

22  A.  Yes.

23  Q.  Who did you hear her tell?

24  A.  She told IF, Ari, and Theiya her age.

25  Q.  What did she say?

Hbm1alm2                         Jose - Direct

1    A.  That she was 14.

2    Q.  I'm showing you what has been marked for identification as

3    Government Exhibit 514.  Do you recognize this?

4    A.  Yes.

5    Q.  What is it?

6    A.  A picture of JF.

7    Q.  Does it fairly and accurately depict JF?

8    A.  Yes.

9           MS. LAKE:  Your Honor, the government moves to admit

10   Government Exhibit 514.

11          MR. CECUTTI:  No objection.

12          THE COURT:  Government Exhibit 514 is received without

13   objection.

14          (Government's Exhibit 514 received in evidence)

15          MS. LAKE:  Ms. Geier, can you please publish

16   Government Exhibit 514.

17          You can take it down.

18   BY MS. LAKE:

19   Q.  Ms. José, after this time, what, if anything, did you do

20   for money?

21   A.  I started a iPhone scam.

22   Q.  Approximately when was that?

23   A.  Ending 2015.

24   Q.  Had you been involved in this scam before?

25   A.  Yes.

Hbm1alm2                        Jose - Direct

1   Q.  Over what period of time from the first time you became

2   involved to the end were you involved in the iPhone scam?

3   A.  I started when I was 18, then I stopped, and then I started

4   doing iPhone scams again when I would hit 20 years old.

5   Q.  And in what different places did you participate in this

6   iPhone scam?

7   A.  Everywhere.

8   Q.  And how did it generally operate?

9   A.  I'll take people's -- I'll take people's social and their

10  credit and use it and buy iPhones with them.

11  Q.  Did you do this alone or with other people?

12  A.  With other people.

13  Q.  So during this time when you went back to the iPhone scam,

14  did you continue to speak with Soly?

15  A.  On and off, yes.

16  Q.  How often?

17  A.  Two, three times a month.

18  Q.  In the course of your conversations with Soly, what, if

19  anything, did she tell you about where the prostitution

20  business was operating out of?

21  A.  They started working in Daweezy's trap.

22  Q.  What's a trap?

23  A.  A trap is like an abandoned house.

24  Q.  What kind of things happen in a trap?

25  A.  Prostitution was going on, drugs was going on there, etc.

1   Q.  And do you know where Daweezy's trap was?

2   A.  No, but I overheard that it was on the 11th floor.

3   Q.  What building was it in?

4   A.  Nine –– 1408.

5   Q.  1408 what?

6   A.  Webster Ave.

7   Q.  And what, if anything, did Soly tell you about Daweezy's

8   role?

9   A.  That he was a bodyguard.

10  Q.  Did you learn anything else from Soly about what happened

11  in the prostitution business, after you left?

12  A.  No.

13  Q.  Did she tell you anything about what happened with respect

14  to Daweezy's trap?

15  A.  Yes.

16  Q.  What did she tell you?

17  A.  That a undercover came to Daweezy's trap and arrested

18  Theiya, Ari, and Daweezy.

19  Q.  Did she tell you where she was when that happened?

20  A.  She was outside.

21          MS. LAKE:  Your Honor, can I have one moment.

22          THE COURT:  Yes.

23          MS. LAKE:  Your Honor, now might be a convenient time

24  in the testimony to take our brief recess, if that's convenient

25  for the Court.

1              THE COURT:  That's fine.

2              So we will now take a half-hour break and we'll resume

3     at five minutes to 12.  Thank you.

4              I see that some of the jurors look a bit bundled up.

5     Is it cold?

6              THE JURORS:  Yes.

7              THE COURT:  We'll try to get the building to raise the

8     temperature.

9              (Jury not present)

10             THE COURT:  Please have a seat.

11             Does anyone want to raise anything?

12             MR. CECUTTI:  No, your Honor.

13             MS. LAKE:  No, your Honor.  Thank you.

14             THE COURT:  Okay.  I shall note for the record that

15    fairly early in our day I sent a little Post-it to Mr. Cecutti

16    noting for him that his client was shaking her head back and

17    forth as if to signal no, and the conduct ceased immediately.

18             Okay.  We're on a half-hour break.

19             (Luncheon recess)

20

21

22

23

24

25

HBMHALM3

                              AFTERNOON SESSION

                                  12:00 p.m.

           (In open court; jury not present)

           THE COURT:  I'm not sure that my staff knows what time
it is, so I think I'll have to ask someone else to -- here we
go.  My law clerk will bring the jury in.

           THE COURT:  Mr. Cecutti, if the government's exhibits
continue to come in so fast, maybe you don't need to stand up
to object.

           MR. CECUTTI:  That's fine, your Honor.

           THE COURT:  OK.  Not to object, tell me you don't
object.

           (Continued on next page)

 1          (Jury present)

 2          THE COURT:  Please have a seat.  I believe the

 3   building has turned up the temperature here, but I'm glad that

 4   you didn't count on it.

 5          OK.  We can continue.

 6   GABRIELY JOSE, resumed

 7   DIRECT EXAMINATION (Cont'd)

 8   BY MS. LAKE:

 9   Q.  Ms. Jose, we'll go on to another topic.  I want to go back

10   to Government Exhibit 901K which is in evidence.

11          Ms. Geier, would you pull up that exhibit.

12          Now, who's depicted in the first photograph here?

13   A.  IF.

14   Q.  And how can you tell that this is IF?

15   A.  The tattoo that's on her left bottom.

16          MS. LAKE:  Ms. Geier, you can take this down.

17   Q.  You testified previously about your trip to Pennsylvania.

18   When you went to Pennsylvania, who made money on that trip?

19   A.  Me, Ari, Nikki, and Soly.

20   Q.  How did Soly make money?

21   A.  Through the part that was given to her.

22   Q.  Thank you.

23          Now I want to switch gears and talk about your

24   cooperation agreement with the government.  As part of your

25   cooperation agreement, what crimes did you plead guilty to?

HBMHALM3

1   A.   I pleaded guilty to sex trafficking of a minor, to using

2   phone and websites to engage in prostitution, identity theft,

3   the phone fraud.

4   Q.   What is the maximum sentence you face for the crimes you

5   pled guilty to?

6   A.   Life.

7   Q.   Do any of the charges you pled guilty to carry any

8   mandatory minimum sentence?

9   A.   Yes.

10  Q.   What's the mandatory minimum sentence you face?

11  A.   Fifteen.

12  Q.   Did you plead guilty to those charges pursuant to a

13  cooperation agreement between yourself and the United States

14  Attorney's Office?

15  A.   Yes.

16  Q.   Was that agreement oral or in writing?

17  A.   In writing.

18  Q.   Did you review that agreement with your attorney before you

19  signed it?

20  A.   Yes.

21          MS. LAKE:   Ms. Geier, can you please show the witness

22  3510-09.

23  Q.   Turning to page 2, do you recognize this document,

24  Ms. Jose?

25  A.   Yes.

HBMHALM3

1    Q.   What is is this?

2    A.   A copy of my cooperation agreement.

3           MS. LAKE:  Your Honor, the government offers 3510-09

4    starting at page 2.

5           MR. CECUTTI:  No objection.

6           THE COURT:  All right.  The Court receives without

7    objection Government Exhibit 3510-09 page 2, starting at

8    page 2.

9           MS. LAKE:  Yes, your Honor.  Thank you.

10          (Government's Exhibit 3510-09 starting at page 2

11   received in evidence)

12   BY MS. LAKE:

13   Q.   Have you been sentenced yet for the crimes that you pled

14   guilty to?

15   A.   No.

16   Q.   Who will sentence you?

17   A.   The judge.

18   Q.   Now, you previously testified that you pled guilty, in

19   addition to the sex trafficking related offenses, to fraud with

20   respect to the iPhone and identity theft; is that correct?

21   A.   Yes.

22   Q.   Had you been charged with those crimes by the government

23   when you first met with the government to talk about sex

24   trafficking?

25   A.   No.

HBMHALM3

1    Q.  Did the government specifically ask you about those crimes

2    to your recollection?

3    A.  No.

4    Q.  Have you ever used drugs?

5    A.  Yes.

6    Q.  What kinds of drugs?

7    A.  Marijuana, I've tried Molly, Xanax, Percocet.

8    Q.  Cocaine?

9    A.  Yes, I tried cocaine.

10   Q.  How many times?

11   A.  Six to ten times.

12   Q.  Have you ever shoplifted?

13   A.  Yes.

14   Q.  Have you been arrested before?

15   A.  Yes.

16   Q.  Where have you been arrested before?

17   A.  In Wyoming.

18   Q.  Anywhere else?

19   A.  In New York and in Florida.

20   Q.  Did you disclose all of this information to the government

21   voluntarily?

22   A.  Yes.

23   Q.  After you were arrested, did the FBI interview you?

24   A.  Yes.

25   Q.  Were you honest about everything with the FBI?

HBMHALM3

```
 1    A.   No.

 2    Q.   What were you dishonest about?

 3    A.   About knowing JF.

 4    Q.   What did you say about knowing JF?

 5    A.   That I didn't know her.

 6    Q.   After you were arrested, did you attempt to have anybody

 7    reach out to JF?

 8    A.   Yes.

 9    Q.   What happened?

10    A.   I had my mother reach out to Yaya to reach out to JF for JF

11    could take away the charges with me and Soly.

12    Q.   Did you discuss that with Soly?

13    A.   Yes.

14    Q.   What did Soly want you to do?

15    A.   She agreed that I should -- that it was a good idea to talk

16    to JF about taking the charges off.

17    Q.   What, if any, other conversations with Soly did you have

18    about your case after you were arrested?

19    A.   For us to put the blame on Daweezy.

20    Q.   And did you agree to put the blame on Daweezy?

21    A.   Yes.

22    Q.   Was that before or after you started meeting with the

23    government?

24    A.   Before.

25    Q.   When you met with the government, did you try to put the
```

HBMHALM3

1    blame on Daweezy?

2    A.  No.

3    Q.  In general terms, what is your understanding about what

4    you're required to do under the cooperation agreement you

5    signed with the government?

6    A.  To do what I've been doing, saying the truth and nothing

7    but the truth.

8          MR. CECUTTI:  Objection, your Honor, as to "do what

9    I've been doing."

10         THE WITNESS:  I have been saying the truth.

11         THE COURT:  I'll permit it.

12   Q.  Are you required to testify here today?

13   A.  Yes.

14   Q.  Can you commit any additional crimes?

15   A.  No.

16   Q.  If you live up to your obligations under your cooperation

17   agreement, what is your understanding of what the government

18   will do?

19   A.  The government will write a letter to my judge.

20   Q.  What is your understanding of what information will be in

21   that letter?

22   A.  Saying the good things but also the bad things that I've

23   done.

24   Q.  If you were to violate your cooperation agreement by not

25   telling the truth today, what do you understand would happen?

1   A.  The letter would not be given to my judge.

2   Q.  Have you received any promise about what sentence you'll

3   get if you cooperate?

4   A.  No.

5   Q.  What impact do you hope cooperation will have on your

6   sentence?

7   A.  A lower sentencing.

8   Q.  What sentence do you hope to get?

9   A.  I don't know.

10  Q.  Do you have an understanding of whether the government is

11  going to recommend any specific sentence to the judge?

12  A.  No.

13  Q.  Who decides the sentence you'll receive?

14  A.  The judge.

15  Q.  Prior to testifying today, approximately how many times

16  have you met with the government?

17  A.  Approximately ten times.

18  Q.  In general terms, what have been the topics of your

19  meetings with the government?

20  A.  To speak the truth.

21  Q.  The truth about what?

22  A.  About everything that happened in this prostitution thing.

23  Q.  Now, as far as you understand, will the outcome of this

24  case, that is, whether the defendant is found guilty or not

25  guilty, have any effect on whether or not the government sends

HBMHALM3                         Jose - Cross

1   a letter to the judge?

2   A.  No.

3   Q.  What do you need to do today in order to get a letter from

4   the government?

5   A.  To say the truth and nothing but the truth.

6           MS. LAKE:  May I have one moment, your Honor?

7           THE COURT:  Yes.

8           MS. LAKE:  Nothing further at this time, your Honor.

9           THE COURT:  Thank you.

10          Mr. Cecutti, you may.

11          MR. CECUTTI:  Thank you, your Honor.

12  CROSS-EXAMINATION

13  BY MR. CECUTTI:

14  Q.  Good afternoon, Ms. Jose.

15  A.  Good afternoon.

16  Q.  You've prepared for this day; correct?

17  A.  Yes.

18  Q.  You've prepared with the government for this day?

19  A.  Yes.

20  Q.  You've met with them many times?

21  A.  I met with them approximately ten times.

22  Q.  And you've met with them a lot recently to go over your

23  testimony today?

24  A.  Yes.

25  Q.  You've gone over your questions?

1    A.  Yes.

2    Q.  The questions that were asked of you today; correct?

3    A.  Yes.

4    Q.  And you've also gone over your answers as well; correct?

5    A.  Yes.

6    Q.  You were given feedback about your answers; correct?

7    A.  Come again?

8    Q.  You were given feedback about your answers in preparing for

9    your testimony today by the government?

10   A.  No.

11   Q.  Did anyone practice cross-examination with you?

12   A.  Yes.

13   Q.  Who is that?

14   A.  Someone.  I don't recall their name.

15   Q.  They pretended to be someone like me; correct?

16   A.  Right.

17   Q.  And they asked you questions; correct?

18   A.  Correct.

19   Q.  And they gave you feedback as to how you were doing in your

20   responses; correct?

21   A.  Yes.

22   Q.  And you've been practicing your testimony for today;

23   correct?

24   A.  Yes.

25   Q.  And you've been doing so over many weeks; correct?

1   A.  Yes.

2   Q.  Now, Ms. Jose, you're a scammer; correct?

3   A.  Yes, I was.

4   Q.  You're also a liar too; correct?

5   A.  I was a liar.

6   Q.  You're a deceiver too; correct?

7   A.  No.

8   Q.  You're a manipulator; right?

9   A.  No.

10  Q.  You were involved in iPhone scams?

11  A.  Yes.

12  Q.  Over three years; correct?

13  A.  Yes.

14  Q.  You've lied to your mother; correct?

15  A.  Yes, I have.

16  Q.  And you've lied to your mother about your involvement in

17  this case; correct?

18  A.  No.

19  Q.  You've lied to your sisters; correct?

20  A.  I have in the past.

21  Q.  And you've lied to your sisters about your involvement in

22  this case?

23  A.  No.

24  Q.  You have friends?

25  A.  No.

HBMHALM3                    Jose - Cross

1    Q.  You have had numerous contacts with law enforcement;

2    correct?

3    A.  Come again?

4    Q.  You've had numerous conversations with police over the

5    years; correct?

6    A.  Yes.

7    Q.  You've had conversations with federal agents as part of

8    this case; correct?

9    A.  Yes.

10   Q.  And over the years, you have lied to police when you've

11   been arrested; correct?

12   A.  Yes, I have.

13   Q.  And as part of this case, you've lied to federal agents;

14   correct?

15   A.  When I first got arrested, yes.

16   Q.  When you first got arrested, they warned you about telling

17   the truth; correct?

18   A.  Yes.

19   Q.  They told you how important it was to tell the truth;

20   correct?

21   A.  Yes.

22   Q.  And you looked at them in the eye and you told them, I will

23   be 100 percent honest with you; correct?

24   A.  I don't recall saying I was -- saying that, but I did lie

25   to them.

