UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>            v.<br><br>MARIA SOLY ALMONTE,<br><br>            Defendant. | S2 16 Cr. 670 (KMW) |

### Government's Memorandum of Law

GEOFFREY S. BERMAN<br>
United States Attorney for the<br>
Southern District of New York<br>
One St. Andrew's Plaza<br>
New York, New York 10007

Stephanie Lake
Alison Moe
Assistant United States Attorneys
    *Of Counsel*

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in opposition to Maria Soly Almonte's (the "defendant's") motions pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure for a judgment of acquittal with respect to Counts One and Two,[1] and for a new trial. Dkt. No. 165 ("Def. Mem."). The defendant was convicted by a jury after a fair trial during which she made many of the arguments she now raises. She nevertheless claims that the evidence admitted at trial was insufficient to support a guilty verdict on any of the five counts. Def Mem. at 6-10. The defendant further argues that a new trial is warranted "because the cumulative weight of the evidence does not support a judgment of guilt." Def. Mem. at 11.

The Court should decline the defendant's invitation to substitute its own judgment for that of the jury. The defendant's arguments are without merit, and the motions should be denied. The evidence admitted at trial—particularly when viewed in the light most favorable to the Government—was more than sufficient for the jury to find the defendant guilty beyond a reasonable doubt as to all counts. Accordingly, the jury's verdict should not be set aside, and the Court should not order a new trial.

**BACKGROUND**

**I.     The Indictment**

On or about August 31, 2017, a Grand Jury sitting in the Southern District of New York returned a Superseding Indictment, S2 16 Cr. 670 (the "Indictment"), against the defendant,

---

[1] The defendant's brief is inconsistent with respect to the relief it seeks. In the preliminary statement, it purports to seek "a judgment of acquittal on Count Two" only. Def. Mem. at 1. However, the brief goes on to argue, in conclusory terms, that "[t]his Court should grant a judgment of acquittal as to Count One of the Indictment". *Id.* at 10. The Government notes that the defendant does not appear, at any point, to seek a judgment of acquittal with respect to Counts Three, Four, or Five.

charging her in five counts for her participation in a conspiracy to traffic minors for sex. Specifically, the defendant was charged with three sex trafficking counts, including (1) conspiring with others to engage in sex trafficking of minors, in violation of 18 U.S.C. § 1594(c), (2) sex trafficking of a minor under fourteen, in violation of 18 U.S.C. § 1591(a), (b)(1), and 2, and (3) sex trafficking of a minor under eighteen in violation of 18 U.S.C. § 1591(a), (b)(2), and 2. Almonte was also charged with two counts relating to the use of phones and the Internet in furtherance of a prostitution business, including (4) violating the Travel Act, in violation of 18 U.S.C. § 1952(a)(3) and 2, and (5) conspiracy to violate the Travel Act, in violation of 18 U.S.C. § 371. All of these charges stemmed from the defendant's management of a prostitution business in the Bronx and Manhattan from in or about 2014 until 2016, which business sold minors for sex.

## II.    The Trial

The trial against the defendant began on November 20, 2017 before this Court. At trial, the Government presented testimony from two New York City Police Department ("NYPD") detectives, three agents from the Federal Bureau of Investigation ("FBI"), two cooperating witnesses, who worked with the defendant at her prostitution business, an employee of the Administration for Children's Services, the mother of one of the defendant's minor victims, and a physician's assistant who treated another of the minor victims in this case. The Government introduced dozens of exhibits, including Facebook messages, text and audio messages the defendant exchanged with one of her minor sisters, and advertisements for prostitution the defendant posted to the website Backpage.com. The defendant then testified in her own defense and introduced several Facebook exhibits. On November 30, 2017, the parties delivered their

closing arguments. On December 1, 2017, after several hours of deliberation, the jury returned a verdict of guilty on all counts.

### III. Summary of Proof at Trial

The proof presented at trial established beyond a reasonable doubt the defendant's guilt as to each element contained in the five charged offenses.