1   Q.  But you told them that you would tell the truth; correct?

2   A.  Yes.

3   Q.  In fact, you told the agent sitting to your far right that

4   you would tell her the truth; correct?

5   A.  Yes.

6   Q.  And you did not; correct?

7   A.  Yes.

8   Q.  Now, Ms. Jose, you've been smoking marijuana since the age

9   of 13; correct?

10  A.  Correct.

11  Q.  And you've been smoking daily marijuana since the age of

12  15; correct?

13  A.  Correct.

14  Q.  When you were 17 years old, you were arrested for the first

15  time; correct?

16  A.  Correct.

17  Q.  And that was for marijuana possession; right?

18  A.  Yes.

19  Q.  And to be exact, that happened on August 17, 2013?

20  A.  Yes.

21  Q.  And then you were arrested again a year later -- withdrawn.

22          You were arrested when you were 18 again for marijuana

23  possession; correct?

24  A.  Correct.

25  Q.  And that was on January 24, 2014?

HBMHALM3                        Jose - Cross

1   A.  I don't recall, but --

2   Q.  Do you recall being arrested in January of 2014?

3   A.  I recall being arrested.

4   Q.  When you were arrested, you went to a precinct; correct?

5   A.  Yes.

6   Q.  And you were given a desk appearance ticket; correct?

7   A.  Yes.

8   Q.  And that avoided you having to be processed that night;

9   correct?

10  A.  Correct.

11  Q.  You didn't have to see the judge that night; correct?

12  A.  Correct.

13  Q.  And you were instructed by the police to come back to court

14  on the date that was identified in the desk appearance ticket;

15  correct?

16  A.  Correct.

17  Q.  And you were told to voluntarily come back to court;

18  correct?

19  A.  Correct.

20  Q.  And you said to the police that you would do so; correct?

21  A.  Yes.

22  Q.  And you did not come back to court on your own; correct?

23  A.  I went back to court on my own, but not the day that was

24  given to me.

25  Q.  What date was that?  Do you recall?

1   A.  No, I don't recall.

2   Q.  Well, during that time period you were arrested again;

3   correct?

4   A.  Yes.

5   Q.  And you were arrested this time for stealing; right?

6   A.  Yes.

7   Q.  And this time that occurred in about May of 2014; correct?

8   A.  Correct.

9   Q.  So at that point in time, you had two open cases; correct?

10  A.  Correct.

11  Q.  You had a marijuana case; right?

12  A.  Yes.

13  Q.  And you had a stealing case; correct?

14  A.  Yes.

15  Q.  And you were given a deal by the prosecutors for both

16  cases; correct?

17  A.  No.

18  Q.  Was your case resolved with what's called an ACD?

19  A.  Yes.

20  Q.  An ACD means that the case would be dismissed as long as

21  you stay out of trouble for six months; correct?

22  A.  Correct.

23  Q.  And you had to do community service as part of that

24  agreement; correct?

25  A.  Yes.

1   Q.  And you did not do your community service; correct?

2   A.  I did to an extent.

3   Q.  You didn't complete it; right?

4   A.  No, I didn't complete it.

5   Q.  And you didn't stay out of trouble for six months either;

6   correct?

7   A.  I don't recall.

8   Q.  Well, you were doing your iPhone scamming in 2014; correct?

9   A.  Correct.

10  Q.  And that was at the same time that you got arrested for

11  these two offenses; correct?

12  A.  I did my iPhone fraud in 2013.

13  Q.  And 2014; correct?

14  A.  I don't recall 2014.

15  Q.  And you did your iPhone scamming in 2015; correct?

16  A.  Yes, I did.

17  Q.  And you did your iPhone scamming in 2016; correct?

18  A.  Correct.

19  Q.  You've been to Florida before; correct?

20  A.  Yes.

21  Q.  And you went to Florida in December of 2015; right?

22  A.  Yes.

23  Q.  And you went to Florida at that time for a vacation;

24  correct?

25  A.  Correct.

1   Q.  With your friend Jovan; is that right?

2   A.  Yes.

3   Q.  When you went to Florida in 2015, in December, you stayed

4   in a hotel; correct?

5   A.  No.

6   Q.  Where did you stay?

7   A.  In my friend's house.

8   Q.  Did you rent a car?

9   A.  No.

10  Q.  That, again, was for a vacation; correct?

11  A.  Yes.

12  Q.  And vacations to you involve scamming; correct?

13  A.  I didn't scam when I went to vacation in December.

14  Q.  You were arrested on that vacation; right?

15  A.  Yes.

16  Q.  And when you were arrested, police officers recovered from

17  you two false identification documents; correct?

18  A.  Correct.

19  Q.  And on one of those documents, there was a name; correct?

20  A.  Yes.

21  Q.  And that wasn't your name; right?

22  A.  Correct.

23  Q.  What name was that?

24  A.  Rosa.

25  Q.  Do you know the last name?

HBMHALM3                      Jose - Cross

1    A.  I don't recall the last name.

2    Q.  Does Perry sound familiar?

3    A.  Yes.

4    Q.  You presented that identification document to the police;

5    correct?

6    A.  I did.

7    Q.  And you told the police officer that your name was Rosa

8    Perry; right?

9    A.  Yes.

10   Q.  And that you were from Maryland; correct?

11   A.  Correct.

12   Q.  Now, you're from the Bronx; right?

13   A.  Yes.

14   Q.  You're not from Maryland?

15   A.  No, I'm not.

16   Q.  When you told the police officer your name was Rosa Perry,

17   that was a lie; correct?

18   A.  Yes.

19   Q.  And you looked that police officer in the eye; right?

20   A.  I don't recall looking at him in the eye.

21   Q.  But you told him or her a lie; correct?

22   A.  Yes.

23   Q.  You also told him or her a lie about where you were from;

24   right?

25   A.  Correct.

1    Q.  And this was all to avoid a problem for you; correct?

2    A.  Yes.

3    Q.  And you've used aliases before; correct?

4    A.  Yes.

5    Q.  You've told police officers stories before; right?

6    A.  Yes.

7    Q.  You've lied to them; right?

8    A.  Yes, I have lied.

9    Q.  And you've also provided them with false dates of birth;

10   correct?

11   A.  Yes.

12   Q.  That's all intended to avoid problems for you; right?

13   A.  At the given moment, yes.

14   Q.  You tell stories to law enforcement so that you can get out

15   of trouble; correct?

16   A.  Yes.

17   Q.  Now, you were arrested as part of that Florida case;

18   correct?

19   A.  Yes, I was.

20   Q.  And you were released on bail?

21   A.  Yes.

22   Q.  And as part of your release, you were told by a judge that

23   you couldn't commit any further crimes; correct?

24   A.  Correct.

25   Q.  And you didn't abide by that instruction; correct?

1    A.  I didn't, you're right.

2    Q.  You continued to commit crimes?

3    A.  Yes.

4    Q.  You continued to deceive people; right?

5    A.  No.

6    Q.  You continued your scamming, though; right?

7    A.  Yes.

8    Q.  But you see that as different; correct?

9    A.  Yes.

10   Q.  Deceiving versus scamming, that's different to you?

11   A.  At that point, yes.

12   Q.  Ms. Jose, in 2013 you graduated from high school; right?

13   A.  No, I didn't graduate.

14   Q.  You told the government that you graduated high school;

15   correct?

16   A.  No, I didn't tell the government I graduated.

17   Q.  How far'd you get in school?

18   A.  To the 12th grade.

19   Q.  And you didn't finish?

20   A.  No.

21   Q.  No.  Because getting your high school diploma was less of a

22   priority to you than scamming; correct?

23   A.  No, it wasn't.

24   Q.  But after you left high school, you started to do your cell

25   phone scams?

1    A.  Yes.

2    Q.  And how old were you?

3    A.  Eighteen.

4    Q.  And you were good at scamming; correct?

5    A.  I was.

6    Q.  You were good at deceiving other people; right?

7    A.  No.

8    Q.  Well, you made a lot of money in your scamming; correct?

9    A.  Yes.

10   Q.  You used to make thousands of dollars on your trips

11   everywhere around the country; correct?

12   A.  Yes.

13   Q.  Victims would get hurt financially by your actions?

14   A.  I don't recall.

15   Q.  You don't know if people would get hurt by your actions of

16   scamming?

17   A.  At that given time, no.

18   Q.  But now, how about reflecting on your past behavior, do you

19   understand that victims got hurt by your actions?

20   A.  Yes.

21   Q.  They got hurt financially; correct?

22   A.  Yes.

23   Q.  You put your interests ahead of other people; correct?

24   A.  At that time, yes.

25   Q.  You only cared about making money; right?

HBMHALM3                          Jose - Cross

1     A.  No.

2     Q.  At that time period?

3     A.  Yes, I did at that time.

4     Q.  You wanted to help yourself; right?

5     A.  Yes.

6     Q.  Now let's talk about some of the things that you were able

7     to buy through your scamming.  You bought iPhones; right?

8     A.  Yes.

9     Q.  You bought Air Jordans; correct?

10    A.  Yes.

11    Q.  You bought Louis Vuitton bags; right?

12    A.  Yes.

13    Q.  You also bought UGG boots; right?

14    A.  Yes, I did.

15    Q.  And nice watches; correct?

16    A.  Yes.

17    Q.  And nice jewelry; right?

18    A.  Yes.

19    Q.  Purses?

20    A.  Yes.

21    Q.  Clothing?

22    A.  Yes.

23    Q.  You were also able to go on vacations; right?

24    A.  I did.

25    Q.  You went to Miami; right?

1    A.  Yes.

2    Q.  Orlando; correct?

3    A.  Yes.

4    Q.  In fact, it's true that you traveled all across this

5    country; correct?

6    A.  Not all across, but I've traveled.

7    Q.  You traveled to many areas of this country scamming;

8    correct?

9    A.  Yes.

10   Q.  You've been as far west as Montana and Wyoming; right?

11   A.  Yes, I have.

12   Q.  You've been to North Dakota; correct?

13   A.  Yes.

14   Q.  You've been down south in North Carolina scamming; correct?

15   A.  Yes.

16   Q.  Making thousands of dollars doing so; correct?

17   A.  At a time.

18   Q.  Now, you worked with other people scamming; right?

19   A.  Yes.

20   Q.  However, you were the one that actually went into the

21   stores; right?

22   A.  Yes.

23   Q.  So there were some people who got cell phone information;

24   right?

25   A.  Yes.

1    Q.  And then they would give it to you; correct?

2    A.  Correct.

3    Q.  And then you would be the one that would go into the

4    stores; right?

5    A.  Yes.

6    Q.  And talk to the store clerks; correct?

7    A.  Yes.

8    Q.  And lie to them; right?

9    A.  Yes.

10   Q.  When you would speak with the clerks of the stores, you

11   would give them information related to cell phone accounts;

12   right?

13   A.  Yes, I did.

14   Q.  And you would look the clerks in the eye, and you would

15   tell them the account information; correct?

16   A.  Correct.

17   Q.  And you would lie to them; right?

18   A.  I did.

19   Q.  And you would tell them stories as part of your scam;

20   correct?

21   A.  No, I didn't tell them stories.

22   Q.  Well, do you remember going to Rawlins, Wyoming?

23   A.  Yes.

24   Q.  Do you remember meeting with a store clerk there?

25   A.  Yes.

HBMHALM3                           Jose - Cross

1    Q.  Do you remember having a conversation with that store clerk

2    about what was going on around town?

3    A.  Yes.

4    Q.  And you told him that your name was Mary Mansek; correct?

5    A.  Correct.

6    Q.  And that you were an interior decorator?

7    A.  Yes.

8    Q.  And that was a lie; correct?

9    A.  Yes.

10   Q.  And it was also a lie that your name was Mary Mansek;

11   correct?

12   A.  Correct.

13   Q.  And it was also a lie that you knew anything about what was

14   going on around town in Rawlins, Wyoming; correct?

15   A.  Correct.

16   Q.  You had no idea; right?

17   A.  I had no idea.

18   Q.  But you made up a story; correct?

19   A.  I did at that time.

20   Q.  And that story was so persuasive that this store clerk

21   allowed you to buy cell phones that belonged to someone else's

22   account; correct?

23   A.  Correct.

24   Q.  Now, do you know a person named Fernando Jimenez?

25   A.  Yes.

HBMHALM3                          Jose - Cross

1   Q.  He's a friend of yours; right?

2   A.  He was, yes.

3   Q.  And you took a trip with him in 2013; correct?

4   A.  Yes.

5   Q.  And this time you went to North Carolina; right?

6   A.  Right.

7   Q.  And you were there for a week?

8   A.  Approximately.

9   Q.  During that one-week trip, you went into Best Buy stores;

10  right?

11  A.  Yes.

12  Q.  And that was to do your cell phone scam; correct?

13  A.  Correct.

14  Q.  And you spoke with many Best Buy workers; correct?

15  A.  Yes.

16  Q.  You told all these different workers over the course of the

17  week that you wanted to buy and add cell phones to accounts;

18  correct?

19  A.  Yes.

20  Q.  And in order to do that, you needed to provide all of these

21  different clerks a cell phone account number; correct?

22  A.  Correct.

23  Q.  A number that belonged to Verizon customers; right?

24  A.  Yes.

25  Q.  Now, in order to pull off this scam, you needed to memorize

1    certain information; right?

2    A.   Yes.

3    Q.   You needed to practice it; right?

4    A.   I needed to memorize it.

5    Q.   Right.  So you and Fernando would talk about the

6    information; right?

7    A.   No.  Fernando would give me the information, and I would

8    try to memorize it.

9    Q.   And you would practice on your own; correct?

10   A.   No, I would just try to memorize.

11   Q.   But before you went into any of these stores, you made sure

12   you knew all the information?

13   A.   Yes.

14   Q.   That you knew every answer that could be asked of you by

15   any of these store clerks; right?

16   A.   Not any answer, just the information that was given to me.

17   Q.   The important information; correct?

18   A.   Correct.

19   Q.   The important information that you needed to memorize

20   wasn't just one thing; correct?

21   A.   No.

22   Q.   It was several things; right?

23   A.   Yes.

24   Q.   You needed to memorize several important details in order

25   to pull off your scam; correct?

1    A.  Yes.

2    Q.  You needed to memorize the account number; right?

3    A.  Yes.

4    Q.  You needed to memorize the cell phone number of the account

5    number; correct?

6    A.  Yes.

7    Q.  You needed to memorize the PIN number of the account

8    number; right?

9    A.  Yes.

10   Q.  And you needed to provide this information to all of these

11   different store clerks; right?

12   A.  Yes.

13   Q.  In order to pull off your scam; correct?

14   A.  Correct.

15   Q.  And you pulled off your scam every single time that week;

16   right?

17   A.  I don't recall.

18   Q.  Well, you were so good that you made $3,700 that week;

19   correct?

20   A.  Yes.

21   Q.  You benefited, Ms. Jose, financially through deception;

22   correct?

23   A.  No.

24   Q.  You benefited, though; right?

25   A.  Yes.

1    Q.   You benefited through lying; right?

2    A.   I did at a point.

3    Q.   I'm just talking about this one week.

4    A.   Yes, I know.

5    Q.   You benefited by lying; right?

6    A.   Yes.

7    Q.   You benefited by scamming; right?

8    A.   Yes.

9    Q.   You benefited by deceiving these store clerks; right?

10   A.   I don't think it's deceiving at that time.

11   Q.   What about now?  Do you think it's deceiving now?

12   A.   Yes.

13   Q.   But, again, you didn't know the distinction between

14   scamming and deceiving; right?