The defendant ran a prostitution business that used minor girls and adult women as prostitutes. *See* Trial Tr. at 37:24-38:6, 370:10-25, 371:1-2, 469:18-470:1. The prostitution business began operating in at least 2014, *see* GX 901A (Backpage Advertisement); Trial Tr. at 126:10, and continued until 2016, *see, e.g.*, GX 800R (Facebook Message). The business advertised for customers using the website Backpage.com, where the defendant and, as time went on, others, would post advertisements for prostitution services using a combination of stock photographs and photographs of the actual girls and women working in the business. *See* Trial Tr. at 145:22; GX 900 (Backpage Advertisements). Law enforcement collected approximately 1,000 ads for prostitution connected to the defendant's prostitution business. GX 900 (Backpage Advertisements); *see also* Trial Tr. at 555:15-556:6. After seeing an advertisement, customers would call one of the defendant's phones, which were used to run the business, and would be directed to the location the prostitution business was working out of. Once there, the client would choose from the women and girls available. A standard price was $60 for half an hour of sex. Of that $60, the woman or minor girl who took the "date" would keep $40, and she would then pay a $20 cut to the defendant. *See* Trial Tr. at 135:6-7; 369:19-21.

In the time that the defendant ran this prostitution business, there were at least six minor girls who worked for her as prostitutes. Three of the girls—Maribel, Gladys (who went by "Bibi") and I.F.—are the defendant's younger sisters. *See* Trial Tr. at 379:19-20; 385:8-9; 389:2-3. They were, during the summer of 2015, when the defendant's prostitution business was at its peak, 17, 16, and 14 years old, respectively. *See* GX 530, 531, 532 (Birth Certificates). Another minor victim, Arianna Roman, was a runaway. Arianna found herself at the apartment the defendant shared with her cousin and co-conspirator, Darlene Deleon, and out of which the defendant ran her business during the summer of 2015. The defendant told Arianna that she could stay at the apartment if she worked for the defendant as a prostitute. *See* Trial Tr. at 163:9-12. Arianna was 17 years old at the time. *See* GX 533 (Birth Certificate). J.G. was 15 years old when she worked for the defendant, *see* Trial Tr. at 64:23-25, 403:14-25; GX 535 (Birth Certificate), and J.F. was 13 years old when she worked for the defendant, *see* Trial Tr. at 623:13-15; GX 534 (Birth Certificate).

The defendant ran her business out of different locations in the Bronx and Harlem, which she would find and direct her workers to. *See* Trial Tr. at 124:3–191:20, 194:9-22, 359:19–394:1, 397:5–420:7. Early on, the business operated out of the defendant's mother's shelter at 203 West 145th Street in Harlem. *See* Trial Tr. at 137:20-139:4. It later moved, with the defendant, to Deleon's apartment at 1408 Webster Avenue, Apartment 19G, in the Bronx. *See id.* After the Administration for Children's Services ("ACS") began investigating complaints connected to Deleon's apartment, Deleon told the defendant to relocate her business. *See* Trial Tr. at 185:19-186:25. The business moved first to houses at 169th Street and Grand Concourse, in the Bronx,

and later back to 1408 Webster Avenue, in a new apartment on a lower floor. *See* Trial Tr. at 402:3-403:16.

During this time, the defendant advertised the prostitution business on the website Backpage.com. *See* GX 950 (Backpage Analysis); GX 800A; Trial Tr. at 558:12-559:25. These advertisements frequently used email addresses that the defendant admitted belonged to her, *see* Trial Tr. at 767:7-769:3, as well as phone numbers registered to the defendant's alias "Soly Montana," and which she provided to others as her phone numbers over Facebook, *see* GX 950 (Backpage Analysis). Some of the advertisements the defendant posted contained photographs of herself, some contained photographs of co-conspirators, some contained stock photographs from the internet, and some contained photographs of the defendant's minor victims. Specifically, the jury saw Backpage advertisements depicting the defendant's sisters, I.F. and Maribel, as well as Arianna for sex when they were 14, 16, and 17 years old, respectively. *See* GX 901A, 901K, 901L, 901H (Backpage Advertisements); Trial Tr. at 569:3-19, 480:15-481:25, 583:14-584:9.