15   A.   I didn't know.

16   Q.   Now, $3,700 wasn't enough for you; right?

17   A.   It wasn't.

18   Q.   No.  You went to Georgia; correct?

19   A.   Yes.

20   Q.   Immediately after North Carolina; correct?

21   A.   Yes.

22   Q.   And you went there with Fernando; right?

23   A.   Yes.

24   Q.   And to do more scamming; correct?

25   A.   Yes.

HBMHALM3                          Jose - Cross

1    Q.  How much money did you make in Georgia?

2    A.  That was the same week that I made all of that.  So in

3    total I made 3,700.

4    Q.  So you went to multiple states that week and made a total

5    of $3,700 through your lying and scamming?

6    A.  I did.

7    Q.  Then you came back to the Bronx; correct?

8    A.  Yes.

9    Q.  But that wasn't enough for you.  You wanted to continue

10   scamming; correct?

11   A.  Yes.

12   Q.  So a week later you did the same thing with Fernando;

13   right?

14   A.  Not a week later.

15   Q.  How long later?

16   A.  I don't recall, but it wasn't that soon.

17   Q.  You remember telling the government it was a week later?

18   A.  I don't recall.

19   Q.  But went back to North Carolina and Georgia; correct?

20   A.  Yes.

21   Q.  To do more scamming?

22   A.  Yes.

23   Q.  You made a lot of money again; correct?

24   A.  Yes.

25   Q.  Now, you'd been to Utah; right?

1    A.  Yes.

2    Q.  You've been to Utah with Fernando; right?

3    A.  Yes.

4    Q.  And you've been to Utah with Fernando to do scamming;

5    correct?

6    A.  Correct.

7    Q.  When you went to Utah again, it was to get more cell

8    phones; correct?

9    A.  Correct.

10   Q.  Then to sell them to other people and make money; right?

11   A.  Yes.

12   Q.  This time it wasn't just you and Fernando that went to

13   Utah; right?

14   A.  Right.

15   Q.  You brought a close friend with you; correct?

16   A.  Yes.

17   Q.  Her name is Jennifer Rosado; correct?

18   A.  Correct.

19   Q.  Now, Jennifer is a friend of yours from high school; right?

20   A.  Yes.

21   Q.  And you asked her to come to Utah; correct?

22   A.  Correct.

23   Q.  To drive you around to do your scamming; correct?

24   A.  No.

25   Q.  What was her role when you went to Utah?

HBMHALM3                          Jose - Cross

1    A.  The same one as mine's.

2    Q.  She hadn't participated in scamming before; correct?

3    A.  I don't recall.

4    Q.  But you talked to Jennifer about how to scam; correct?

5    A.  I don't recall.

6    Q.  You taught her how to go into Best Buy stores and give

7    memorized information and lie to clerks?

8    A.  I didn't teach her that.

9    Q.  She knew all this on her own?

10   A.  I don't recall.

11   Q.  What did she do?

12   A.  She scammed when I -- the same thing as I did.

13   Q.  Tell us how she did it.

14   A.  She'll go in the store and give the account number and the

15   PIN.

16   Q.  And you would go with her; correct?

17   A.  Not at the same time, but I'll go in the same store.

18   Q.  You would go in the same store as Jennifer Rosado and scam;

19   correct?

20   A.  Yes.

21   Q.  And you would talk about your scamming with her; correct?

22   A.  Yes.

23   Q.  And how you did; right?

24   A.  Yes.

25   Q.  And how she did; correct?

1   A.  Yes.

2   Q.  You would compare and discuss your experiences; right?

3   A.  No.

4   Q.  You would talk about how much money you made with her;

5   right?

6   A.  No.  She was there to see.

7   Q.  Did you ever talk with Jennifer Rosado about scamming --

8   A.  Yes.

9   Q.  -- in Utah?

10  A.  Yes.

11  Q.  What did you talk about?

12  A.  As in going to store.  She'll ask me if I'm going to the

13  store first or she will, and that's how we'll talk, as in like

14  that, but not in how to scam.

15  Q.  You never talked about how much money either of you made?

16  A.  No, because we both knew how much money we made.

17  Q.  You already knew, without any information, how much

18  Jennifer Rosado made?

19  A.  No.  Because if we worked together, then she'll pull out a

20  certain amount of phones.  I already know how much money she'll

21  make, just as the same way I'll go in a store and pull out a

22  set of phones, she'll know how much money I made.  So we never

23  discussing each other making money.

24  Q.  Now, you did scams with Fernando in other states; correct?

25  A.  In North Carolina and in Georgia, yes.

HBMHALM3                          Jose - Cross

1    Q.   And Indiana as well; right?

2    A.   Yes.

3    Q.   Now, you have a friend named Yaya; correct?

4    A.   Yes.

5    Q.   And she has a brother named Luigi?

6    A.   Yes.

7    Q.   And Luigi's in prison right now; correct?

8    A.   Correct.

9    Q.   For gun possession?

10   A.   Correct.

11   Q.   And Yaya put you in touch with Luigi in order to do cell

12   phone scams; correct?

13   A.   Yes.

14   Q.   And Yaya did so to help her brother; correct?

15   A.   Yes.

16   Q.   By hurting others through your scamming?

17   A.   At that time I didn't think it was like that.

18   Q.   What about now?

19   A.   Now, yes, I do.

20   Q.   Now, at the end of 2015, you spoke with one of your best

21   friends about scamming; correct?

22   A.   Correct.

23   Q.   And that best friend is Carlos; right?

24   A.   Yes.

25   Q.   Carlos knew that you were involved in scamming; correct?

HBMHALM3                          Jose - Cross

1    A.  Yes.

2    Q.  By that point you had been scamming for a couple of years;

3    correct?

4    A.  On and off.

5    Q.  And he introduced you to a person; correct?

6    A.  Yes.

7    Q.  Named Fukar; right?

8    A.  Yes.

9    Q.  And Fukar took photos of you; correct?

10   A.  Yes.

11   Q.  And he created false identification documents with your

12   photograph in them?

13   A.  Yes.

14   Q.  And you hadn't scammed before in this way; correct?

15   A.  No.

16   Q.  You hadn't scammed before with false identification

17   documents with your photograph; correct?

18   A.  Correct.

19   Q.  Fair to say that your scamming was getting more

20   sophisticated; correct?

21   A.  No.

22   Q.  It was different, though; right?

23   A.  Yes.

24   Q.  And it was different in order to reduce the risk of you

25   getting caught; correct?

1   A.  No, it's the same risk.  At that time to me, I thought it

2   was the same risk.

3   Q.  But it was different; right?

4   A.  But it was different.

5   Q.  And you continued to go into Verizon stores; right?

6   A.  Yes.

7   Q.  This time you went to stores in Virginia; correct?

8   A.  I don't recall.

9   Q.  But you went to your favorite state of North Carolina to do

10  more scamming; correct?

11  A.  I don't recall if it was North Carolina.

12  Q.  You don't remember the states; correct?

13  A.  No.

14  Q.  But you remember the scamming; correct?

15  A.  I did.

16  Q.  And when you would go into these -- while working with

17  Fukar, when you would go into these stores, you never

18  personally had an account; correct?

19  A.  No.

20  Q.  A cell phone account; correct?

21  A.  No.

22  Q.  You would lie to workers and say that you did; correct?

23  A.  Yes.

24  Q.  And you would lie to workers and say that you were the

25  primary account holder; correct?

HBMHALM3                          Jose - Cross

1   A.  Yes.

2   Q.  And you would use someone else's name; correct?

3   A.  Correct.

4   Q.  You would provide their address; right?

5   A.  Yes.

6   Q.  Their account number; correct?

7   A.  Yes.

8   Q.  Their cell phone number; right?

9   A.  Yes.

10  Q.  The last four digits of their social; correct?

11  A.  Correct.

12  Q.  You memorized all this information beforehand; right?

13  A.  Yes.

14  Q.  So that you could best pull off your scam; correct?

15  A.  Yes.

16  Q.  And you would request to add phone lines to somebody else's

17  account; correct?

18  A.  Yes.

19  Q.  And you would get iPhones; correct?

20  A.  Yes.

21  Q.  And then sell them; right?

22  A.  I didn't sell them, but I'll get them.

23  Q.  But you would make money; correct?

24  A.  Yes.

25  Q.  You would make money, and victims of your crimes would get

1   hurt financially; correct?

2   A.  At that time I didn't see it like that.

3   Q.  How about now?

4   A.  Yes.

5   Q.  You would put your interest ahead of somebody else;

6   correct?

7   A.  Correct.

8   Q.  So that you could benefit; right?

9   A.  At that time, yes.

10  Q.  Let's talk about another person that you did scamming with,

11  a person named Luz.  Do you remember her?

12  A.  Yes.

13  Q.  Luz had Verizon accounts; right?

14  A.  Yes.

15  Q.  And you would go into Verizon stores with false

16  identification documents; correct?

17  A.  Yes.

18  Q.  And, of course, with memorized information; right?

19  A.  Yes.

20  Q.  To pull off these additional scams; right?

21  A.  No.

22  Q.  You would go into stores with your memorized information;

23  correct?

24  A.  Yes.

25  Q.  While you were doing your scamming with Luz; right?

1    A.  Yes.

2    Q.  And you did your scams with Luz in Idaho; right?

3    A.  Yes.

4    Q.  Florida; right?

5    A.  Yes.

6    Q.  Alabama; correct?

7    A.  Yes.

8    Q.  Louisiana; right?

9    A.  Yes.

10   Q.  North Dakota; correct?

11   A.  Yes.

12   Q.  Montana; correct?

13   A.  Yes.

14   Q.  How would you get to all these different states?

15   A.  By driving.

16   Q.  And you made a lot of money on each of these trips with

17   Luz; right?

18   A.  Not a lot of money, but I made money.

19   Q.  Well, you would make between four and $6,000 per trip;

20   right?

21   A.  At times, yes.

22   Q.  And that's what you told the government; correct?

23   A.  Yes.

24   Q.  Now, there came a point when you stopped working with Luz;

25   right?

1    A.  Yes.

2    Q.  That happened in 2016; correct?

3    A.  Correct.

4    Q.  In April of 2016; right?

5    A.  Yes.

6    Q.  That's because you wanted to do your scamming now on your

7    own; right?

8    A.  Yes.

9    Q.  You didn't want to work with anybody; correct?

10   A.  No.

11   Q.  Now, as part of your own work, you reconnected with Fukar;

12   correct?

13   A.  Correct.

14   Q.  And you decided that it was best to partner with him;

15   correct?

16   A.  At that point I did.

17   Q.  And you thought it was best for your scamming business to

18   partner with Fukar; correct?

19   A.  Yes.

20   Q.  To make the most money you could; right?

21   A.  I tried.

22   Q.  As part of your partnership with Fukar, you would split

23   your profits from scamming?

24   A.  Yes.

25   Q.  Down the middle; right?

```
 1    A.  Yes.

 2    Q.  50/50?

 3    A.  Yes.

 4    Q.  And you would also split your expenses 50/50; right?

 5    A.  Correct.

 6    Q.  Now, based upon your experience, you told Fukar that you

 7    thought it was best to do scamming in Alabama; correct?

 8    A.  I don't recall.

 9    Q.  How about South Carolina?

10    A.  I don't recall.

11    Q.  How about Illinois?

12    A.  Yes.

13    Q.  Those are good states to scam in; correct?

14    A.  I don't recall.

15    Q.  Illinois is, though; right?

16    A.  At that time.

17              MS. LAKE:  Objection.

18              THE COURT:  Ground.

19              MS. LAKE:  Basis of knowledge.

20              THE COURT:  All right.  Do you have any way of knowing

21    one way or the other whether Illinois is a good state to scam

22    in?

23              THE WITNESS:  No, I just went to go.

24    Q.  You made a lot of money in Illinois scamming; correct?

25    A.  I don't recall.
```

HBMHALM3                          Jose - Cross

1    Q.  Now, in your partnership with Fukar, you did your scamming

2    a little differently again; correct?

3    A.  Yes.

4    Q.  This time you would get a prepaid card with cash on it;

5    right?

6    A.  Yes.

7    Q.  And you hadn't done this type of scamming before; correct?

8    A.  No.

9    Q.  And you gave the prepaid card to a person who made false

10   identification documents; right?

11   A.  Yes.

12   Q.  This person would put account holders' names on the cards;

13   right?

14   A.  Right.

15   Q.  To make it look like a real credit card; correct?

16   A.  Correct.

17   Q.  Then you would go into the Verizon store; right?

18   A.  Yes.

19   Q.  And you would buy the cell phones; correct?

20   A.  Yes.

21   Q.  And pay for the phones using this card instead of cash;

22   right?

23   A.  Yes.

24   Q.  And that was your idea; correct?

25   A.  Yes.

HBMHALM3                         Jose - Cross

1    Q.  Fair to say, Ms. Jose, that your scamming got more

2    sophisticated; correct?

3    A.  No.

4    Q.  More deceitful; right?

5    A.  No.

6    Q.  Well, let's talk about Wyoming.  You'd been to Wyoming;

7    right?

8    A.  Yes.

9    Q.  You've taken at least two trips there; correct?

10   A.  Yes.

11   Q.  Now, the first trip was when?  What year?

12   A.  2016.

13   Q.  Your second trip was just shortly thereafter; correct?

14   A.  Correct.

15   Q.  Now let's talk about the first trip.  You went there with

16   another friend; right?

17   A.  Yes.

18   Q.  This person's name was Francisco Perdomo; correct?

19   A.  Yes.

20   Q.  He was a friend of yours from the Bronx?

21   A.  Yes.

22   Q.  You were close with him?

23   A.  Yes.

24   Q.  You believed he trusted you?

25   A.  Yes.

HBMHALM3                              Jose - Cross

1    Q.  But you scammed him; right?

2    A.  No.

3    Q.  Well, after the first trip that you took to Wyoming, you

4    didn't pay him; correct?

5    A.  I did pay him.

6    Q.  Later on, though; right?

7    A.  The first trip, once we came back, I paid him.

8    Q.  But not immediately; correct?

9    A.  Yes, as soon as I got the money, I paid him.

10   Q.  Well, you didn't pay him immediately, and you felt bad;

11   correct?

12   A.  No.

13   Q.  Well, didn't you tell the government that?

14   A.  I didn't tell the government that.

15   Q.  You never told the government about this first Wyoming

16   trip?

17   A.  I told the government about the trip.  I didn't tell the

18   government that I felt bad about not paying him, because I did

19   pay him.

20   Q.  Later on; correct?

21   A.  No.

22   Q.  Well, let's talk about the second trip.  You went there

23   again with Mr. Perdomo; correct?

24   A.  I did.

25   Q.  And this time you bought 26 cell phones through your

1    scamming; correct?

2    A.  Correct.

3    Q.  And a couple of iPads too; correct?

4    A.  Yes.

5    Q.  And you sent half of these cell phones to a PO Box that you

6    had opened; correct?

7    A.  Correct.

8    Q.  And you opened this PO Box under a false name; correct?

9    A.  Yes.

10   Q.  What name was that?

11   A.  I don't recall.

12   Q.  But you also opened a second PO Box; correct?

13   A.  Yes.

14   Q.  Under a false name; correct?

15   A.  Yes.

16   Q.  And that was for Francisco Perdomo; correct?

17   A.  No, not for Francisco.

18   Q.  Who was it for?

19   A.  For myself.

20   Q.  You opened two PO Boxes under false names for yourself;

21   correct?

22   A.  Correct.

23   Q.  In order to send your cell phones to these PO Boxes;

24   correct?