In an effort to make more money for the prostitution business, the defendant arranged a trip to Pennsylvania in approximately June 2015 for herself and several of her workers, including Gabriely Jose, Arianna, and another minor girl known as Nikki. *See* Trial Tr. at 170:16-20. While there, the defendant posted advertisements to Backpage for Jose, Arianna, and Nikki. *See* GX 901H, 901I (Backpage Advertisements). Each of Jose, Arianna, and Nikki had sex with men for money and provided a portion of the earnings to the defendant during the trip. *See* Trial Tr. at 194:18-21. The defendant wrote a message to her sister about the trip, explaining "am out to pa with my girls i got 2 new ones . . . am definitely popn pussy." GX 721F (WhatsApp Message).

5

The defendant also sustained her prostitution business by recruiting others to work for her. Conversations between the defendant and her minor sister, Bibi, revealed the defendant's efforts to recruit a "black girl" who the defendant instructed her sister should not be brought "today if they ain't working." GX 721D (WhatsApp Message). The defendant's conversations with one of her co-conspirators and co-defendants, Dawitt Dykes, a/k/a "Dawezzy," also demonstrated her interest in recruiting new workers. In the spring of 2016, Dykes asked the defendant if she "still be doing [her] thing." GX 800R (Facebook Message). The defendant confirmed that she was, and after receiving photographs of the girls from Dykes, agreed to "post them" but warned Dykes "my clients will tell me if they pass is 50/50." *Id.*

In the summer of 2015, the defendant coordinated with Gabriely Jose, who had helped the defendant run the prostitution business and later became a cooperating witness at trial, to recruit a thirteen-year-old girl to work for the defendant as a prostitute. Specifically, Jose testified that she told the defendant about a girl named J.F. who was interested in working and the defendant instructed Jose to bring J.F. to the location the brothel was operating out of at that time. *See* Trial Tr. at 187:8-23. Jose agreed and brought J.F. to the brothel location, where "Soly told J.F. how the business worked, as in getting a pop . . . ." *Id.* at 187:24-188:7. Jose testified that the defendant explained to J.F. that when "she got a pop, she would have to give Soly a part and take the rest, and J.F. said okay." *Id.* at 188:8-11. After this exchange, the defendant allowed J.F. and Arianna to participate in a "two-girl special" with the landlord of the building the defendant was operating out of. *Id.* at 398:6-24. After the landlord paid for sex with J.F. and Arianna—both minors at the time—the defendant received a portion of the payment. *Id.* at 398:25-399:4.

Shortly after J.F. began working for the defendant, the defendant moved the prostitution business to 1408 Webster Avenue, Apartment 10J. *See* Trial Tr. at 402:11-403:16. During this same time period, on September 12, 2015, the defendant messaged a friend over Facebook, explaining "[m]y business busy . . . [t]hese are my money days. I get real busy. I've been trying to leave these traps since ten, but I can't leave these hos unattended." GX 800H (Facebook Message); *see also* Trial Tr. at 584:10-585:15. Also in September 2015, the NYPD received a tip through the National Center for Missing and Exploited Children (the "NCMEC Tip") about a thirteen-year-old girl working as a prostitute at 170th Street and Webster Avenue in the Bronx. *Id.* at 47:14-20. The NYPD located a Backpage advertisement that provided the defendant's phone number and an address corresponding to the location provided in the NCMEC Tip, which advertisement depicted Arianna. *See* GX 960 (Backpage Advertisement). On September 15, 2015, the NYPD sent undercover officers into the apartment, where they located Alcius, J.G., and Arianna, all of whom were working there as prostitutes. *See* Trial Tr. at 58:12-19; 88:21-89:19. The NYPD also recovered the defendant's phone from the apartment. *See* trial Tr. at 57:10-17; GX 301 (Cellphone), 601 (Cellphone Subscriber Record). A subsequent search revealed that J.F.'s name and phone number were stored in that phone. *See* GX 702 (Cellphone Contacts).