25   A.  Yes.

HBMHALM3                          Jose - Cross

1   Q.   For you to make money; correct?

2   A.   Yes.

3   Q.   This time you got arrested; correct?

4   A.   Correct.

5   Q.   That happened on May 10, 2016; correct?

6   A.   May 11.

7   Q.   That was after, again, you had spoken with a store clerk

8   and told them that you were Mary Mansek, the interior

9   decorator; correct?

10  A.   Yes.

11  Q.   And had this story to tell about the dealings of what was

12  going on in Rawlins, Wyoming?

13  A.   Yes.

14  Q.   A place that you'd never been to before; correct?

15  A.   Correct.

16  Q.   But you told such a persuasive story, that this store clerk

17  believed you; correct?

18          MS. LAKE:   Objection.

19          THE COURT:   Sustained.

20  Q.   Now, during this scam you signed up new cell phone lines;

21  right?

22  A.   I don't recall.

23  Q.   Did you sign a contract?

24  A.   I don't recall.

25  Q.   Now, you were arrested after police officers stopped you;

1    correct?

2    A.  Yes.

3    Q.  When you were stopped, the police officers asked you what

4    you had been doing; correct?

5    A.  Correct.

6    Q.  And you told a police officer that you went to a Verizon

7    store; right?

8    A.  Yes.

9    Q.  But that they didn't have what you wanted, so you left;

10   right?

11   A.  Correct.

12   Q.  And that was a lie; correct?

13   A.  No, it wasn't a lie.

14   Q.  Well, you didn't tell them about your scamming; right?

15   A.  Correct, I didn't.

16   Q.  You didn't tell them that you had scammed a store clerk out

17   of 26 cell phones; correct?

18   A.  No.

19   Q.  Now, you told a police officer at the time of your arrest

20   that you met a man in New York who told you to go to Wyoming;

21   correct?

22   A.  Correct.

23   Q.  And that was a lie; right?

24   A.  No, that wasn't a lie.

25   Q.  Who was the man that told you to go to Wyoming?

HBMHALM3                       Jose - Cross

1   A.  Fukar.

2   Q.  Now, during this same conversation with the police, you

3   told the police officers that a man forced you to go and do

4   this scam; correct?

5   A.  Correct.

6   Q.  That was a lie; right?

7   A.  It was.

8   Q.  And you were lying about Fukar; correct?

9   A.  No.

10  Q.  But you were lying about someone forcing you to commit a

11  crime; correct?

12  A.  Correct.

13  Q.  That was in order for you to get out of your problem;

14  right?

15  A.  At the time, yes.

16  Q.  You wanted to blame somebody else in order to get from

17  underneath your problem --

18  A.  No.

19  Q.  -- right?

20         Why did you do it?

21  A.  I was scared.

22  Q.  So you told a lie?

23  A.  Yes.

24  Q.  You also told the police officers that you -- withdrawn.

25         Now, after you were arrested, you were detained in

HBMHALM3                          Jose – Cross

1    Wyoming; correct?

2    A.  Yes.

3    Q.  While you were detained, you spoke with your sister;

4    correct?

5    A.  Correct.

6    Q.  And you told your sister to go to one of your PO Boxes;

7    right?

8    A.  Yes.

9    Q.  And get half of the cell phones that you had sent; right?

10   A.  Yes.

11   Q.  And your sister agreed?

12   A.  Yes.

13   Q.  And your sister picked up the cell phones; correct?

14   A.  Correct.

15   Q.  And she gave them to Fukar; right?

16   A.  Correct.

17   Q.  She gave them to Fukar in order to sell them; right?

18   A.  To bail me out of jail.

19   Q.  To bail you out of jail.

20           To use money from your scamming in order for you to

21   get out of jail; correct?

22   A.  Correct.

23   Q.  Money that you had gotten by hurting other people; right?

24   A.  At that time I didn't see it like that.

25   Q.  Well, what about now?

1   A.  Yes, now I see that it was wrong.

2   Q.  By hurting others and scamming them, you were able to get

3   out of jail in Wyoming; right?

4   A.  Yes.

5   Q.  And you spent a month and a half in jail in Wyoming;

6   correct?

7   A.  Correct.

8   Q.  Separated from your family; right?

9   A.  Yes.

10  Q.  They never came to see you; correct?

11  A.  Correct.

12  Q.  And then you were released on bail finally; right?

13  A.  Yes.

14  Q.  As part of your bail conditions, a judge told you,

15  Ms. Jose, you can't commit further crimes; right?

16  A.  Correct.

17  Q.  You violated those bail conditions; correct?

18  A.  I did.

19  Q.  You continued to scam; correct?

20  A.  Yes.

21  Q.  You continued to lie to other people?

22  A.  No, I didn't lie to other people.

23  Q.  You didn't lie to any of the store clerks?

24  A.  Yes.

25  Q.  So you were arrested in May of 2016 in Wyoming; correct?

1   A.  Correct.

2   Q.  And you spent the rest of that month in jail in Wyoming?

3   A.  Yes.

4   Q.  And you were released sometime in June of 2016; correct?

5   A.  June 29, yes.

6   Q.  June 29, almost July; correct?

7   A.  Correct.

8   Q.  But then a month later, you went back on your tour of

9   scamming; correct?

10  A.  I went to Florida for vacation, and I decided to scam.

11  Q.  And you went to Florida for two weeks; correct?

12  A.  Almost a month, three weeks.

13  Q.  And again while you were there, you continued your

14  scamming; correct?

15  A.  Yes, I scammed.

16  Q.  In direct disregard of a judge's order for you not to

17  commit crimes; correct?

18  A.  I did, but I needed the money.

19  Q.  You didn't go out and look for a job; right?

20  A.  No.

21  Q.  You didn't put in any job applications; correct?

22  A.  No.

23  Q.  You didn't ask your family for help in trying to find work;

24  correct?

25  A.  No.

HBMHALM3                         Jose - Cross

1   Q.  You took the easy way out; correct?

2   A.  I didn't take the easy way out.  I just took the way that I

3   always knew.

4   Q.  The way that you always know?

5   A.  Which was to scam.

6   Q.  Correct.

7          Now, you came back from Florida in early September;

8   correct?

9   A.  Correct.

10  Q.  And only a few days later, you got arrested; correct?

11  A.  Yes.

12  Q.  As part of this case; correct?

13  A.  Correct.

14  Q.  Where were you arrested?

15  A.  In my house.

16  Q.  Who arrested you?

17  A.  A police officer.

18  Q.  You remember the name?

19  A.  No.

20  Q.  Where did you go after you were arrested?

21  A.  I don't recall.

22  Q.  Were you ever interviewed by law enforcement?

23  A.  Yes.

24  Q.  Who were you interviewed by?

25  A.  Two agents.

1   Q.  Do you remember their names?

2   A.  No.

3   Q.  Do you see any of them in the courtroom?

4   A.  Yes.

5   Q.  Where is one of the agents?

6   A.  On the left side -- on the right side.

7   Q.  The woman on your far right, my far left?

8   A.  Correct.

9   Q.  You don't know her name?

10  A.  No.

11  Q.  Now, you were scared at that point; correct?

12  A.  Yes, I was.

13  Q.  You had this open Wyoming case; correct?

14  A.  Yes.

15  Q.  And you now had this federal case; correct?

16  A.  Yes.

17  Q.  Where you were facing a possible life sentence; correct?

18  A.  Correct.

19  Q.  And you also had an upcoming court appearance in Wyoming;

20  right?

21  A.  Yes.

22  Q.  Only a week later; correct?

23  A.  Yes.

24  Q.  On or about September 19 or so?

25  A.  Yes.

1    Q.  And you really needed to get out of custody; right?

2    A.  I needed to get to Wyoming.

3    Q.  Right.  That was because if you didn't get to Wyoming, you

4    would lose your bail money; correct?

5    A.  That and I would have a warrant out to my arrest.

6    Q.  So you wanted to be cooperative with the agents; correct?

7    A.  Yes.

8    Q.  To try and get out of custody; right?

9    A.  No, I was just scared, so I didn't know what to do.

10   Q.  Well, you didn't want to face a more serious situation if

11   you warranted out of Wyoming; correct?

12   A.  Yes.

13   Q.  You needed to get back to Wyoming; right?

14   A.  Yes.

15   Q.  So when the agents asked you if you would agree to be

16   interviewed, you said yes; correct?

17   A.  Yes.

18   Q.  And you said yes because you needed to get back to Wyoming

19   and thought this would be the way to do it; correct?

20   A.  No.

21   Q.  Well, you wanted to be cooperative because that would

22   improve your chances of possibly getting back to Wyoming;

23   right?

24   A.  No, I -- at that time I didn't see it like that.

25   Q.  Well, you didn't want to warrant out of Wyoming; right?

HBMHALM3                    Jose - Cross

1   A.  I didn't want a warrant.

2   Q.  You wanted to put yourself in the best possible position to

3   get yourself back to Wyoming; right?

4   A.  I didn't want to be in no trouble.

5   Q.  Correct.  So when the agents asked you if you wanted to be

6   interviewed, you agreed; correct?

7   A.  Yes.

8   Q.  Before they interviewed you, they stressed to you how

9   important it was to tell the truth; right?

10  A.  Right.

11  Q.  They didn't want to hear anything else; correct?

12  A.  No, not that I know of.

13  Q.  You sat only a few feet away from them; correct?

14  A.  Yes.

15  Q.  It was in a small room; right?

16  A.  Yes.

17  Q.  You were seated in a chair; correct?

18  A.  Yes.

19  Q.  And they were directly across from you; correct?

20  A.  Correct.

21  Q.  There was a man; right?

22  A.  Yes.

23  Q.  And this female agent; correct?

24  A.  Yes.

25  Q.  Only a few feet away from you; right?

1   A.  Yes.

2   Q.  You were emotional; right?

3   A.  Yes.

4   Q.  You were crying; right?

5   A.  Yes.

6   Q.  And you told them, I am going to tell you the truth; right?

7   A.  Yes.

8   Q.  And you didn't?

9   A.  I didn't.

10  Q.  You looked them in the eye; right?

11  A.  Not that I recall.

12  Q.  You looked at them; right?

13  A.  Yes.

14  Q.  And you said, I'm going to tell you the truth; correct?

15  A.  Correct.

16  Q.  And you told the agents, I'm not going to lie to you;

17  right?

18  A.  Right.

19  Q.  And at the end of the interview, you said, I've told you

20  everything I know; right?

21  A.  Right.

22  Q.  I've been 100 percent honest with you; correct?

23  A.  I don't recall saying that.

24              (Continued on next page)

25

Hbm1alm4                        Jose - Cross

1   BY MR. CECUTTI:

2   Q.  But you told them that you'd been honest.

3   A.  Yes.

4   Q.  You told that to two federal agents, right?

5   A.  Yes.

6   Q.  You told them that you never worked out of 1408 Webster,

7   right?

8   A.  Right.

9   Q.  And that was different than what you later told these three

10  prosecutors and the two agents, correct?

11  A.  Correct.

12  Q.  And the agents asked you about your friend Yaya, right?

13  A.  Yes.

14  Q.  And Yaya is also involved in prostitution, correct?

15  A.  She was.

16  Q.  And she's involved in the prostitution of minors, correct?

17  A.  No.

18  Q.  Well, the agents asked you about Yaya, right?

19  A.  Yes.

20  Q.  And the agents asked you, "What's her real name," right?

21  A.  Yes.

22  Q.  And you said, "I don't know," correct?

23  A.  I -- I'm -- I think I did.  I don't recall.

24  Q.  Well, you didn't give them Yaya's real name.

25  A.  Okay.

Hbm1alm4                          Jose - Cross

1    Q.  Right?

2    A.  No.

3    Q.  But you knew Yaya's real name.

4    A.  Yes.

5    Q.  And that's a lie, correct?

6    A.  No.

7    Q.  Well, you knew Yaya's real name, and when asked what her

8    real name was, you said you didn't know it, correct?

9    A.  Yes.

10   Q.  That's a lie, right?

11   A.  That was a lie.

12   Q.  Now you met JF through Yaya, right?

13   A.  Yes.

14   Q.  And Yaya asked you to have JF prostitute with you, correct?

15   A.  Yes.

16   Q.  Now during this interview you also told the agents that you

17   never brought in any girls, correct?

18   A.  Correct.

19   Q.  You told the agents that you didn't even know who JF was,

20   right?

21   A.  I was scared, so yes, I did lie.

22   Q.  I didn't ask you that.  I said --

23           THE COURT:  Counsel.

24   Q.  You told the agents that you didn't know who brought in JF,

25   correct?

1   A.  Correct.

2   Q.  And you denied bringing in JF, correct?

3   A.  Correct.

4   Q.  And again, that was different than what you told these

5   three prosecutors, correct?

6   A.  Yes.

7   Q.  And the agents later on, right?

8   A.  Yes.

9   Q.  You would agree with me, Ms. José, that during this

10  interview, you lied to federal agents about your involvement in

11  sex trafficking, correct?

12  A.  When I first got interviewed?

13  Q.  Yes.

14  A.  Yes.

15  Q.  And after your arrest you met with the government several

16  times, right?

17  A.  Yes.

18  Q.  And you told them different things than what you initially

19  had told them, correct?

20  A.  No.

21  Q.  Well, you told them different things than what you told

22  them during your postarrest statement, correct?

23  A.  Yes.  I told them the truth this time.

24  Q.  You told them something different, right?

25  A.  No, I told them the truth.

Hbm1alm4                         Jose - Cross

1   Q.  And that was something different, correct?

2   A.  Yes.

3   Q.  Now let's talk about your time in prison.

4           You've been to the -- you're at the MDC, correct?

5   A.  Yes.

6   Q.  And you've been at the MCC, correct?

7   A.  Yes.

8   Q.  And what's the MCC?

9   A.  Manhattan Correctional Center.

10  Q.  And inside the MCC there is a unit for women, correct?

11  A.  Correct.

12  Q.  There's only one unit for women, right?

13  A.  Yes.

14  Q.  And there's about 16 cells?

15  A.  Yes.

16  Q.  And those cells consist of two people in a cell, three

17  people in a cell, four people in a cell?

18  A.  Correct.

19  Q.  And there's also a common area, correct?

20  A.  Yes.

21  Q.  And a kitchen, right?

22  A.  Yes.

23  Q.  And all the female inmates are locked in that unit,

24  correct?

25  A.  Correct.

Hbm1alm4                         Jose - Cross

1   Q.  You can't walk around the MCC, right?

2   A.  No.

3   Q.  You have to stay in the unit, right?

4   A.  Yes.

5   Q.  And you have to either be inside your cell, right?

6   A.  Yes.

7   Q.  Or be in the common area, correct?

8   A.  Yes.

9   Q.  And other female inmates can go inside your cell if they're

10  permitted to, right?

11  A.  Yes.

12  Q.  And you can go into theirs, correct?

13  A.  Yes.

14  Q.  You're free to talk to other people, right?

15  A.  Come again?

16  Q.  You're free to talk to other female inmates, correct?

17  A.  Yes.

18  Q.  Now do you know a woman by the name of Vetthya Alcius?

19  A.  Yes.

20  Q.  She was a prostitute, right?

21  A.  Yes.

22  Q.  And she was also charged in this case, correct?

23  A.  Correct.

24  Q.  And she wasn't arrested with you back in September of 2016,

25  correct?