J.F. was not present at Apartment 10J on the day of the raid, but the next day she and the defendant's younger sister Bibi exchanged text and Facebook messages discussing what had happened. *See* GX 724 (Text Messages), 805C (Facebook Message). J.F. wrote to Bibi over Facebook "Where Soly and the girls at that was in the trap u can't find out if they got booked or anything." GX 805C (Facebook Message). In a text message sent the same day, Bibi explained to

7

J.F., "soly dnt want me to give her number out. So she sed to tell me everything." GX 724 (Text Messages). J.F. opined "[w]e was making to much money shit got too hot for us," and Bibi told her that "soly got another sppot." *Id.* Approximately one month later, the defendant explained in a message to a friend on Facebook that "my trap got rated (*sic*)." GX 800Q (Facebook Message).

### IV. The Defendant's Rule 29 and 33 Motions

On February 6, 2018, approximately two months after the jury returned its verdict in this case, the defendant moved for a judgment of acquittal with respect to Counts One and Two pursuant to Federal Rule of Criminal procedure ("Rule") 29. Dkt. No. 164. On the same date, the defendant moved, in the alternative, for a new trial pursuant to Rule 33. *See id.*

## DISCUSSION

### I. Applicable Law

A defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008)). A conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011). The Court cannot disturb a jury's verdict unless "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (internal quotation marks omitted).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed "in the light most favorable to the Government." *United States v. George*, 779

8

F.3d 113, 115 (2d Cir. 2015). The Court must analyze the pieces of evidence "in conjunction, not in isolation," *Persico*, 645 F.3d at 104 (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *Cuti*, 720 F.3d at 462 (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)).

The Court must also "credit[] every inference that the jury might have drawn in favor of the government," because "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." *Cuti*, 720 F.3d at 461-62 (internal quotation marks and citations omitted). Even where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks omitted); *see also United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) ("[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." (citing *Guadagna*, 183 F.3d at 129 ("Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."))); *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994) (stating that Court must affirm conviction "so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt").

"The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences drawn were not available or were not reasonable." *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *see also United States v. Plitman*, 194 F.3d 59, 67 (2d

9

Cir. 1999) ("Even if there had been evidence regarding these [defense] theories in the record, the jury was free to reject it."). Accordingly, "the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *Guadagna*, 183 F.3d at 130 (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)); *see United States v. Martinez*, 54 F.3d 1040, 1042 (2d Cir. 1995) ("[I]t is the task of the jury, not the Court, to choose among competing inferences.").

Rule 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). To grant a Rule 33 motion, a trial judge "must harbor a real concern that an innocent person may have been convicted." *United States v. Lin Guang,* 511 F.3d 110, 119 (2d Cir. 2007) (citations omitted). "Motions for a new trial are disfavored in th[e] [Second] Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and Rule 33 motions should be granted only "sparingly and in only the most extraordinary circumstances," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotations and citation omitted).

**II.  Argument**

The defendant seeks a judgment of acquittal with respect to Counts One and Two of the Indictment. With respect to Count One, the defendant contends that "there was insufficient evidence . . . to prove beyond a reasonable doubt that [the defendant] was a member of the conspiracy." Def. Mem. at 10. This argument is devoid of any support, aside from the bare assertion that the defendant's "relationship with her younger sisters and their friends do not make her part of a conspiracy." With respect to Count Two, the defendant principally argues that there was insufficient evidence that (1) the defendant had a reasonable opportunity to observe J.F., a minor who was under 14 years old and who the defendant knew would be caused to engage in

10

prostitution, and (2) "any minor victim was under fourteen years old at the time of this conspiracy." Def. Mem. at 7-10.