Hbm1alm4                        Jose - Cross

```
 1    A.  Correct.

 2    Q.  She was actually on the run, right?

 3    A.  Yes.

 4    Q.  And she was committing crimes while on the run, right?

 5         MS. LAKE:  Objection.

 6    A.  I don't know if she was.

 7    Q.  And she was arrested in June of 2017, correct?

 8         MS. LAKE:  Objection.

 9    A.  I don't know if she was.

10    Q.  She was brought into the MCC in 2017?

11         MS. LAKE:  Your Honor --

12         THE COURT:  Yes.  This is getting close to testimony.

13    I think leading is not appropriate right here.

14    Q.  Did there come a point in time, Ms. José, that you met

15    Ms. Alcius at the MCC?

16    A.  Yes.

17    Q.  And when was that?

18    A.  June 2017.

19    Q.  And that was after you had met with the government,

20    correct?

21    A.  Correct.

22    Q.  Several times.  Right?

23    A.  Yes.

24    Q.  And had entered into a cooperation agreement with them,

25    correct?
```

Hbm1alm4                          Jose - Cross

1    A.  Yes.

2    Q.  And had pled guilty pursuant to that cooperation agreement,

3    correct?

4    A.  Yes.

5    Q.  And Ms. Alcius was new to the MCC, right?

6    A.  Yes.

7    Q.  And you talked to Ms. Alcius while both of you were there

8    at the MCC, right?

9    A.  Yes, I spoke to her.

10   Q.  And you were there together for one week, correct?

11   A.  Yes.

12   Q.  And you told her -- the two of you discussed the case,

13   correct?

14   A.  No.

15   Q.  You discussed your experiences --

16   A.  Yes.

17   Q.  -- related to the case?  And you had discussed the fact

18   that you had entered into a cooperation agreement with the

19   government, correct?

20   A.  No, I didn't tell her that.

21   Q.  Well, you encouraged her to cooperate, right?

22   A.  No, I didn't.

23   Q.  You said to her that the best thing for her was to get out

24   of this problem through cooperation, right?

25   A.  I didn't tell her that.

Hbm1alm4                          Jose - Cross

1   Q.  Well, you spoke to her during this time period, right?

2   A.  Yes.

3   Q.  And you spoke to her about this particular case, correct?

4   A.  We spoke about our experiences in the case.

5   Q.  And what you were facing, correct?

6   A.  Yes.

7   Q.  The nature of the charges, right?

8   A.  Yes.

9   Q.  That you were facing a 15-year mandatory minimum, right?

10  A.  Yes.

11  Q.  And she was also facing a 15-year mandatory minimum,

12  correct?

13  A.  Yes.

14  Q.  For sex trafficking involving minors, right?

15  A.  Yes.

16  Q.  And also child pornography offenses, correct?

17  A.  Correct.

18  Q.  And that she was in a whole lot of trouble, right?

19  A.  She didn't tell me that.

20  Q.  Well, you both shared the fact that you're facing a lot of

21  prison time, correct?

22  A.  Yes.

23  Q.  And what to do about this situation, correct?

24  A.  No.

25  Q.  Now let's go back to JF.  Maria never recruited JF,

Hbm1alm4                    Jose - Cross

1    correct?

2    A.  No.

3    Q.  That was you, right?

4    A.  Yes.

5    Q.  You brought her in, correct?

6    A.  Yes.

7    Q.  And JF would give money to Ms. Alcius to post, correct?

8    A.  I don't recall that.

9    Q.  She would give money to Ari to post, right?

10           MS. LAKE:  Objection.

11   A.  I don't know that.

12           MR. CECUTTI:  If she knows.

13           MS. LAKE:  Beyond the scope of the direct.

14           THE COURT:  All right.  Sustained.

15   Q.  Ms. José, you know Maria's sisters, right?

16   A.  Yes.

17   Q.  And in the time period that you knew them, they weren't in

18   school, correct?

19   A.  Come again?

20   Q.  In the time period that you knew them, they were not in

21   school, correct?

22   A.  Correct.

23   Q.  They were doing whatever they wanted, right?

24   A.  Yes.

25   Q.  Living a wild life, correct?

Hbm1alm4                          Jose - Cross

1   A.  Yes.

2   Q.  Prostituting themselves?

3   A.  Yes.

4   Q.  And they had their own clients, correct?

5   A.  They'll have their own clients at a time.

6   Q.  Now you testified that Maria had a phone, correct?

7   A.  Yes.

8   Q.  And you used her phone, right?

9   A.  Yes.

10  Q.  And so did Maria's sisters from time to time, right?

11  A.  Yes.

12  Q.  Bibi used Maria's phone, correct?

13  A.  Yes.

14  Q.  IF used Maria's phone, right?

15  A.  Yes.

16  Q.  Maribel used her phone, right?

17  A.  Yes.

18  Q.  And not only did they use her phone, but they used her

19  Facebook account, correct?

20  A.  I don't know if they did.

21  Q.  Now you're aware that -- withdrawn.

22       Maria's sisters had boyfriends, right?

23  A.  Yes.

24  Q.  Bibi had a boyfriend?

25  A.  Yes.

Hbm1alm4                        Jose - Cross

1   Q.  IF had a boyfriend?

2   A.  Yes.

3   Q.  Taisha had a boyfriend?

4   A.  Bibi is Taisha.

5   Q.  You're right.  She's also known as T-Money, right?

6   A.  I don't know.

7   Q.  Or Jessica, correct?

8   A.  No.  I don't know.

9   Q.  But her sisters had boyfriends.

10  A.  Yes.

11  Q.  And Maribel had a boyfriend.

12  A.  Yes.

13  Q.  Flip, right?

14  A.  Yes.

15  Q.  And Maribel also worked with a person by the name of Ana

16  Miliano, correct?

17  A.  Yes.

18  Q.  And Ana was a bottom, right?

19  A.  Come again?

20  Q.  Do you know what a bottom is?

21  A.  No.

22  Q.  Do you know who Gordie is?

23  A.  Gordie?  I don't recall.

24  Q.  You know who Ana is, right?

25  A.  Yes.

1    Q.  Who's Ana?

2    A.  Maribel's friend.

3    Q.  And she's also involved in the prostitution business,

4    correct?

5    A.  Yes.

6    Q.  And Maribel worked with her?

7    A.  Yes.

8    Q.  And made a lot of money with her, right?

9    A.  Yes.

10   Q.  She was a boss, right, Ana?

11   A.  I don't know if she was.

12   Q.  She worked with Maribel, right?

13   A.  Yes.  They worked together.

14   Q.  And again, they made a lot of money, correct?

15   A.  Yes.

16   Q.  They had nice things, right?

17   A.  I don't know.

18   Q.  Well, you saw some of the things that Maribel had, right?

19   A.  Clothes.

20   Q.  Air Jordans, correct?

21   A.  Yes.

22   Q.  Nice clothing, right?

23   A.  Yes.

24   Q.  Nice jewelry, correct?

25   A.  Never seen jewelry on her.

Hbm1alm4                        Jose - Cross

1    Q.  What did you see on her that was nice?

2    A.  Clothes, that's about it, and her having a phone.

3    Q.  And sometimes that phone would get cut off, correct?

4    A.  I don't know if it did.

5    Q.  But she would use Maria's phone from time to time, right?

6    A.  I don't know if she did.

7    Q.  You testified a few moments ago that Maria's sisters would

8    use her phone, correct?

9    A.  She would use their phone, yes.

10   Q.  Now, Ms. José, you remember Ari, right?

11   A.  Yes.

12   Q.  And you and her reconnected in the end of 2015, correct?

13   A.  Yes.

14   Q.  December, actually, to be more specific, is that right?

15   A.  I don't recall.

16   Q.  But at the end of 2015, right?

17   A.  Yes.

18   Q.  And she contacted you about doing scamming, correct?

19   A.  Yes.

20              MS. LAKE:  Objection.

21              THE COURT:  I'm sorry?

22              MS. LAKE:  Objection to relevance.

23              THE COURT:  All right.  Sustained.

24              MS. LAKE:  I'd move to strike the answer, your Honor.

25              THE COURT:  All right.  I strike the answer.  The jury

Hbm1alm4                     Jose - Cross

1    should disregard it.

2    BY MR. CECUTTI:

3    Q.  Ms. José, you pleaded guilty in this case, correct?

4    A.  Yes.

5    Q.  Again, pursuant to a cooperation agreement with the

6    government?

7    A.  Yes.

8    Q.  And you pleaded guilty to participating in a sex

9    trafficking conspiracy?

10   A.  Yes.

11   Q.  And you pleaded guilty to sex trafficking a minor who was

12   under 14?

13   A.  Yes.

14   Q.  And that minor was JF, right?

15   A.  Correct.

16   Q.  And you also -- withdrawn.

17          You're facing a mandatory minimum prison sentence of

18   15 years on that charge, correct?

19   A.  Yes.

20   Q.  And the possibility of life, correct?

21   A.  Correct.

22   Q.  And you also pleaded guilty, as part of your agreement with

23   the government, to sex trafficking a minor who is under the age

24   of 18, correct?

25   A.  Yes.

Hbm1alm4                          Jose - Cross

1    Q.  And what minor is that?

2    A.  JF.

3    Q.  The same person?

4    A.  She's under 18.

5    Q.  So your understanding with respect to your agreement with

6    the government is that you are convicted involving the same

7    minor?

8    A.  Yes.

9    Q.  And you're facing a mandatory minimum sentence of ten years

10   on that, correct?

11   A.  Yes.

12   Q.  And the possibility of life, right?

13   A.  Right.

14   Q.  And you also pled guilty to fraud offenses, correct?

15   A.  Yes.

16   Q.  And you're facing a mandatory minimum of two years as part

17   of those fraud offenses, correct?

18   A.  Yes.

19   Q.  For a total of 17 years, correct?

20   A.  Correct.

21   Q.  And you're 22 years old?

22   A.  Twenty-one.

23   Q.  Twenty-one.  And you want the government to write a letter

24   to a judge for you, correct?

25   A.  Yes.

Hbm1alm4                          Jose - Cross

1    Q.  And you actually need them to, right?

2    A.  No.

3    Q.  Well --

4    A.  It's part of the agreement.

5    Q.  If you don't get your letter from the government, the best

6    you could do at sentencing is 17 years, correct?

7    A.  Correct.

8    Q.  Now again, you committed scams all over the country,

9    correct?

10   A.  Yes.

11   Q.  And you're facing open charges in Wyoming, right?

12   A.  Yes.

13   Q.  And you're facing another prison sentence on that case,

14   correct?

15   A.  Correct.

16   Q.  And what kind of sentence are you facing in Wyoming?

17   A.  Three to four years' probation.

18   Q.  You're facing prison time, correct?

19   A.  In Wyoming?

20   Q.  Yes.

21   A.  No.

22   Q.  But you're facing additional punishment in Wyoming,

23   correct?

24   A.  Yes.

25   Q.  And you could be facing charges in other states, correct?

Hbm1alm4                    Jose - Cross

1   A.  Yes.

2   Q.  For conduct all related to your scamming, right?

3   A.  Yes.

4              THE COURT:  I'm going to suggest that we take a

5   stretch break just briefly.

6              When you're ready, we'll continue.

7              MR. CECUTTI:  May I have -- I don't know the

8   government exhibit, but it's 3510-09, the cooperation

9   agreement, please.

10             Thank you.  And could we have page 3, please.  And if

11  you could please highlight the paragraph, second last

12  paragraph, second full last paragraph on the bottom, please.

13             THE COURT:  As the jurors are doing that, I note, my

14  law clerk tells me that -- oh, okay.  The screen in front of

15  one juror was not working but it's now working again.  Okay.

16             MR. CECUTTI:  Actually, it's page 3, please.  I may

17  have misspoke.  And it's the final full paragraph.  If I could

18  please have that highlighted.

19  BY MR. CECUTTI:

20  Q.  Ms. José, do you see that portion highlighted in front of

21  you?

22  A.  Yes.

23  Q.  And do you see where it says, "It is understood that this

24  agreement does not bind any federal, state, or local

25  prosecuting authority other than this office.  This office,

Hbm1alm4                          Jose - Cross

1   will, however, bring the cooperation of the defendant to the

2   attention of other prosecuting offices if requested by her"?

3   Do you see that?

4   A.  Yes.

5   Q.  So pursuant to your agreement with the government, the

6   government can contact the Wyoming prosecutors and tell them

7   about your cooperation, correct?

8   A.  Yes.

9   Q.  And if you are arrested in any other state, North Carolina,

10  Virginia, Idaho, Montana, North Dakota, wherever, you can ask

11  the government to help you on that case too, correct?

12          MS. LAKE:  Objection.

13  A.  I didn't know that.

14          THE COURT:  Sustained.

15          MR. CECUTTI:  Thank you.  We can close that.

16  Q.  Now, Ms. José, pursuant to your agreement, you're not the

17  one who decides if you told the truth, correct?

18  A.  Correct.

19  Q.  And it's not Judge Wood either, correct?

20  A.  Correct.

21  Q.  It's the government, right?

22  A.  Yes.

23  Q.  They're the ones that ultimately have that decision,

24  correct?

25  A.  Yes.

Hbm1alm4                          Jose - Cross

Q.  And the government who has that decision is the government

that you have lied to about your participation in sex

trafficking of minors in this case, correct?

A.  I didn't lie to them.

Q.  You never lied to the government about your involvement in

this case?

A.  In the beginning, when I got arrested, I lied because I was

scared, but after that I have not lied.

Q.  So the same government that you initially lied to is going

to make the decision as to whether or not you've told the

truth, correct?

A.  Correct.

Q.  Now if you tell the truth but the government doesn't

believe you, you don't get a cooperation agreement, correct?

A.  Correct.

Q.  But if you lie and the government buys your story, then you

can get a cooperation agreement, correct?

A.  No.

Q.  If you lie and the government believes that you've told the

truth, you can get a cooperation agreement, correct?

        MS. LAKE:  Objection.

A.  No.

        THE COURT:  I think it's beginning to get confusing.

The government decides whether or not to send me a letter, but

I also have an independent function of deciding whether a

Hbm1alm4                    Jose - Cross

1   witness has told the truth and I have an independent function

2   with respect to cooperation.

3           Go ahead.

4   BY MR. CECUTTI:

5   Q.  Ms. José, if the government writes you a letter, a judge

6   can sentence you below 17 years, correct?

7   A.  Yes.

8   Q.  And that's the only way, correct, to get below 17 years?

9   A.  No.

10  Q.  The only way for you to get a sentence below 17 years is if

11  the government writes a letter, correct?

12  A.  It's whatever the judge wants to give me.

13  Q.  If you don't comply with your cooperation agreement, you're

14  not going to get your letter, correct?

15  A.  Correct.

16  Q.  And if you get your letter, you can get a sentence below 17

17  years, correct?

18  A.  Yes.

19  Q.  And you're hoping for a sentence below 17 years, correct?

20  A.  Yes.

21  Q.  You're hoping that you're going to be able to go home,

22  correct, after your sentencing?

23  A.  I don't know.

24  Q.  Well, you believe you should go home, correct?

25  A.  I don't know.

Hbm1alm4                         Jose – Cross

1   Q.  You don't know whether or not you should go home?

2   A.  I want to go home.

3   Q.  And you deserve to go home, correct?

4   A.  I don't know yet.

5   Q.  Now you miss your mother?

6   A.  Yes.

7   Q.  You love her?

8   A.  Yes.

9   Q.  You listen to her advice?

10  A.  At times I did.

11  Q.  After you were arrested you were brought to the MCC,

12  correct?

13  A.  Yes.

14  Q.  And immediately after you were arrested, you spoke with

15  your mom every day on the phone?

16  A.  Yes.

17  Q.  Sometimes more than once, correct?

18  A.  Yes.

19  Q.  And these conversations were recorded, correct?

20  A.  Yes.

21  Q.  And you told your mother that you were innocent of the

22  charges, correct?