### A. The Jury Reasonably Concluded that the Defendant Is Guilty on All Counts

#### i. The Defendant's Conviction on Count One Is Supported by the Evidence

The jury heard overwhelming evidence of the defendant's guilt on Count One. Most obviously, Gabriely Jose and Vetthya Alcius testified at trial that they had pled guilty to conspiring to traffic minors for sex in connection with their participation in the defendant's prostitution business. *See* Trial Tr. at 124:13-25, 125:16-17 (Jose Testimony) (Q: "Who ran the prostitution business?" / A: "Soly"); 358:19-359:4, 360:1-7 (Alcius Testimony) (Q: "Do you see anyone in the courtroom who participated in prostitution with you while you were involved?" / A: "Yes." / Q: "Who do you see?" / "Soly Almonte."); *see also* GX 3510-09, 3507-07 (Cooperation Agreements).

Jose and Alcius testified in detail about their own involvement in the defendant's prostitution business as well as all of the ways in which the defendant was responsible for running the prostitution business. For example, they testified that the defendant was responsible for posting advertisements for prostitution to Backpage using her phone numbers, setting prices for prostitution services, arranging a trip out of state during which minors engaged in prostitution, and finding locations out of which to run the prostitution business, and that, in exchange for running the prostitution business, the defendant demanded a cut of each girl or woman's earnings. This was all done in coordination with the defendant's many co-conspirators, including the defendant's mother, Darlene Deleon, and Dawitt Dykes, to name only a few.

11

Specifically, Jose testified that when she was first introduced to the prostitution business, both the defendant and the defendant's mother explained the prostitution business to her.  "I first talked to Maria, which is Soly's mother," and then "Soly just told me how it goes and after that, whenever a guy would come in, if it's $60 for a half-hour or an hour – or 150 for an hour, I have to give her $40 for the hour and $20 for the half-hour."  Trial Tr. at 134:23-135:10.  The defendant later explained to Jose "that since she's the one that's bringing the clients out, that she gets part of the money. . . . She would post on Backpage . . . through her cell phone number."  *Id.* at 137:5-12.  However, as time went on, Jose assisted the defendant in running the business by, among other things, posting to Backpage for the business.  *Id.* at 139:15-18.  With respect to the trip to Pennsylvania in the summer of 2015, Jose testified that the trip was the defendant's "idea to spend time with her family and make some money over there" by "posting to Backpage."  *Id.* at 171:2-16.  Furthermore, Jose testified about her own agreement with the defendant to recruit J.F. to work for the defendant's prostitution business.  *See* Trial Tr. at 187:8-188:7.

Alcius testified similarly about the defendant's role in running the prostitution business.  She explained that, while she was involved in the prostitution business, the defendant and one of the minor victims generally posted advertisements to Backpage.  *Id.* at 365:12-13.  She explained that Almonte set the prices for prostitution services, and that she provided the "[t]he phone that used to get posted to Backpage."  *Id.* at 367:21-22, 368:15-21.  Alcius also testified about the various locations out of which the prostitution business operated, and the individuals at those locations with whom the defendant conspired, *see, e.g.*, Trial Tr. at 371:6-16, and her own role in facilitating communication about the prostitution business between the defendant and the

12

defendant's minor victims. *See, e.g.*, Trial Tr. at 382:13-25, 384:1-25; GX 825P, 825O (Facebook Messages).

Jose and Alcius further testified at length about the minors who worked for the defendant as prostitutes. For example, Jose testified that during the time she worked out of the defendant's sister's apartment, "[Jose], Daniela, Maribel at times, [and] I.F. at times" all worked there. Although the defendant did not work there, the defendant still received a cut of the money earned by the women and girls working as prostitutes at that location. Trial Tr. at 152:18-25. Jose explained "[Jose], Daniela, Ari, Theiya, Nikki, I.F., Bibi at times, [Deleon] at times[, and] Maria at times" worked for the defendant's prostitution business once it moved to the defendant's cousin's apartment at 1408 Webster Avenue, 19G. *Id.* at 162:4-7. She further testified regarding the ages of the girls working for the defendant's prostitution business. *Id.* at 162:24-164:11 (Q: "How old was Ari when you met her?" / A: "Seventeen." / Q: "You said you met her through IF. How old was IF at that time?" / A: "Fourteen." / . . . Q: "How old was [Nikki]? / A: "Sixteen."). Alcius testified consistently about the minors who the defendant used as prostitutes. For example, she testified that Arianna "had sex for money" in Apartment 19G, and then "gave Soly 20 [dollars] and kept the rest." *Id.* at 375: 22-376:6. She similarly testified that I.F. "had sex for money" and then "gave Soly 20 [dollars of the money she made]." *Id.* at 381:12-18.