23  A.  Yes.

24  Q.  You had nothing to do with JF, right?

25  A.  Yes.

Hbm1alm4                        Jose - Cross

1   Q.  So you lied to your mother, correct?

2   A.  At that time I lied 'cause I was scared.

3   Q.  You lied to her, right?

4   A.  Yes.

5   Q.  And you not only lied to her but you insisted that you were

6   telling the truth, correct?

7   A.  Correct.

8   Q.  Now in one of your calls your mother suggested to you that

9   you accuse someone of taking the charges, correct?

10  A.  Come again?

11  Q.  In one of your calls your mother suggested to you that you

12  accuse someone else of the charges you were facing, correct?

13  A.  I don't know.  I don't recall.

14          MR. CECUTTI:  One moment, your Honor.

15          Your Honor, I'd like to mark for identification a

16  phone call in order to try and refresh Ms. José's recollection.

17  My request would be that she listen to a portion of the call

18  outside the jury's presence to see whether or not her memory is

19  refreshed as to her conversation with her mother.

20          THE COURT:  All right.  Then we'll take a brief recess

21  for the jury to go back to the jury room.

22          It won't take long.

23          (Continued on next page)

24

25

1             (Jury not present)

2             THE COURT:  All right.

3             Can the government be of any assistance here?

4             MS. LAKE:  We're making efforts, your Honor.  We have

5    a disc.  It's not working.

6             THE COURT:  Okay.  Thank you.

7             (Recording played)

8    BY MR. CECUTTI:

9    Q.  Ms. José, does this refresh your recollection?

10   A.  Yes.

11   Q.  And that your mother accused someone -- I'm sorry.

12   Withdrawn.

13            That your mother suggested?

14            THE COURT:  I think we should bring the jury back at

15   this point.

16            MR. CECUTTI:  Yes, sorry.

17            MS. LAKE:  Could we have one moment.

18            THE COURT:  Yes.  Just a moment.

19            MS. LAKE:  Your Honor, before we get started, since we

20   don't speak Spanish, we don't know exactly what was said and

21   whether it's necessary to play any other portion of the

22   recording in order to fully refresh the witness as to the

23   nature of the conversations.  We would suggest that she be

24   allowed to hear the rest of her answers, to the extent she

25   doesn't remember it.

Hbm1alm4                          Jose - Cross

1          MR. CECUTTI:  I didn't hear the --

2          THE COURT:  Okay.  Let's try this again.  The

3    recording was in Spanish.  You understand what it said,

4    Mr. Cecutti?

5          MR. CECUTTI:  I don't.

6          THE COURT:  Does your client?

7          MR. CECUTTI:  My client speaks Spanish,

8    Ms. Louis-Jeune also is proficient in Spanish.

9          THE COURT:  Okay.  So your question is, you don't know

10   whether any other portion needs to be heard by the witness.

11         MS. LAKE:  Correct, your Honor.

12         THE COURT:  All right.  Well, I certainly don't

13   either.  Is there a proffer?

14         MR. CECUTTI:  Your Honor, my understanding -- well, if

15   I give a proffer, I'd like to do that outside the presence of

16   the witness.

17         THE COURT:  Okay.  Why don't we solve it by simply

18   playing more of the recording to her now.

19         MS. LAKE:  Thank you, your Honor.

20         THE COURT:  It will be faster.

21         (Recording played)

22         THE COURT:  Does this suffice, do you think?

23         MS. LAKE:  Yes, your Honor.  Thank you.

24         THE COURT:  Okay.  Let's bring the jury back in now.

25

1              (Jury present)

2              THE COURT:  Please have a seat.

3    BY MR. CECUTTI:

4    Q.  Ms. José, did you have an opportunity to listen to the

5    phone call?

6    A.  Yes.

7    Q.  And does it refresh your recollection as to whether your

8    mother suggested to you to accuse someone else of the charges?

9    A.  My mother said that if I have to say the truth, to say the

10   truth, even if she -- as a saying, even if she was involved,

11   for me to either bring her -- if I have to bring her down, to

12   bring her down.

13   Q.  And her meaning Maria, correct?

14   A.  No, her meaning as my mother herself.

15   Q.  But she was suggesting to you to accuse someone else,

16   correct?

17   A.  She didn't suggest to me to accuse.  She told me if I have

18   to speak the truth and say whatever I have to say, even if it

19   has to bring -- even if she was involved, as a saying, to do

20   so.

21   Q.  And she used the word "accuse," correct?

22   A.  Yes.

23   Q.  Accuse someone, right?

24              MS. LAKE:  Objection.  She just testified as to the

25   content.

Hbm1alm4                    Jose - Cross

1              THE COURT:  Yes.

2     Q.  Now, Ms. José, you have a Facebook page?

3     A.  Yes.

4     Q.  And the name on your account is GabrieLa Vuitton, right?

5     A.  Yes.

6     Q.  And it's still active although you're incarcerated?

7     A.  I don't know.

8     Q.  But you were using this page before your arrest in 2016,

9     correct?

10    A.  Yes.

11    Q.  And in 2015, right?

12    A.  Yes.

13    Q.  And you made posts to your page during these times?

14    A.  Yes.

15    Q.  I'd like to show you what's been marked for identification

16    as Defense Exhibit B.

17              MR. CECUTTI:  Your Honor, may I approach?

18              THE COURT:  Yes.  You may both approach if you want.

19    Q.  Ms. José, could you please take a look at that.

20              Ms. José, do you recognize the post?

21    A.  Yes.

22    Q.  What is it?

23    A.  A status.

24    Q.  I'm sorry.  I can't see you.  I don't know if you're still

25    reading it.

Hbm1alm4                          Jose - Cross

1    A.  Oh, sorry.

2    Q.  Is it a post?

3    A.  Yes, it's a status on Facebook.

4    Q.  That you wrote?

5    A.  Yes.

6              THE COURT:  You have to let her finish.

7    Q.  Ms. José, you wrote that post?

8    A.  Yes.

9              MR. CECUTTI:  Your Honor, I offer Defense Exhibit B

10   into evidence.

11             MS. LAKE:  We object on hearsay grounds.

12             THE COURT:  I don't know.  I'd have to see it to rule

13   on the hearsay objection.

14             MR. CECUTTI:  Your Honor, I have a copy.

15             THE COURT:  Well, she can testify that she heard this.

16   The question needs to be phrased in that way.

17   BY MR. CECUTTI:

18   Q.  Ms. José, you heard what was in the post?

19   A.  I don't recall.  I honestly think it was more -- more of a

20   feeling that I was feeling.

21   Q.  And --

22   A.  So I guess -- not I guess, but -- whatever that I post at

23   that time, it was just like a status as a -- as of like how am

24   I feeling.

25   Q.  And how you were feeling and what you posted was that you

Hbm1alm4                          Jose - Cross

1   put yourself first when it matters, correct?

2   A.  Yes, in the status I did write that.

3   Q.  And that you have to make sure that you're straight before

    anybody else, correct?

5   A.  Right.

6   Q.  Those were your words, right?

7   A.  I posted that as a status.

8   Q.  Now, Ms. José, you're a sneaky person, right?

9            MS. LAKE:  Objection.

10  A.  No.

11           THE COURT:  Overruled.

12  A.  No.

13  Q.  You told people that you're sneaky, right?

14  A.  No, not that I recall.

15  Q.  You've told people not to trust you, right?

16  A.  Not that I recall.

17           MR. CECUTTI:  Your Honor, may I approach.

18           THE COURT:  Yes.  And the government may as well.

19  Q.  Ms. José, please take a look at this.

20           Ms. José, do you recognize this?

21  A.  Yes.

22  Q.  It's a Facebook post, right?

23  A.  Yes.

24  Q.  That you wrote?

25  A.  Yes.

1    Q.  And you said you were sneaky, right?

2    A.  That's a part of a song.

3    Q.  But you said that you were sneaky, correct?

4    A.  Yes, it's a part of a song.

5    Q.  Why don't you tell the jury what you said in your post.

6    A.  "I'm super sneaky, please don't trust me."

7             MR. CECUTTI:  No further questions.  Thank you.

8             MS. LAKE:  Brief redirect, your Honor.

9             THE COURT:  Yes.

10   REDIRECT EXAMINATION

11   BY MS. LAKE:

12   Q.  Ms. José, defense counsel just asked you about a post

13   saying that you were sneaky.  Do you recall that?

14   A.  Yes.

15   Q.  What was the date of that post?

16   A.  October 7th.

17   Q.  Of what year?

18   A.  2015.

19   Q.  Do you recall defense counsel asking you about a post

20   talking about putting yourself first?

21   A.  Yes.

22   Q.  What was the date of that Facebook post?

23   A.  August 21st.

24   Q.  Of what year?

25   A.  2015.

Hbm1alm4                    Jose - Redirect

1   Q.   Now defense counsel also asked you about preparing to

2   testify today.  Do you remember those questions?

3   A.   Yes.

4   Q.   And do you remember him asking you about whether the

5   government cross-examined you during preparation and gave you

6   feedback?

7   A.   Yes.

8   Q.   Ms. José, what does your agreement with the government

9   require you to do in court today?

10  A.   To say the truth.

11  Q.   And during the ten or so times that you met with the

12  government before testifying here today, what did the

13  government tell you to do in court here today?

14  A.   To say the truth.

15  Q.   Did the government ever tell you what answers to give?

16  A.   No.

17  Q.   Now the defense attorney asked you many questions about

18  committing fraud.  Do you remember those questions?

19  A.   Yes.

20  Q.   I think you testified that at the time you didn't

21  understand the difference between scamming and deceiving.  Did

22  I understand that right?

23  A.   Yes.

24  Q.   Sitting here today, do you understand that you were

25  deceiving people when you were scamming them?

Hbm1alm4                          Jose – Redirect

1    A.  Yes.

2    Q.  Are you deceiving anyone today?

3    A.  No.

4    Q.  Are you scamming anyone today?

5    A.  No.

6    Q.  Now you remember all of the questions that defense counsel

7    asked you about the scamming, right?

8    A.  Yes.

9    Q.  And do you remember giving a lot of very detailed answers

10   about that?

11   A.  Yes.

12   Q.  Had you told the government all of those details before?

13   A.  Yes.

14   Q.  Was that voluntarily?

15   A.  Yes.

16   Q.  And have you pled guilty to fraud and identity theft based

17   on all of that conduct?

18   A.  Yes.

19   Q.  Now the defense attorney also asked you about lies that you

20   told the FBI agents when you were very first arrested in

21   connection with this case.  Do you remember that?

22   A.  Yes.

23   Q.  Now in fact did you work at 1408 Webster Avenue, Apartment

24   19G?

25   A.  Yes, I did.

Hbm1alm4                         Jose - Redirect

1    Q.   Doing what?

2    A.   Prostituting.

3    Q.   Who did you work with?

4    A.   Soly, Daniela, IF, Bibi, Ari, Theiya, Nikki, Maria, Darleny

5    at times.

6    Q.   And were some of those people minors?

7    A.   Yes.

8    Q.   Is that what you told the prosecutors the ten or so times

9    that we had meetings with you?

10   A.   Yes.

11             MS. LAKE:  May I have one moment, your Honor.

12             THE COURT:  Yes.

13             MS. LAKE:  Nothing further.  Thank you.

14             MR. CECUTTI:  No questions, your Honor.

15             THE COURT:  Okay.  Thank you.  Thank you, Ms. José.

16   You may step down.

17             (Witness excused)

18             MS. LAKE:  Could we have just one moment.

19             THE COURT:  Yes.

20             MS. LAKE:  Your Honor, the government calls Special

21   Agent Skyler Whittington.

22             THE COURT:  Thank you.  Good afternoon.

23             THE WITNESS:  Good afternoon.

24   SKYLER WHITTINGTON,

25        called as a witness by the Government,

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MS. LAKE:

4     Q.   Good afternoon, Special Agent Whittington.

5     A.   Good afternoon.

6     Q.   Where do you work?

7     A.   The FBI.

8     Q.   What is your title?

9     A.   Special agent.

10    Q.   How long have you been a special agent with the FBI?

11    A.   Just over two years.

12    Q.   Are you assigned to a particular squad?

13    A.   Yes.

14    Q.   What squad?

15    A.   C11.

16    Q.   When did you join that squad?

17    A.   January of this year.

18    Q.   And what, if any, squad were you assigned to before C11?

19    A.   C20.

20    Q.   And what is C20?

21    A.   C20 investigates crimes against children, human

22    trafficking, and child pornography.

23    Q.   And what were your job responsibilities as a special agent

24    in the crimes against children squad?

25    A.   I was assigned to investigate instances of human

1    trafficking, minor and adult, and assist with child pornography

2    investigations.

3            MS. LAKE:  Your Honor, before we go any further, I'd

4    like to read a stipulation between the parties.

5            THE COURT:  All right.

6            MS. LAKE:  "It is hereby stipulated and agreed by and

7    among the parties that if called as a witness, a special agent

8    with the Federal Bureau of Investigations would testify that

9    Government Exhibits 401 through 404 were recovered from 203

10   West 145th Street, Apartment 2A, Harlem, New York, on

11   September 12, 2016, and are in substantially the same condition

12   as when they were recovered on that date.

13           "It is further stipulated and agreed that this

14   stipulation, as Government Exhibit 1005, as well as Government

15   Exhibits 401 through 404, may be received in evidence as

16   government exhibits at trial."

17           And the government moves Government Exhibits 401, 402,

18   403, 404, and 1005 into evidence at this time.

19           THE COURT:  All right.  I take it there's no

20   objection.

21           MR. CECUTTI:  One moment, your Honor.  I just want to

22   review the stipulation briefly.

23           No objection, your Honor.

24           THE COURT:  All right.  Government Exhibits 1005 and

25   401 through 404 are received without objection.

1          (Government's Exhibits 401 through 404 and 1005

2     received in evidence)

3     BY MS. LAKE:

4     Q.  Special Agent Whittington, directing your attention to

5     September 12, 2016, did you assist in an FBI operation that

6     day?

7     A.  I did.

8     Q.  What was the nature of that FBI operation?

9     A.  It was a search warrant in connection with a human

10    trafficking investigation.

11    Q.  What was your role?

12    A.  My role was to be the search team leader.

13    Q.  What is a search team leader?

14    A.  Search team leader's role is to oversee the logistical

15    operations of the search and to designate the personnel

16    assigned to the search certain tasks that are required

17    during -- during the search.

18    Q.  What, if anything, provided authority to conduct the search

19    on that day?

20    A.  A search warrant.

21    Q.  Who signed the search warrant?

22    A.  A judge.

23    Q.  Where did you go to execute the search?

24    A.  An apartment at the address of 203 West 145th Street in

25    New York.

1    Q.  Do you remember the apartment number?

2    A.  Apartment 2A.

3    Q.  What kind of building is 203 West 145th Street?

4    A.  It's a tan brick building, in the front of the building

5    there's a security gate you have to go through, and then once

6    you're through that gate, there are two entrances to two

7    different sides of the building.

8            MS. LAKE:  Ms. Geier, can you show the witness what's

9    been marked for identification as Government Exhibit 213,

10   please.

11   Q.  Do you recognize this?

12   A.  I do.

13   Q.  What is it?

14   A.  That's the apartment building.

15           MS. LAKE:  Your Honor, the government offers

16   Government Exhibit 213.

17           THE COURT:  I take it there's no objection.

18           MS. LOUIS-JEUNE:  No objection, your Honor.

19           THE COURT:  Government Exhibit 213 is received without

20   objection.