The jury was entitled to convict the defendant on Count One based on this testimony alone. There was, however, a wealth of other evidence of the defendant's guilt for the jury to rely on in reaching its verdict. Most potently, the defendant's own words—introduced through Government Exhibit 800 and its subparts, which are excerpts from the defendant's Facebook account, and

13

Government Exhibit 721, which are excerpts from WhatsApp chats between the defendant and her minor sister—also provided the jury with a more than sufficient evidence on which to convict. By way of just one example, GX 721B contains an audio recording of the defendant telling her minor sister that the girls and women working for her should not complain about giving the defendant a cut of the money because "first and foremost . . . You fuckin' my clients!" GX 721B-T (WhatsApp Message). In the defendant's words, "You think I'm gonna let you really come to my side of town and you ain't gonna give me no money, you gonna use my place where I pay rent at, and you gonna use the bathroom where my cousin let, you know what I mean… I rent a room from my cousin and I let y'all be, know what I'm saying?" *Id.* She went on to reference her fourteen-year-old sister, I.F., "working," explaining that she never begged I.F. to work. *See id.* On the basis of this recording alone, the jury was entitled to find the defendant guilty of conspiring with her cousin and co-defendant, Darlene Deleon, to traffic minors for sex.

> ii. **The Defendant's Conviction on Count Two Is Supported by the Evidence**

The jury's verdict with respect to Count Two is supported by extensive testimony at trial as well as Government Exhibits demonstrating that the defendant trafficked a minor under fourteen years old for sex.

Count Two charged the defendant with violating Title 18, United States Code, Sections 1951(a), (b)(1), and 2. As the jury was properly instructed, the defendant was guilty on Count Two if: (1) the defendant recruited, enticed, harbored, transported, provided, obtained, or maintained a person, (2) the person was under fourteen, (3) the defendant knew or recklessly

disregarded that the person would be caused to engage in a commercial sex act, and (4) the defendant had a reasonable opportunity to observe that person.

The Government presented extensive proof at trial of the defendant's involvement in trafficking J.F., a minor who was thirteen years old, for sex. However, the defendant now argues that there was insufficient evidence that she had a reasonable opportunity to observe J.F., and appears to argue that J.F. was not in fact under fourteen at the relevant time.

First, it is unquestionable that J.F. was thirteen years old during the relevant time period. The Government introduced J.F.'s birth certificate, which shows that J.F. was born on ▪▪▪▪▪▪▪▪. GX 534 (Birth Certificate). Melinda Jimenez, a physician's assistant who regularly treated J.F. at J.F.'s middle school health clinic, also testified that J.F. was born on ▪▪▪▪▪▪▪▪. *See* Trial Tr. at 547:6-7. The cooperating witnesses both testified that J.F. first began working for the defendant in the summer of 2015, at which point she was in fact thirteen years old. *See* Trial Tr. at 185:5-189:1, 397:17-399:4. This is in stark contrast to the defendant's meritless assertion that "[t]here was no evidence presented in this case that any minor victim was under fourteen years old at the time of this conspiracy." Def. Mem. at 10.