21           (Government's Exhibit 213 received in evidence)

22           MS. LAKE:  Ms. Geier, can you please publish

23   Government Exhibit 213.

24   BY MS. LAKE:

25   Q.  Now when you arrived at this building, where did you go?

1    A.   Through the security gate --

2            THE COURT:  I'm sorry.  All right.  There's a monitor

3    that's not working here.  I'll ask the two jurors who have that

4    monitor in front of them whether you can move so that you can

5    see another monitor.

6            Thank you.  I appreciate that.  We'll work on getting

7    that working.

8            You may continue.

9            MS. LAKE:  Thank you, your Honor.

10   BY MS. LAKE:

11   Q.   When you arrived at that building, where did you go?

12   A.   Through the security gate and then I believe through the

13   next set of doors that was on the right and up to the second

14   floor to Apartment 2A.

15   Q.   Did you have your gun drawn when you approached that

16   apartment?

17   A.   I did not.

18   Q.   Did you see anyone who had a gun drawn when they approached

19   that apartment?

20   A.   I can't recall.  I -- my position for the entry of the

21   search was further back in what we call the stack, the lineup

22   of personnel, so I don't -- I wasn't able to see who, if

23   anyone, at the front of the stack had their weapon drawn.

24   Q.   Approximately how many other agents were with you that day?

25   A.   For our entry, at least ten, and more then arrived later

1    after that.

2    Q.  And what is the FBI policy with respect to drawing a

3    firearm when entering an apartment or a house to conduct a

4    search or an arrest?

5    A.  It's the discretion of the -- of the search personnel, the

6    special agents as to whether or not they decide to have their

7    weapon drawn.  It's very common to have the weapon drawn

8    because it's almost always an unknown environment you're

9    getting ready to enter during a search.

10   Q.  What happened when you entered Apartment 2A?

11   A.  As I entered, other personnel, other special agents, were

12   encountering individuals that were located in the residence,

13   and so once I came in, I observed that that was going on and I

14   began to facilitate my role of designating the search.

15   Q.  Who, if anyone, did you observe inside the apartment when

16   you arrived?

17   A.  I observed two adult females, one adult male, and two

18   juvenile females.

19   Q.  Do you see any of those people in the courtroom here today?

20   A.  I do.

21   Q.  Can you please identify that individual by an article of

22   clothing that they're wearing.

23   A.  The female sitting with defense counsel with a black shirt

24   on, or black -- dark color.

25              THE COURT:  Identifying the defendant.

1    Q.  What was your focus once you were inside of that apartment?

2    A.  My focus was to coordinate the logistical aspect of the

3    search to make sure that the tasks that are necessary for the

4    search to be completed are assigned to personnel, such as

5    photography, evidence photography, a diagram sketch of the

6    layout of the apartment, evidence recovery forms, documentation

7    that I main -- that's part of my job is to maintain that

8    documentation.

9    Q.  I'm going to show you what's been marked as Government

10   Exhibits 410 through 437.  Can you please take a look through

11   those photographs.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

HBMHALM5                         Whittington - Direct

1   Q.  Have you had an opportunity to look at Government

2   Exhibit 410 through 437?

3   A.  I have.

4   Q.  Do you recognize those documents?

5   A.  I do.

6   Q.  What are they?

7   A.  These are copies of photographs taken from the search.

8   Q.  Did those fairly and accurately depict what you observed in

9   your search of 203 West 145th Street, Apartment 2A?

10  A.  They do.

11          MS. LAKE:  Your Honor, the government offers

12  Government Exhibit 410 through 437.

13          MS. LOUIS-JEUNE:  No objection.

14          THE COURT:  Government Exhibits 410 through 437 are

15  received without objection.

16          (Government's Exhibits 410 through 437 received in

17  evidence)

18          MS. LAKE:  Ms. Geier, could you please publish

19  Government Exhibit 410.

20  Q.  Special Agent Whittington, what is this?

21  A.  This is called a photograph identifier.  This is the first

22  photograph taken during a search to identify the date, the case

23  number for this investigation, who's conducting the

24  photography, and where the location is.

25          MS. LAKE:  Ms. Geier, can you please publish 411.

1   Q.  Special Agent Whittington, what is this?

2   A.  This is the door, entrance door, to the apartment just

3   inside the first door which was the security gate.

4           MS. LAKE:  Ms. Geier, can you move to 412, please.

5   Q.  Special Agent Whittington, what is this?

6   A.  This is the door to the apartment.

7           MS. LAKE:  Ms. Geier, could you publish 413.

8   Q.  What is this?

9   A.  This is the door to the apartment open, looking into the

10  apartment.

11          MS. LAKE:  Ms. Geier, could you please publish 414.

12  Q.  What is this, Special Agent Whittington?

13  A.  This is a diagram sketch of the layout of the apartment.

14  Q.  What is marked as C in this diagram?

15  A.  C is what appeared to be a common living space within the

16  layout of the apartment but was being used as a bedroom.

17  Q.  What is marked as B?

18  A.  B is what appeared to be a bedroom in the apartment.

19          MS. LAKE:  Ms. Geier, can you please publish

20  Government Exhibit 415.

21  Q.  What is this?

22  A.  So this photograph is once you're into the apartment

23  through the front door, turn to your right looking at the Room

24  C.

25          MS. LAKE:  Ms. Geier, can you please publish 416.

1    Q.  What is this, special agent?

2    A.  This is another overall picture of Room C.

3          MS. LAKE:  Ms. Geier, can you please publish 417.

4    Q.  What is this?

5    A.  Again, another picture of Room C from a different angle.

6          MS. LAKE:  Ms. Geier, can you please publish 418.

7    Q.  What is this?

8    A.  Another picture in Room C of table and chairs in the back

9    corner.

10         MS. LAKE:  Ms. Geier, can you please publish 419.

11   Q.  What is this?

12   A.  This is photograph of a red purse recovered within the

13   apartment.

14   Q.  Do you recall where it was recovered from?

15   A.  I don't recall.

16   Q.  Can you see what was inside of that purse?

17   A.  Yes.  It appears to be U.S. currency, condoms, various

18   other personal items, cards.

19         MS. LAKE:  Ms. Geier, can you please publish

20   Government Exhibit 420.

21   Q.  Special Agent Whittington, what is this?

22   A.  This is the contents of the red purse we just spoke of,

23   showing U.S. currency, two condoms, a small multicolored bag, a

24   small bag with material in it, and two -- one benefit card and

25   one Visa debit card.

HBMHALM5                    Whittington - Direct

1          MS. LAKE:  Ms. Geier, can you zoom in on the two

2     cards.

3     Q.  Can you tell what those cards were, special agent?

4     A.  Card on top was a Visa card of some kind.  Card on the

5     bottom is a benefits card.

6     Q.  Thank you.

7          Ms. Geier, can you please publish Government

8     Exhibit 421.

9          What is this, Special Agent Whittington?

10    A.  This is an article of mail recovered from the apartment.

11         MS. LAKE:  Ms. Geier, can you zoom in on the address

12    on the envelope.

13    Q.  What is the address there?

14    A.  The address on this envelope is 211 West 145th Street,

15    Apartment 2A.  At the time of our search, there was another

16    search also taking place in connection to this investigation at

17    211.  And as both apartments addresses had been used, somehow

18    the case agents had linked them to the investigation, and my

19    understanding was that the search of Apartment 211 concluded

20    that there was no -- the people living there were no longer

21    connected to this investigation.  However, this mail was still

22    recovered within the apartment that I was located at, 203.

23    Q.  Who's the individual this is addressed to at 211 West 145th

24    Street?

25    A.  Maria Almonte.

1    MS. LAKE:  Ms. Geier, could you please zoom out.

2    Could you please zoom in on the return address.

3    Q.  Who is this from?

4    A.  Department of Education, City of New York.

5    MS. LAKE:  Ms. Geier, can you please publish

6    Government Exhibit 422.  Can you zoom in on the address

7    information.

8    Q.  Special Agent Whittington, who is this addressed to?

9    A.  Maribel, and the last name begins with the letter F.

10   Q.  What's the address here?

11   A.  211 145th Street.

12   MS. LAKE:  Ms. Geier, can you please zoom out.  Can

13   you please publish Government Exhibit 423.  Can you please zoom

14   in on the address information.

15   Q.  Special Agent Whittington, what is this?

16   A.  This is another article of mail recovered within the

17   apartment, addressed to the address of 211 West 145th Street,

18   Apartment 2A, and the addressee's first name begins with an

19   "F," last name begins with an "I."

20   MS. LAKE:  Ms. Geier, can you zoom out and zoom in on

21   the return address.

22   Q.  Who is this from?

23   A.  This is from the Pablo Neruda Academy in the Bronx.

24   MS. LAKE:  Ms. Geier, can you please turn to

25   Government Exhibit 424.  What is this, Special Agent

1  Whittington?

2  A.  This is a photograph of the kitchen within the apartment of

3  a chair with some kind of plastic sheeting over it.

4          MS. LAKE:  Ms. Geier, can you please publish

5  Government Exhibit 425.

6  Q.  What is this?

7  A.  A photograph of the bathroom within the apartment.

8          MS. LAKE:  Ms. Geier, can you please publish

9  Government Exhibit 426.

10  Q.  What is this?

11  A.  A photograph of Room B.

12          MS. LAKE:  Ms. Geier, can you please publish

13  Government Exhibit 427.

14  Q.  What is this?

15  A.  This is a photograph of a closet within the apartment.

16          MS. LAKE:  Ms. Geier, can you please move to

17  Government Exhibit 428.

18  Q.  What is this?

19  A.  A photograph of another closet within the apartment.

20          MS. LAKE:  Ms. Geier, can you please move to

21  Government Exhibit 429.

22  Q.  What is this?

23  A.  This is a photograph of a piece of paper with mathematics

24  on it found in the apartment.

25  Q.  Do you recall where this piece of paper was recovered from?

1    A.  No, I don't.

2              MS. LAKE:  Ms. Geier, if you could zoom in on the math

3    equation that's in the top left.

4    Q.  What are the numbers being added there?

5    A.  420 and 60.

6              MS. LAKE:  Ms. Geier, can you zoom out.

7    Q.  The next one below it, what are the numbers being added

8    there?

9    A.  540 and 60.

10             MS. LAKE:  Please zoom out.

11   Q.  What about the next one below that?

12   A.  60, 60, and 60.

13             MS. LAKE:  Thank you.  Ms. Geier, can you please zoom

14   out.

15   Q.  If you go to the right, towards the top, yes?

16   A.  That looks like 480 and 60.

17             MS. LAKE:  Ms. Geier, can you please zoom in.

18   Q.  If you look below, what are the numbers there?

19   A.  180 and 60.

20             MS. LAKE:  Ms. Geier, can you please zoom in, to the

21   right.

22   Q.  What are the numbers there?

23   A.  240 and 60.

24             MS. LAKE:  Ms. Geier, can you please zoom out.

25   Q.  And the one on the top right, what are the numbers there?

1    A.   360.

2    Q.   Below that?

3    A.   360.   I'm sorry, 360 and 60.

4    Q.   Thank you.

5            Ms. Geier, can you please move to Government

6    Exhibit 430.

7            What is this?

8    A.   This is a photograph of a cell phone found within the

9    apartment on the floor.

10   Q.   Did you recover that cell phone from the apartment?

11   A.   We did.

12           MS. LAKE:   Ms. Geier, can you please move to

13   Government Exhibit 431.

14   Q.   What is this?

15   A.   This is a photograph of another cell phone within a purse

16   found in the apartment.

17           MS. LAKE:   Ms. Geier, can you please publish

18   Government Exhibit 432.

19   Q.   What is this?

20   A.   This is a photograph, I believe, in the bathroom of one of

21   the floor heating rails, and it's kind of hard to tell there

22   are condoms within the heating rail itself.

23           MS. LAKE:   Ms. Geier, can you please move to

24   Government Exhibit 433.

25   Q.   What is this?

1   A.  Once again, it's a heating rail within, I believe, the

2   bathroom with condoms located within the heating rail.

3           MS. LAKE:  Ms. Geier, can you please move to

4   Government Exhibit 434.

5   Q.  What is this?

6   A.  This is another heating rail along the floor within the

7   apartment, and there are condoms located within that heating

8   rail.

9           MS. LAKE:  Ms. Geier, can you please zoom in the

10  middle of the image, the gold object.

11  Q.  What is that?

12  A.  That would be the condom.

13          MS. LAKE:  Ms. Geier, can you please move to

14  Government Exhibit 435.

15  Q.  What is this?

16  A.  This is a photograph within the apartment near the window

17  ledge with various personal items and condom in the center of

18  the photograph.

19          MS. LAKE:  Ms. Geier, can you please move to

20  Government Exhibit 436.

21  Q.  What is this?

22  A.  Another photo of a different window ledge in the apartment,

23  another condom on the window ledge.

24          MS. LAKE:  Ms. Geier, can you please publish

25  Government Exhibit 437.

1   Q.  What is this?

2   A.  This appears to be a used condom outside of the window

3   ledge on a fire escape along with a paper towel or Kleenex.

4   Q.  Thank you.

5       Special Agent Whittington, you testified that you

6   recovered phones from the apartment.  Why were phones recovered

7   in the search?

8   A.  Phones were recovered because in these kind of

9   investigations, they're often a tool of communication or tool

10  for advertising for prostitution.

11  Q.  Were you involved in the seizure of any other evidence from

12  Apartment 2A?

13  A.  Yes.

14  Q.  What kinds of evidence did you seize?

15  A.  Other electronic devices, other personal items.  I believe,

16  I think, other -- other mail, other phones.

17  Q.  Did you recover lingerie?

18  A.  Yes, we did.

19  Q.  Why did you seize that?

20  A.  We seized lingerie because based on the investigation

21  having to do with prostitution, lingerie is often associated

22  with prostitution, and there were copious amounts of lingerie

23  within the apartment.

24  Q.  How would you describe the conditions in that apartment?

25  A.  Unsanitary.

HBMHALM5                          Whittington - Direct

1    Q.  What made the apartment unsanitary?

2    A.  It appeared to have not been well-maintained by the

3    occupants.  It was dirt and mold and food and as well as the

4    condoms, and such, throughout the apartment.

5    Q.  Did you observe any structural problems with the apartment?

6    A.  No, not that I observed, no.

7    Q.  I'm going to show you what has been admitted into evidence

8    as Government Exhibits 401, 402, 403, and 404.  Special Agent

9    Whittington, can you look at what's marked Government

10   Exhibit 401.

11   A.  Yes.

12   Q.  What is that?

13   A.  Appears to be condoms located in the apartment.

14   Q.  Just hold it up so that the jury can see.  I don't know

15   that we need to pass this around.  You can step down, if the

16   Court will permit it.

17           THE COURT:  Yes.

18   A.  OK.  So there are condoms here, and you see through the

19   bag.

20           THE COURT:  A little louder.

21           THE WITNESS:  You can see the condoms here, a few of

22   the condoms, and then an opened-up condom right here, almost

23   within the tissue paper.

24           THE COURT:  If any juror has not seen this, please

25   raise your hand.

1    BY MS. LAKE:

2    Q.  Directing your attention now to Government Exhibit 402.  I

3    believe it's inside the Redweld.  What is this?

4    A.  It's a cell phone recovered from the apartment.

5    Q.  How can you tell it's one of the phones recovered?

6    A.  It has a label on the back indicating so.

7    Q.  Directing your attention to Government Exhibit 403.  What

8    is this?

9    A.  This is, looks like, two -- a few condoms and the Visa

10   debit card and the benefits card for New York State.