Second, the evidence supports the jury's conclusion that the defendant had a reasonable opportunity to observe J.F. The defendant herself admitted during her testimony that she met J.F. two times. *See* Trial Tr. at 808:1-9. This alone satisfies the standard, which requires only that "the defendant had an in-person, face-to-face interaction with the victim." Trial Tr. at 962:24-963:1 (Jury Instructions). The defendant did not object to the accuracy of this instruction, but now attempts to warp the standard to require something greater by citing cases in which the defendant

15

had known the victim for years, or personally had a sexual relationship with the victim. *See* Def. Mem. at 8. Simply because a defendant in another case may have had a different type of relationship with his or her minor victim, or a relationship of different duration than the relationship in this case, does not warrant a judgment of acquittal. It is undisputed that the defendant had multiple "in-person, face-to-face interaction[s] with" J.F. The defendant met her on multiple occasions, and messages between J.F. and the defendant's younger sister that were introduced at trial strongly support the conclusion that J.F. had been working for the defendant. The jury's verdict therefore should remain undisturbed as to Count Two.

Finally, it is not clear whether the defendant has put forth an argument that she did not in fact traffic J.F. In the event that she did raise this argument, the evidence at trial makes quick work of it. As set forth in detail above, Gabriely Jose testified about the defendant's role in recruiting J.F. to the prostitution business. The defendant instructed Jose to send J.F. to one of the locations where she operated her business. Once J.F. arrived, the defendant explained to J.F. in person how the business operated, including the requirement that J.F. pay the defendant a portion of her earnings. The defendant then allowed J.F. and another minor victim to have sex with the landlord in exchange for money. Alcius was also a witness to this first encounter, and she further testified about J.F.'s continued exploitation as a child prostitute at 1408 Webster, Apartment 10J. *See* Trial Tr. at 397:17-404:13. J.F.'s own text and Facebook messages with Almonte's minor sister, Bibi, corroborate the nature and extent of the defendant's relationship with J.F. For example, the day after Apartment 10J was raided by the NYPD, J.F. wrote to Bibi over Facebook "Where Soly and the girls at that was in the trap u can't find out if they got booked or anything." GX 805C (Facebook

16

Message).  In a text message that same day, Bibi explained to J.F. "soly dnt want me to give her number out. So she sed to tell me everything." GX 724 (Text Message).  J.F. opined "[w]e was making to[o] much money shit got too hot for us," and Bibi told her that "soly got another sppot." *Id.* These messages fully support the jury's conclusion that J.F.—a thirteen-year-old girl who the defendant had met on multiple occasions—was used as a prostitute by the defendant.  The jury's verdict on Count Two is legally and factually supported and should not be disturbed.

### B.  A New Trial Is Not Warranted

The defendant sets forth no basis for granting a new trial in this case.  The defendant's argument that "the verdict was against the cumulative weight of the evidence" appears to ignore entirely the mountain of evidence of the defendant's guilt that was presented at trial.  As set forth above, two cooperating witnesses testified at length about the defendant's role in running a prostitution business that trafficked minors, including her own sisters.  The defendant profited from this venture, charging $20 per half hour each girl worked.  She provided the apartments out of which the minors worked having sex for money.  She, herself, explained as much in a recorded statement to her minor sister, which recorded statement was played for the jury.

To the extent the defendant's argument for a new trial rests principally on her arguments concerning her opportunity to observe J.F., these arguments too should be rejected.  As is discussed above, there was extensive evidence at trial that the defendant used J.F. as a child prostitute while J.F. was under fourteen years old.  There can be no question that this testimony and the corresponding documentary evidence were sufficient to support the defendant's guilt on Count Two.  The defendant did not, as she appears to argue "[m]erely see[] someone who may or may

not be underage who was engaging in prostitution." The defendant helped to recruit a thirteen-year-old girl to work for her as a prostitute, provided the locations for that young girl to work out of, facilitated her sexual encounter with an adult man, and then took a cut of the proceeds from that sexual encounter.

## CONCLUSION

For the reasons set forth above, the Court should deny the defendant's motions in their entirety.

Dated: New York, New York
       March 5, 2018

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney for the
                                        Southern District of New York

                                  By:   ___/s_____
                                        Stephanie Lake / Alison Moe
                                        Assistant United States Attorneys
                                        Tel.: 212-637-1066 / 2225