11          MS. LAKE:  With the Court's permission, may Special

12   Agent Whittington step down and show that to the jury?

13          THE COURT:  Yes.

14          If any juror needs more time to look at it, please

15   raise your hand.

16   Q.  Finally, directing your attention to Government

17   Exhibit 404.  What is this?

18   A.  This is the piece of paper recovered from the apartment

19   with all the math on it.

20          MS. LAKE:  With the Court's permission --

21          THE COURT:  Yes.

22          MS. LAKE:  -- may Special Agent Whittington show the

23   jury?

24          THE COURT:  Yes.

25          MS. LAKE:  Thank you very much.  Your Honor, the

```
 1   government has no further questions at this time for this
 2   witness.
 3              MS. LOUIS-JEUNE:  No questions, your Honor.
 4              THE COURT:  No questions.  All right.
 5              Thank you very much, special agent.  You may step
 6   down.
 7              (Witness excused)
 8              THE COURT:  Perhaps the jurors would like to stretch
 9   while we wait for the next witness.
10              MS. LAKE:  Yes, your Honor.  The government calls
11   Stephanie Hecker.
12              THE COURT:  OK.
13              MS. LAKE:  May I retrieve the physical evidence?
14              THE COURT:  You may.
15              I'd like to check with defense counsel which defense
16   exhibits were offered.  Defense Exhibit B was offered.  There
17   was a hearsay objection which I partially sustained because I
18   didn't understand who the speaker was.  Is there still an
19   objection to it, Defense Exhibit B?
20              MS. LAKE:  Yes, your Honor.
21              THE COURT:  What is your objection?  You had said
22   hearsay, but it's the declarant's own.
23              MS. LAKE:  It is the declarant's out-of-court
24   statement.  We don't understand any purpose it was offered for
25   other than truth.  We thought it was permissible to discuss it.
```

1           THE COURT:  Well, I overrule the objection, and I

2     receive Defense Exhibit B.

3           (Defendant's Exhibit B received in evidence)

4           THE COURT:  Was there another one?  We have another

5     excerpt, but you didn't offer it.  Was it just to refresh?

6           MR. CECUTTI:  I'll offer it now.

7           THE COURT:  Do you want to mark it?

8           MR. CECUTTI:  Yes, as Defense Exhibit A.

9           THE COURT:  All right.  I'll mark it.

10          MR. CECUTTI:  Thank you.

11          THE COURT:  Is there any objection to Defense Exhibit

12    A?  This is the excerpt from a song.

13          MS. LAKE:  No, your Honor.

14          THE COURT:  Defense Exhibit A is received without

15    objection.

16          (Defendant's Exhibit A received in evidence)

17          MR. CECUTTI:  Thank you.

18    STEPHANIE HECKER,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21    DIRECT EXAMINATION

22    BY MS. LAKE:

23    Q.  Good afternoon, Ms. Hecker.

24    A.  Good afternoon.

25    Q.  What kind of an organization do you work for?

HBMHALM5                          Hecker - Direct

1    A.  I work for a foster care organization.

2              THE COURT:  Move the mic a little closer to you.

3    Thank you.

4    Q.  What is your title?

5    A.  I work as a sociotherapist.

6    Q.  How long have you been a sociotherapist for this foster

7    care organization?

8    A.  December 2016 to current.

9    Q.  Where, if anywhere, did you work before that?

10   A.  The Administration for Children's Services for New York

11   City.

12   Q.  Over what period of time did you work for the

13   Administration for Children's Services?

14   A.  October 2014 to April 2016.

15   Q.  What was your title there?

16   A.  Child protective specialist.

17   Q.  What were your duties and responsibilities as a child

18   protective specialist with the Administration for Children's

19   Services?

20   A.  Investigating allegations of child abuse and neglect.

21   Q.  When you were assigned to a case to investigate, what steps

22   would you take from the beginning to the end?

23   A.  Initially, we would make contact with the family, make

24   contact with the source collateral contact, medical providers,

25   school, along with ongoing home visits with the family.

1              MS. LAKE:  Ms. Geier, can you please publish what has

2    been admitted into evidence as Government Exhibit 503.

3    Q.  Ms. Hecker, do you recognize this person?

4    A.  Yes, I do.

5    Q.  Who is this?

6    A.  This is Ms. Darlene DeLeon.

7    Q.  When did DeLeon first come to your attention?

8    A.  August 6, 2015.

9    Q.  How did she first come to your attention?

10   A.  I was assigned to a case based on a report that was made to

11   the state central registry with allegation of inadequate

12   guardianship.

13   Q.  And how many children did DeLeon have?

14   A.  Three children.

15   Q.  Were they boys or girls?

16   A.  Boys.

17   Q.  What were their approximate ages?

18   A.  At the time, seven, eight, and ten.

19   Q.  Did there come a time when you visited DeLeon's apartment?

20   A.  Yes, I did.

21   Q.  What was the address of that apartment?

22   A.  1408 Webster Avenue, Apartment 19G, Bronx, New York.

23              MS. LAKE:  Ms. Geier, can you please publish

24   Government Exhibit 223 which has been admitted into evidence.

25   Q.  Ms. Hecker, do you recognize this?

1    A.   That is the building Ms. DeLeon reside in at the time of my

2    investigation.

3    Q.   The first time that you went to DeLeon's apartment, who, if

4    anyone, did you observe inside?

5    A.   On my initial contact with the family, there was

6    Ms. DeLeon, her three sons, and three unidentified women.

7    Q.   When you say "unidentified women," what do you mean?

8    A.   At the time they refused to present any identification and

9    also encouraged Ms. DeLeon not to release anything so that I

10   couldn't verify if she was the mother of the children.

11   Q.   Do you see any of those three individuals in the courtroom

12   today?  You can stand up if you need to.

13   A.   No, I don't.

14   Q.   You can't recognize anyone?

15   A.   Maybe because I don't --

16   Q.   Can you please describe the appearance of the females who

17   were in the apartment.

18   A.   There was a younger female with short black hair around

19   neck length, slim in build.  Probably around, I would say,

20   5'6", 5'7".  There was a heavyset woman, Hispanic.  All three

21   women were Hispanic women.  Second woman, she had blond hair at

22   the time.  She had piercings, several tattoos.  And there was a

23   third woman who had probably around shoulder-length brown hair,

24   slimmer build.  I would say probably around 5'6", 5'7", within

25   that height.

HBMHALM5                        Hecker - Direct

1          MS. LAKE:  Ms. Geier, can you please publish

2     Government Exhibit 513 which is in evidence.

3     Q.  Do you recognize this individual?

4     A.  Yes, I do.

5     Q.  How do you recognize her?

6     A.  She was one of the women in the home, the younger woman of

7     the three with the short hair, shoulder length, small build.

8          MS. LAKE:  Ms. Geier, can you please publish

9     Government Exhibit 501.

10    Q.  Do you recognize this individual?

11    A.  Yes, I do.

12    Q.  Who is this?

13    A.  This is Ms. Almonte, which I later discovered her name.

14    But at the time of my initial contact, she had blond hair.

15    Q.  Where did you see her?

16    A.  She was at Ms. DeLeon's residence when -- my first initial

17    contact with the family.

18    Q.  What, if anything, did DeLeon tell you about these

19    individuals?

20    A.  Ms. DeLeon stated that they were her three cousins who

21    frequently visit the home, and they were coming from

22    Pennsylvania.

23    Q.  When you visited the apartment, what did you observe inside

24    of the apartment?

25    A.   Initially, the home had no furniture.  It was a

1    three-bedroom apartment.  The first room, the children shared

2    the first room.  The middle had a mattress on the floor,

3    queen-size mattress.  There was a very strong smell of

4    marijuana coming from the bedroom.  And Ms. DeLeon's bedroom --

5    I'm sorry.  I don't know if I could proceed to -- in terms of

6    what I -- when I questioned Ms. DeLeon regarding it, she stated

7    that that was the room she used as a guest room when her

8    relatives, making reference to the three women, came to visit

9    the home.

10   Q.  So, just to be clear, what were the conditions in the

11   apartment, generally speaking?

12   A.  Generally, other than that room, the home was clean,

13   unfurnished but clean.  But that one room had a very strong

14   smell of marijuana, and there was no bed in the room, just a

15   mattress on the floor and a --

16           MS. LAKE:  Ms. Geier, you can take down Government

17   Exhibit 501.

18   Q.  Now, after this first visit, did you return to Apartment

19   19G?

20   A.  Yes, I did.

21   Q.  Approximately how often?

22   A.  I made -- a few days after, I went back to the home.

23   During the life of my investigation, I made seven face-to-face

24   contacts in the home.

25   Q.  What, if anything, did you observe in your subsequent

1    visits to Apartment 19G?

2    A.  The first time I went to the home, the three women were

3    there.  After going to the home, there was only one other

4    incident where I had met Ms. Almonte.  Other than that, the

5    three women were not in the home.  Ms. DeLeon stated to me that

6    her cousins had returned back to Pennsylvania.

7    Q.  Aside from visiting the apartment and speaking with the

8    family, what, if any, steps did you take in your investigation?

9    A.  As part of ACS mandate, NYPD was notified about the

10   concerns reported, and the case was assigned to the Bronx

11   mobile unit.

12   Q.  Did you conduct any searches on the Internet?

13   A.  Yes, I did.

14   Q.  What did you search for?

15   A.  The source of the report provided me with information about

16   an ad that was placed on Backpage.  He gave me a description of

17   what I should be looking for.  He said to me there was an ad

18   with Ms. DeLeon's address.  When I did conducted a Backpage

19   search, I did find numerous ads with the address listed, and I

20   was also able to identify some of the women that I saw in the

21   home.

22   Q.  When you say "the source of the report," where did that

23   person work for?

24   A.  NYCHA police.

25   Q.  I'm going to show you what's been marked for identification

1    as Government Exhibits 971 and 984.  Can you please just look

2    through those documents and just look up when you're done.

3            Do you recognize those documents?

4    A.  Yes, I do.

5    Q.  What are they?

6    A.  This is the initial search when I search Backpage ad as

7    reported by the source.

8    Q.  Did those documents fairly and accurately depict the

9    documents you found on the Internet in your search?

10   A.  Yes.

11           MS. LAKE:  The government offers Government

12   Exhibits 971 through nine 984.

13           MS. LOUIS-JEUNE:  No objection.

14           THE COURT:  Government Exhibits 971 and 984 will be

15   received without objection.

16           (Government's Exhibits 971 through 984 received in

17   evidence)

18           MS. LAKE:  Your Honor, I note that it's 2:30, given

19   the holiday --

20           THE COURT:  Yes, we've reached the time when we should

21   end.  I want to thank you all for your patience so far.  I wish

22   you a very happy Thanksgiving weekend.  Please remember not to

23   discuss the case with anyone and to keep an open mind.  And I

24   look forward to seeing you Monday at 9:30.

25           (Jury excused)

1                    (Jury not present)

2                    THE COURT:  Ms. Lake, did you say 971 and 984 or 971

3      through 984?

4                    MS. LAKE:  971 through 984.

5                    THE COURT:  I'll need to correct that in front of the

6      jury on Monday.

7                    MS. LAKE:  Your Honor, may the witness be excused?

8                    THE COURT:  Thank you very much.  You're excused now

9      to be back at 9:30 Monday.

10                   (Witness excused temporarily)

11                   THE COURT:  Feel free to sit, counsel.  Is there

12     anything further anyone wishes to raise?

13                   MS. LAKE:  Nothing from the government, your Honor.

14                   MS. LOUIS-JEUNE:  Your Honor, there's just one other

15     issue concerning a letter that the government sent on

16     November 15 regarding proposed testimony of a physician's

17     assistant.  We do have an objection to that.  We were told by

18     the Court's clerk that we were to brief it by today.  I would

19     ask for an extension until Sunday to be able to brief that

20     issue for the Court.

21                   THE COURT:  How about the end of the day Saturday so

22     that the government has a chance to respond?

23                   MS. LOUIS-JEUNE:  That's fine, your Honor.  I had

24     spoken with the government earlier, and they stated that Sunday

25     would be fine.

HBMHALM5                         Hecker - Direct

1              THE COURT:  That's easy for them to say.  Excuse me

2    for saying that.  I just need some time to consider arguments

3    sometimes.  The end of the day Saturday, and then the

4    government, say, 5:00 p.m. on Sunday if you want to respond.

5              What is the gist of the objection?

6              MS. LOUIS-JEUNE:  We object to the proposed testimony

7    that Victim 2 was having sex with adult men for money.

8              THE COURT:  I'll review it and review your papers.

9              MS. LOUIS-JEUNE:  Thank you, your Honor.

10             THE COURT:  Thank you.

11             Anything else?  OK.  Well, counsel, you're all doing a

12   very good job.  Thank you.  Have a good Thanksgiving.

13             (Adjourned to November 27, 2017, at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination  of:                                    Page

SUSAN SANCHEZ

Direct By Ms. Moe  . . . . . . . . . . . . . 103

Cross By Ms. Louis-Jeune . . . . . . . . . . 111

Redirect By Ms. Moe  . . . . . . . . . . . . 118

GABRIELY JOSE

Direct By Ms. Lake . . . . . . . . . . . . . 123

Cross By Mr. Cecutti . . . . . . . . . . . . 201

Redirect By Ms. Lake . . . . . . . . . . . . 277

SKYLER WHITTINGTON

Direct By Ms. Lake . . . . . . . . . . . . . 281

STEPHANIE HECKER

Direct By Ms. Lake . . . . . . . . . . . . . 301

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1002  . . . . . . . . . . . . . . . . . . . 121

 1003  . . . . . . . . . . . . . . . . . . . 123

 501  . . . . . . . . . . . . . . . . . . . 128

 502  . . . . . . . . . . . . . . . . . . . 129

 507  . . . . . . . . . . . . . . . . . . . 130

 508  . . . . . . . . . . . . . . . . . . . 130

 510  . . . . . . . . . . . . . . . . . . . 131

 511  . . . . . . . . . . . . . . . . . . . 132

 512  . . . . . . . . . . . . . . . . . . . 133

 1    800D    . . . . . . . . . . . . . . . . . 134

 2    210     . . . . . . . . . . . . . . . . . 138

 3    901K    . . . . . . . . . . . . . . . . . 140

 4    901M    . . . . . . . . . . . . . . . . . 144

 5    217     . . . . . . . . . . . . . . . . . 150

 6    219     . . . . . . . . . . . . . . . . . 151

 7    503     . . . . . . . . . . . . . . . . . 155

 8    801B    . . . . . . . . . . . . . . . . . 158

 9    810E    . . . . . . . . . . . . . . . . . 160

10    810F    . . . . . . . . . . . . . . . . . 161

11    810C    . . . . . . . . . . . . . . . . . 166

12    901H    . . . . . . . . . . . . . . . . . 172

13    901I    . . . . . . . . . . . . . . . . . 175

14    810D    . . . . . . . . . . . . . . . . . 182

15    216     . . . . . . . . . . . . . . . . . 184

16    214     . . . . . . . . . . . . . . . . . 184

17    514     . . . . . . . . . . . . . . . . . 189

18    3510-09 starting at page 2   . . . . . . . 196

19    401 through 404 and 1005  . . . . . . . . . 283

20    213     . . . . . . . . . . . . . . . . . 284

21    410 through 437   . . . . . . . . . . . . 288

22    971 through 984   . . . . . . . . . . . . 308

23

24

25

```
 1                          DEFENDANT EXHIBITS

 2    Exhibit No.                                    Received

 3     B    . . . . . . . . . . . . . . . . . . . 301

 4     A    . . . . . . . . . . . . . . . . . . . 301

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```